**MDL1569**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 0 2 2003

FILED
CLERK'S OFFICE

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re NESTLÉ WATERS NORTH AMERICA INC.,
MARKETING LITIGATION                    MDL No.: 1569

_____/

2003 OCT -1   A 11: 26
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
RECEIVED
CLERK'S OFFICE

PLEADING NO. 13

## PLAINTIFF'S EMERGENCY MOTION AND INCORPORATED MEMORANDUM FOR PRELIMINARY INJUNCTION PURSUANT TO ALL WRITS ACT, 28 U.S.C. § 1651(a)

Plaintiff, Scott Maravilla ("Plaintiff"), on his own behalf and on behalf of the putative

class of Florida consumers, hereby respectfully moves pursuant to 28 U.S.C. § 1651(a) to enjoin

Nestlé Waters North America, Inc. ("Nestlé"), and all those acting in concert or conjunction with

Nestlé, from pursuing or finalizing settlement of any or all of the claims at issue on behalf of a

nationwide class, in any action and in any forum, without the express approval and involvement

of this Panel. In support of this Motion, Plaintiff states as follows:

### Introduction

Absent immediate action by this Panel to enjoin Nestlé from attaining approval of a

settlement presently pending in Illinois state court, the Panel will lose its ability to render

meaningful relief on the claims raised by Plaintiff here and all other claims brought in any

**OFFICIAL FILE COPY** IMAGED OCT 6 '03

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.: 1569

related cases subject to MDL treatment.[1]  As set forth below, this case presents the quintessential

scenario for the Panel's use of its inherent injunctive powers under the All Writs Act.

Plaintiff originally filed this action in Florida state court on July 8, 2003.  On July 29,

2003, Nestlé removed the action to the Southern District of Florida, asserting that Plaintiff's state

consumer protection claims are pre-empted by federal statutory law.  At the time of Nestlé's

removal, there were six (6) cases pending in various federal courts seeking relief similar to that

sought by Plaintiff in this case, all of which had been removed to federal court by Nestlé.

Advocating that MDL treatment of these six cases was appropriate, Nestlé filed a motion to

consolidate all of the cases pending in federal court and for all of these actions to be transferred

to the United States District Court for the District of Connecticut for MDL proceedings.  Plaintiff

has not challenged consolidation or MDL treatment, but has objected to transfer to the

Connecticut court, instead asserting that the Southern District of Florida would be the

appropriate forum for the MDL proceedings affirmatively sought by Nestlé.

At the time of all of its various federal court machinations, and unbeknownst to Plaintiff

or this Panel, Nestlé was engaged in an effort to undercut or moot all of the pending federal

actions through a surreptitious and -- Plaintiff believes, possibly collusive -- settlement in Illinois

state court.  See Settlement Agreement, attached hereto as Exhibit A.  This settlement is

presently scheduled for an approval hearing on **October 20, 2003**, with any objections due on or

before **October 10, 2003**.  These abbreviated deadlines underscore the need for immediate action

---

[1] Due to Nestlé's efforts to have its questionable settlement approved on an expedited basis, and in an abundance of caution, Plaintiff has filed a similar motion with the United States District Court for the Southern District of Florida, where Plaintiff's action is presently pending awaiting a ruling on consolidation and possible transfer.

2

by the Panel to preserve the Panel's ability to administer this case and to bring the litigation to its

natural conclusion.

Plaintiff respectfully submits that the facts and chronology surrounding the Illinois state

court action and proposed settlement strongly indicate a lack of adequate representation in the

Illinois action.  As discussed below, it appears that the representative plaintiff was selectively

accepted by Nestlé to accomplish a settlement "on the cheap" rather than in an arms-length

negotiation, an Illinois state circuit court where there have not been a large number of nationwide

class action settlements was chosen as the forum to settle federal and state causes of action on a

nationwide basis, and the parties supposedly coordinated extensive discovery and case

evaluations in a matter of days, all culminating in a Settlement Agreement that Nestlé actively

hid from the various federal courts wherein related cases were pending.

First, the Illinois state court action is one of only two cases that Nestlé opted not to

remove to federal court; this despite Nestlé's consistent position that any state consumer

protection claims brought against it with regard to its Poland Springs water are pre-empted by

federal statutory law.[2]  At the time the Illinois case was filed (July 20, 2003), Nestlé was actively

engaged in efforts to remove and consolidate other pending cases for MDL treatment, but

curiously omitted to take these same actions concerning the Illinois case.

Second, according to the Settlement Agreement filed in the Illinois state case, Nestlé was

already negotiating a possible settlement with the Illinois plaintiffs' counsel **even before** that

case was filed; this while six other cases were already pending, with no settlement overtures or

---

[2] The other case plaintiff is aware of that Nestlé did not remove was also filed in Illinois state court.

offers from Nestlé in those cases.  See Exhibit A hereto.  Also, the Settlement Agreement tentatively reached in the Illinois state case shows that Nestlé purportedly voluntarily provided counsel in the Illinois state case an alleged extraordinary amount of discovery, including access to critical documents, access to company personnel (including experts) for questioning, and access to Nestlé's water sources and bottling facilities for site visits and inspections, among other disclosures.  Id.  All of this discovery was supposedly accomplished within two weeks of the filing of the Illinois state action, and none of this discovery was provided or offered to Plaintiff's counsel in this case nor any of the other pending federal cases Nestlé moved to MDL.[3]

Third, Plaintiff submits that Nestlé's failure to promptly inform the Panel or the other plaintiffs' counsel of the proposed Illinois settlement strongly indicates possible collusion.  To date, Nestlé has not filed the Illinois Settlement Agreement with the Panel, nor otherwise notified the Panel of the proposed settlement.  Nestlé nonetheless continued to actively seek removal and MDL treatment of the various other federal cases while all the time hiding the fact that it had reached a settlement in Illinois state court which purports to settle all claims brought in any of these cases on behalf of a nationwide class.  Plaintiff submits that Nestlé's lack of candor stems

---

[3] Moreover, Nestlé and the Illinois plaintiffs' counsel have completely rebuffed Plaintiff's efforts to obtain basic discovery relating to the events leading up to the proposed settlement in the Illinois action.  See Composite Exhibit B hereto, Motion to Quash under Rule 45, and September 19, 2003 Letter from Jeffrey M. Garrod.  The United States District Court for the Northern District of Illinois has recently set a briefing schedule for memoranda regarding efforts to quash subpoenas duces tecum served by Plaintiff, which requires counsel for the Illinois plaintiffs to file their reply on or before October 24, 2003 - - four days after the Illinois state court is to pass on the adequacy and fairness of the proposed settlement.  Plaintiff respectfully submits that this further justifies immediate action by this Panel to prevent Nestlé's questionable settlement from being approved before Plaintiff can discover the relevant facts surrounding this settlement.

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.:  1569

from a fear that the Illinois settlement would be properly scrutinized by this Panel or another

federal court should it be announced in sufficient time for proper objections and evaluation.

Fourth, the representative plaintiff in the Illinois state action is the County Sheriff for the

county in which that action is pending (Kane County, Illinois), raising legitimate questions about

how he came to be the named plaintiff and the adequacy of his representation of a purported

nationwide class.  On information and belief, one of the settlement counsel was the

sheriff/plaintiff's campaign manager.  Plaintiff is currently seeking discovery into this issue,

among others, but has been denied such information by Nestlé and the Illinois plaintiffs' counsel.

Finally, there are a number of coincidental relationships between various counsel

involved in these actions.  For example, local counsel for Nestlé in the present action is also co-

counsel with the Illinois plaintiffs' counsel on behalf of plaintiffs in In Re Managed Care

Litigation, 236 F. Supp.2d 1336 (S.D. Fla. 2002).  This is significant in that these lawyers

utilized the All Writs Act in In Re Managed Care to enjoin what they viewed as a collusive

settlement in Illinois in a competing class action.  Also, counsel for one of the bottlers believed

to have asserted claims against Nestlé in a related action is the father of Illinois counsel.[4]

Plaintiff submits that these relationships raise the potential for collusion.

In sum, the Illinois state court settlement certainly raises serious questions about possible

collusion.  More importantly, however, it represents an effort to subvert the MDL process Nestlé

itself initiated, and threatens to frustrate this Panel's administration of the present proceedings

and disrupt the orderly resolution of this federal litigation by destroying the Panel's continuing

---

[4] Interestingly, the father appears to have been retained by the son to assert objections on the
son's behalf to the taking of his deposition, scheduled by Plaintiff herein in preparation for a
possible objection to the Illinois settlement.

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.: 1569

jurisdiction over the cause. This Panel should affirmatively act to stop Nestlé's efforts to oust its

jurisdiction over this case and prevent the Panel from protecting the putative class by properly

evaluating the fairness and adequacy of any settlement reached with Nestlé on behalf of the class

members.[5]

## **Argument**

### I.     **The Panel Has Authority to Enter an Injunction Against Nestlé Under the All Writs Act**

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), this Panel has the power to enjoin any

party over which it has personal jurisdiction from pursuing and/or settling the claims at issue in

this case, as well as any of the claims raised in any case subject to the multidistrict consolidation

sought by Nestlé herein.[6]  As the Southern District of Florida recently stated in granting a similar

motion filed by counsel for Nestlé here on behalf of a plaintiff class:

---

[5] Plaintiff does not seek to enjoin the Illinois state court from continuing to administer the case pending before it, and does not seek to preclude Nestlé from actively defending any of the cases pending against it.  Rather, Plaintiff only seeks to prevent Nestlé from settling the claims at issue in this case absent evaluation and approval by this Panel.

[6] There is also substantial authority for the proposition that non-parties to an action can be enjoined by a federal court where that non-party threatens the court's ability to administer its case.  See Hillman v. Webley, 115 F.3d 1461, 1468 (10th Cir. 1997) ("In *United States v. New York Tel. Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977), the Supreme Court concluded the Act authorizes a federal court to 'issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'  This power is not limited to parties in the original action, the Court held, but rather 'extends, under appropriate circumstances, to persons who . . . are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'"); In Re Baldwin-United Corp., 770 F.2d 328, 338 (2d Cir. 1985) ("An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction.").

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

The All Writs Act, 28 U.S.C. § 1651(a), confers "extraordinary powers" upon federal courts. *See ITT Community Dev. Corp. v. Barton*, 569 F.2d 1351 (5th Cir. 1978). The Act provides: "the Supreme Court and all courts established by this Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). With respect to this Act, the Supreme Court has emphasized that "'a federal court may avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it.'" *United States v. New York Tel. Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (quoting *Adams v. United States ex. rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942). While these powers are extraordinary, they are also "firmly circumscribed." *ITT Community*, 569 F.2d at 1358. The scope of a federal court's power under the All Writs Act depends on the nature of the case brought before the court and the legitimacy of the ends sought to be achieved through the exercise of the power. *See In re Lease Oil Antitrust Litigation*, 48 F. Supp.2d 699 (S.D. Tx. 1998). A court may not rely on the Act to enjoin conduct that is "not shown to be detrimental to the court's jurisdiction," instead, **any order under the Act must be "directed at conduct which, left unchecked, would have had the practical effect of diminishing the court's power to bring the litigation to its natural conclusion."** *ITT Community Dev. Corp.*, 569 F.2d at 1359.

In Re Managed Care Litigation, 236 F. Supp.2d 1336, 1339-40 (S.D. Fla. 2002) (emphasis

added);

When a federal court has jurisdiction over its case in chief, as did the district court here, the All Writs Act grants it ancillary jurisdiction to issue writs "necessary or appropriate in aid of" that jurisdiction. . . . Even before a federal judgment is reached, however, the preservation of the federal court's jurisdiction or authority over an on-going matter may justify an injunction against actions in a state court. **Such "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."** *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970) (dicta).

In Re Baldwin-United Corporation, 770 F.2d 328, 335 (2d Cir. 1985) (emphasis added)[7];

---

[7] "Injunctions issued under the authority of the All Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed.R.Civ.P. 65. Preliminary

> **An injunction may issue, however, where the "state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation."** *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996). In other words, the state action must not simply threaten to reach judgment first, it must **interfere with the federal court's own path to judgment.** . . . Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state proceedings in order to protect its jurisdiction. *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 202-04 (3d Cir. 1993). . . . Implicit in *Carlough* is the recognition that maintaining "the federal court's flexibility and authority to decide" such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti-Injunction Act.

<u>In Re Diet Drugs</u>, 282 F.3d 220, 234-35 (3d Cir. 2002) (emphasis added).

As is clear from the facts and chronology set forth above, Nestlé has sought to prevent this Panel from the proper administration of this pending MDL litigation via a highly questionable settlement in a state court in Illinois. Nestlé's proposed settlement in Illinois state court certainly has the potential to not only hinder this Panel's administration of the present litigation, but also to completely eliminate it. For example, in the Southern District of Florida, Nestlé asserted that this state court settlement, if approved by the state judge, could effectively end Plaintiff's case on res judicata grounds. <u>See</u> Exhibt C hereto, Nestlé's Motion for Stay, filed September 15, 2003, p.5 ("[A]s set forth in Defendant's Notice of Filing dated September 11, 2003, the Settlement Agreement filed in the case styled Plaintiffs v. Poland Springs Water Co., and Nestlé Waters North America, Inc.," Case No. 03-CHK 0817 (Michael J. Colwell), if

---

injunctions under Rule 65 are designed to preserve the status quo between the parties before the court pending a decision on the merits of the case at hand. In contrast, injunctions such as that issued here are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it." <u>In Re Baldwin-United</u>, 770 F.2d at 338-39.

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.: 1569

approved by the court, will resolve the claims asserted in this lawsuit."). Plaintiff submits that

Nestlé will likely take the same position on all cases subject to MDL treatment.

Nestlé's actions in this regard are a transparent -- and totally inappropriate -- effort to

avoid settlement scrutiny by the MDL Panel. Plaintiff submits that this case therefore presents

the quintessential scenario for an injunction pursuant to the All Writs Act prohibiting Nestlé and

any persons or parties acting in concert with Nestlé from settling this action in Illinois state

court, or any other state or federal court, without notification to and full participation of this

Panel.

> **Several district courts have determined that a federal court's inherent power
> under the All Writs Act allows it to enter an injunction which would have
> preclusive effect on a state court's action, where the possibility existed that
> the defendants would attempt to reach an inadequate or collusive settlement
> in the state court proceeding and "settle on the cheap."** *In re Lease Oil
> Antitrust Litigation*, 48 F. Supp.2d 699 (S.D. Tx. 1998); *Reynolds v. Beneficial
> Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002). This is so even in the face of the Anti-
> Injunction Act, which explicitly prohibits federal courts from enjoining state
> courts unless one of three narrow exceptions are met.

In Re Managed Care Litigation, 236 F. Supp.2d 1336, 1339-40 (S.D. Fla. 2002) (emphasis

added). See also In Re Oil Lease, 48 F. Supp.2d at 706 ("'Although courts . . . normally lack the

power to enjoin absent class members (or their attorneys) from bringing suit in another forum,

they do have power over the parties before them. This includes the power to enjoin the

defendant from entering into a settlement class action with another plaintiff in another forum, at

least without notice to the court and its approval.' John C. Coffee, Jr., *Class Actions:

Interjurisdictional Warfare*, N.Y. Law J. 5 (1997). Such preventative action is precisely what is

needed in the instant MDL litigation.").

9

MDL No.: 1569

Plaintiff further submits that neither Nestlé nor plaintiffs' counsel in the Illinois state

court action should be heard to complain about the application of an All Writs Act injunction

here given their respective litigation histories in the <u>In Re Managed Care</u> case, 236 F. Supp.2d

1336. Specifically, Nestlé's local counsel in Plaintiff's case, Kozyak Tropin & Throckmorton,

P.A., successfully availed itself of this very judicial tool in <u>In Re Managed Care</u> to enjoin a

competing class action in another federal court. <u>See</u> Composite Exhibit D hereto, Plaintiff's

Motion for Preliminary Injunction and Supporting Memorandum of Law, and Provider Plaintiffs'

Reply and Supplemental Authority in Support of Amended Motion for Preliminary Injunction, in

<u>In Re Managed Care</u>. Further, Robert Foote, Foote & Meyers, plaintiffs' counsel in the Illinois

state court action, was co-counsel with the Kozyak firm in <u>In Re Managed Care</u>. <u>Id.</u>, Plaintiff's

Motion for Preliminary Injunction, p. 14. Simply stated, the parties to the Illinois state court

action are well aware of the insidious threat of collusive settlements in competing class action

situations, and the appropriateness of injunctive relief to prevent approval of such collusive

settlements without the involvement of a federal court with jurisdiction over the case.

The problems associated with competing class actions, including the potential for

collusive settlements that benefit only the defendant and one set of plaintiffs' counsel, has been

the subject of much litigation and scholarship. A recent law review article in the New York

University Law Review addresses this issue at length, ultimately advocating for increased federal

court scrutiny and involvement under the All Writs Act:

> Through their redundancy and the "reverse auction" dynamic they engender,
> competing class actions compromise the efficiency and fairness goals that justify
> the class action device and impose unnecessary costs on class members,
> defendants, the courts, and society at large. . . . **The problems associated with
> competing class actions are familiar: forum shopping and manipulation of**

10

MDL No.: 1569

**pleadings to avoid removal and consolidation with existing class actions, certification of bogus classes by state courts and approval of sham settlements without adequate judicial scrutiny, defendants playing plaintiffs' attorneys off one another, and the sacrifice of settlement value in favor of fee maximization for plaintiffs' attorneys.** . . . The combination of plaintiffs' attorneys' eagerness to settle first, their flexibility in plaintiff and forum shopping, and the defendant's desire to reach a global settlement creates a collusive environment that sacrifices class members' interests as well as those of society at large. Plaintiffs' attorneys will bring a suit for settlement purposes in a state court in order to underbid the team of attorneys actively litigating a similar case in federal court. As a result, defendants can set the terms and play teams of plaintiffs' attorneys off one another, leading to a "reverse auction." . . . [B]y encouraging collusion and minimizing damage awards, competing class actions impact society at large, which relies on effective class litigation to provide deterrence against illegal and tortious corporate behavior.

Weinstein, Andrew S., Avoiding the Race to Res Judicata:  Federal Antisuit Injunctions of

Competing State Class Actions, N.Y.U. Law Review, October 2000, pp. 1085-91 (emphasis

added).[8]

## II.   Because the Proposed Settlement is Clearly Inadequate Monetarily, the Additional Release of Exclusive Federal Claims for Insufficient Consideration to the Class Further Supports Injunctive Relief Here

It is clear from the proposed Settlement Agreement in the Illinois state case that

Nestlé, with the participation and acquiescence of plaintiffs' counsel in that case, has

provided for a release of all pending federal claims raised against it for an outrageously

---

[8] See also Reynolds v. Beneficial National Bank, 288 F.3d 277, 282-83 (7th Cir. 2002) ("The various objectors to the settlement, primarily intervening or would-be intervening plaintiffs who have claims that the settlement will release, contend that the settlement is the product of a 'reverse auction,' the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude all other claims against the defendant.  The ineffectual lawyers are happy to sell out a class they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom line -- the sum of the settlement and the attorneys' fees -- and not the allocation of money between the two categories of expense.").

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

small amount.  See Settlement Agreement, Exhibit A hereto.[9]  In other words, Nestlé has

asked the Illinois state court to bless a settlement of purely state law claims where

plaintiffs' counsel voluntarily foregoes (on behalf of its clients) any recovery for the

substantial federal law causes of action which the state court has no jurisdiction to

administer.  Where, as here, the monetary recovery for the class is facially woefully

inadequate, several courts have utilized an All Writs Act injunction to guard against or

prevent judicial misadventure or collusion:

> **A threshold factor in determining whether to issue an injunction against a
> competing class action is the presence of exclusively federal claims in the
> federal action.**  First, federal courts have greater experience and competence
> dealing with exclusively federal claims.  Second, because state courts cannot hear
> exclusively federal claims in areas such as antitrust and **consumer protection,**
> there is a substantial federal interest in maintaining a forum in which plaintiffs
> can seek relief on such claims.  In contrast, exclusively federal claims are often
> given short shrift when released in state court settlements.  **As discussed
> previously, the release of potentially valuable federal claims in state court
> often may be a sign of collusion.**  Additionally, while the [Supreme] Court's
> decision in Matsushita permits the release of such claims, the presence of such
> claims militates against the state forum.

---

[9] Notably, in support of its removal of a related case (<u>Joseph</u>) to the Southern District of Florida,
Nestlé argued that all state consumer protection claims asserted by the plaintiffs were pre-empted
by federal law.  See Exhibit E hereto, Nestlé's Memorandum of Law in Opposition to Remand in
<u>Joseph</u>, p. 8-9, note 4 ("[T]he core of plaintiffs' claims is that NWNA has violated the law by
mislabeling its product as 'spring water' when it is not 'spring water,' a matter governed and
determined by federal law.  This federal issue is determinative as to whether plaintiffs prevail in
this action."); p. 9 ("Clearly, putting aside the reality of preemption of the FDCA [Food, Drug
and Cosmetic Act] and federal regulations thereunder, under any and all colorable views of this
case, there is one and only one standard of identity that defines 'spring water' sold in the State of
Florida, and which plaintiff must prove has been violated.  That is the federal standard set forth
in 21 C.F.R. § 165.110(a)(2)(vi). . . . Not only is the federal issue here determinative of
plaintiff's claims, but the federal issues raised by those claims are indeed substantial.").  In other
words, it is Nestlé's position that there are no appropriate state law causes of action to be
litigated here, and that federal law "is determinative of plaintiffs' claims."  Id.  Nestlé's
agreement in Illinois to settle several state law claims in state court (with concurrent release of
all federal claims) is therefore disingenuous, and Plaintiff submits, evinces possible collusion.

MDL No.: 1569

Weinstein, Andrew S., Avoiding the Race to Res Judicata:  Federal Antisuit Injunctions of

Competing State Class Actions, N.Y.U. Law Review, October 2000, pp. 1110-11 (emphasis

added)[10];

> As the Manual for Complex Litigation, Third, ("MCL") recognizes, the
> "pendency of related actions in state and federal courts can cause jurisdictional
> complexities and conflicts." MCL § 31, 32.  From the beginning, this case has
> been wrought with such jurisdictional conflicts because various groups of
> plaintiffs have brought separate actions in disparate forums citing different legal
> authority while, ultimately, all groups base their claims on the same alleged
> wrongful conduct:  the wrongful underpayment of royalties to payees by the
> major oil companies.  While the federal cases have been consolidated in this
> Court, several separate actions are still being pursued in state court – most notably
> the *Lovelace* case in Alabama – and **those parallel proceedings need to be
> harmonized with the federal multidistrict litigation in order to ensure an
> equitable resolution of both the state and federal claims**. . . . [t]he self-interest
> of the state court litigants themselves might drive the case towards an inadequate
> settlement which even the most fastidious [state] court might feel itself bound to
> approve when both parties are insisting that it is a fair resolution.  For this simple
> reason, it has been recognized that, **when there are parallel federal and state
> cases, "[I]f the federal claims are stronger than the state claims, a global
> settlement in state court is not proper.  The dangers of a 'hijacking' of the
> federal claims are too high, and the state's interest too low, to justify state
> court approval of a global settlement that is opposed by the federal plaintiff."
> . . . To allow these federal claims to be "hijacked" by a global settlement in
> state court -- where the claims could not even be adjudicated -- would
> effectively destroy those federal rights and the federal procedures designed to
> safeguard them and to enable their orderly resolution**. . . . In light of this
> mandate to adopt special procedures to better manage complex litigation, the
> Court, acting pursuant to the All Writs Act, will enter a preliminary order
> designed to avoid the conflicts that will inevitably arise if parties in a parallel state
> action prematurely enter into a settlement agreement which purports to release the
> exclusive federal antitrust claims which are now before the Court.

---

[10] See also Id. at 1092 ("[B]ecause state court judges, by the nature of position, have little
experience with exclusively federal claims and have inadequate information regarding the
claims, their ability to evaluate the fairness of the settlement is reduced. . . . As a result, class
members are at the mercy of plaintiffs' attorneys with an incentive to sell out their clients,
defendants with the ability to hold out for a favorable settlement, and state courts ill-equipped, or
unwilling, to conduct an adequate fairness hearing before approving the settlement.").

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.:  1569

In Re Lease Oil, 48 F. Supp.2d at 702-03 (citations omitted) (emphasis added).

Given that Nestlé and the Illinois state court plaintiffs are seeking approval of a settlement whereby substantial federal causes of action are simply released pursuant to a low-ball settlement of purely state law claims, Plaintiff submits that the justification for injunctive relief is even more compelling. It would simply be inappropriate for federal claims to be jettisoned by plaintiffs' counsel in a competing state court class action, wherein the proposed recovery is so meager as to raise serious questions about collusion, without the approval of a federal court (e.g., this Panel) after a substantive evaluation of the fairness or adequacy of such settlement.[11]

## Conclusion

Based on the above arguments and authorities, Plaintiff respectfully requests an order enjoining Nestlé Waters North America, Inc., and all those acting in concert or conjunction with Nestlé, from pursuing or finalizing settlement of any or all of the claims at issue on behalf of a nationwide class, in any action and in any forum, without the express approval and involvement of this Panel.

---

[11] See generally, In Re Managed Care Litigation ("Kaiser"), 246 F. Supp.2d 1363 (J.P.M.D.L., Feb. 21, 2003) (transferring competing federal class action to Southern District of Florida MDL Panel for settlement fairness evaluation: "Inclusion of Kaiser in MDL-1334 will not adversely impact consideration of the Kaiser settlement. Judge Moreno has already invited Cigna to present the proposed settlement to him and he has stated that he has no predisposition about the fairness and adequacy of this settlement.")

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

MDL No.: 1569

Respectfully submitted,

Lance A. Harke, P.A.
Florida Bar No. 863599
Sarah Clasby Engel, P.A.
Florida Bar No. 991030
David J. Maher, Esq.
Florida Bar No. 993484

HARKE & CLASBY LLP
155 South Miami Ave., Suite 600
Miami, Florida 33130
Telephone:   (305) 536-8220
Telecopier:   (305) 536-8229

*Counsel for Plaintiff & Class Members*

## CERTIFICATE OF SERVICE

I hereby certify that served a true and correct copy of the foregoing pleading was served via facsimile and 1st Class U.S. mail to the parties on the attached Panel Service List this 30 day of September 2003.

15

MDL No.:  1569

## <u>PANEL SERVICE LIST</u>

Jeffery M. Gerrod, Esq.
Orloff, Lowenbach, Stifelman & Siegal, P.A.
101 Eisenhower Parkway
Roseland, N.J.  07068

Barry A. Ragsdale, Esq
Ivey & Ragsdale
1615 Financial Center
505 North 20th Street
Birmingham, AL 35203

16





# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

SCOTT MARAVILLA, a
Florida Resident, on behalf of himself
and all others similarly situated,

      Plaintiffs,

NESTLÉ WATERS NORTH
AMERICA INC., a foreign corporation,

      Defendant.

CASE NO. 03-22021-CIV-Hoeveler
Magistrate Judge Bandstra

**FILE COPY**

## NOTICE OF FILING

Defendant Nestlé Waters North America Inc. ("NWNA" or "Defendant") hereby gives notice of the Settlement Agreement (annexed hereto as Exhibit "A") in the action entitled, "Kenneth Ramsey, on behalf of himself and all others similarly situated, *Plaintiffs, v. Poland Spring Water Co., and Nestlé Waters North America Inc.,*" Case No. 03-CHK 0817 (Michael J. Colwell), brought in the Circuit Court of the Sixteenth Judicial Circuit, Kane County, Illinois. If approved by the court, this settlement will resolve the claims asserted in this lawsuit, including the Motion for Entry of Default presently pending before this Court.

      Respectfully submitted,

      KOZYAK TROPIN & THROCKMORTON, P.A.
      2800 Wachovia Financial Center
      200 South Biscayne Boulevard
      Miami, Florida 33131
      Tel: (305) 372-1800

      By: _____
      Harley S. Tropin, Florida Bar No. 241253
      Carmen Contreras-Martinez, Fla. Bar No. 0093475

1

9/11/03

-and-

Jeffery M Garrod, Esq.
Michael S. Haratz, Esq.
ORLOFF, LOWENBACH, STIFELMAN
& SIEGEL, P.A.
101 Eisenhower Parkway
Roseland, New Jersey 07068
Tel: (973) 622-6200/Fax: (973) 622-3073

Counsel for Defendant Nestlé Waters
North America Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was faxed and mailed this 11ᵗʰ day of September, 2003, to: Lance Harke, Esq., Harke & Clasby, LLP, 155 South Miami Avenue, Suite 600, Miami, FL 33130.

By: _Carmen E. ꝛ꜀_

Carmen Contreras-Martinez
Florida Bar No. 0093475

3222/101/229129.1

2

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL
CIRCUIT COURT, KANE COUNTY, ILLINOIS

KENNETH RAMSEY,
on behalf of himself and all others similarly
situated,

     Plaintiff,

  v.

NESTLE WATERS NORTH AMERICA INC.,
d/b/a POLAND SPRING WATER CO.,
     Defendant.

)
)
)
)
)
)
) Case No. 03 CHK 817
)
) Judge Michael J. Colwell
)
) Dated: August 20, 2003

## CLASS ACTION SETTLEMENT AGREEMENT
## BETWEEN PLAINTIFF AND NESTLE WATERS NORTH AMERICA, INC. d/b/a
## POLAND SPRING WATER CO.

THIS CLASS ACTION SETTLEMENT AGREEMENT ("Agreement"), dated as
of August 20, 2003 is entered into by KENNETH RAMSEY, the Class Plaintiff,
individually on behalf of himself and the Settlement Class, and Defendant NESTLE
WATERS NORTH AMERICA INC. d/b/a POLAND SPRING WATER CO.
(hereinafter "DEFENDANT"), each through their counsel of record in the Action (as
defined below), and subject to the approval of the Court to fully settle the Action and
release all claims on the terms and conditions set forth below.


EXHIBIT A

## I.     BACKGROUND AND DESCRIPTION OF THE ACTION

1.1     On July 29, 2003, KENNETH RAMSEY commenced a nationwide class action lawsuit on behalf of himself and all other similarly situated purchasers and consumers of Poland Spring brand of bottled water and/or Poland Spring brand of spring water products (hereinafter referred to collectively as "Poland Spring Water") entitled *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Poland Spring Water Co., and Nestle Waters North America Inc., Case No. 03 CHK 817* (Kane County, Illinois).

1.2     Plaintiff's complaint alleges numerous statutory and common law violations including: common law fraud; statutory fraud; Connecticut Unfair Trade Practices Act, Illinois Consumer Fraud and Deceptive Trade Practices Act and other similar state consumer protection laws and unfair and deceptive practices acts, including, but not limited to New Jersey, Massachusetts, Florida and Alabama; unjust enrichment; breach of implied warranty of good faith and fair dealing; and breach of contract.   The complaint alleges that the labeling and advertising of the Poland Spring Water is false, misleading, or potentially misleading in that the products allegedly are not: (1) "spring water" as defined by the Food & Drug Administration standard of identity codified at 21 C.F.R. §165.110 and/or any applicable local and state regulations defining what constitutes "spring water"; (2) from the geographic or geologic sources as represented; and (3) as pure and healthful as represented.   The complaint seeks restitution, compensatory and punitive damages, disgorgement of profits, injunctive relief, attorney fees and costs.

1.3     Throughout the litigation, Plaintiff and Defendant have met from time to time to discuss settlement.  During the summer of 2003, Plaintiff and Defendant met

2

numerous times and communicated frequently regarding settlement.   Plaintiff and Defendant agreed to facilitate a possible settlement by proceeding to mediation in July.

1.3.1   During the last two weeks of July and August, 2003,   Plaintiff and Defendant negotiated this Agreement (effective as of August 20, 2003).   Plaintiff propounded extensive and detailed interrogatories and requests for production of documents on Defendant.   Defendant made appropriate responses to both Plaintiff's interrogatories and requests for production of documents.

1.3.2   On July 30, 2003, Plaintiff communicated to Defendants a structure for settlement which included a proposal for injunctive relief, i.e., monitoring of spring sites, and a proposal for monetary relief.

1.3.3   On August 1, 2003, Defendants responded to Plaintiffs' injunctive relief proposal and presented a detailed monitoring plan for Defendants' Spring Sources.

1.3.4   On August 5th, 6th and 7th, Plaintiff and Class Counsel conducted inspections of all Defendants' spring sites and its Maine plants.   Plaintiff and Class Counsel also interviewed numerous employees of Defendants, including but not limited to, the vice-president of Corporate Affairs, the Group Marketing Manager, the Director of Supply Chain, the Natural Resource Manager, the Community Relations Manager, the Director of Health and Environmental Affairs, hydrogeologists, plant managers, and water treatment and bottling plant employees.   Defendant made said individuals available for an unlimited period of time and permitted extensive evaluation, questioning, cross-examination and examination of said individuals by both Plaintiff and Defense counsel.

1.3.5   Both parties consulted experts, and elicited expert opinions regarding the underlying facts in dispute.   For settlement purposes only, both parties reviewed, disclosed and made available to one another expert opinions, reports and studies.

1.3.6   On August 7, 2003, Plaintiff made a reply proposal for injunctive relief and monetary damages.   On August 11, 2003, Defendants made another response proposal to Plaintiff and Plaintiff responded.

1.3.7   Also on August 11, 2003, Plaintiff filed his Amended Class Action Complaint.

1.3.8   On August 13, 2003, Plaintiff and Defendant agreed on monetary relief and Defendant communicated another offer regarding injunctive relief.

1.3.9   On August 14, 2003, Plaintiff responded to Defendants offer relating to injunctive relief and proposed several substantive changes.

1.3.10   On August 15, 2003, Defendant provided Plaintiff with a response and proposed changes.

1.3.11   On August 18, 2003, Plaintiff and Defendant agreed to all substantive provisions of the Settlement Agreement.

1.3.12   On August 20, 2003, Plaintiff and Defendant entered into and executed this Settlement Agreement.

1.3.13   From July 31, 2003 to August 18, 2003,   Defendant produced numerous documents and information for purposes of settlement only, including but not limited to, information related to spring sites, spring site monitoring, financial data regarding its sales and revenues, and agreed that Plaintiff could make such data available to Plaintiff's forensic economist.

1.3.14   On August 8, 2003, the Honorable Charles B. Renfrew (retired federal court judge) was contacted to discuss issues related to the ongoing settlement discussions and to determine whether Judge Renfrew would be interested in being designated as the "arbitrator" and/or "mediator" for purposes of post-settlement dispute resolution.   Judge Renfrew was jointly selected by the parties as "arbitrator" and/or "mediator" due to his knowledge and expertise related to spring water litigation and his involvement in a nearly

4

identical lawsuit (against the same Defendant) related to two other of Defendant's brands, entitled *Tara Fields, et. al.   v.   Great Spring Waters of America, Inc. d/b/a Arrowhead Mountain Spring Water Co., et. al.   Case No. 302774* (Superior Court for the County of San Francisco, State of California).  On August 8, 2003, Judge Renfrew agreed to be designated as "arbitrator" and/or "mediator" in the event the parties were to reach a settlement of this matter.

1.3.15  The substantive terms of this Settlement Agreement were finalized on August 18, 2003 and this Agreement was fully executed on August 20, 2003.

1.4      This Agreement is the product of extensive investigation, settlement negotiations and mediation.  Both class counsel and defense counsel have made a thorough analysis of the facts and law applicable to the claims asserted in this action. During the pendency of the action, both parties have engaged in substantial discovery.

1.5      As set forth in greater detail below, the parties have determined that they wish to reach an amicable resolution to the pending action.

NOW, THEREFORE, it is hereby stipulated and agreed by the Class Representative and the Defendant, and through their respective counsel, that subject to the approval of the Court, the Action and the Released Claims shall be finally and fully settled on the terms and conditions set forth in this Agreement.

## 2.  DEFINITIONS

The following terms shall have the meanings set forth below:

2.1      "Action" means the putative class action now pending against Defendant in the Sixteenth Judicial Circuit Court, Kane County, Illinois entitled *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Poland Spring Water Co., and Nestle Waters North America Inc., Case No. 03 CHK 817* (Kane County, Illinois) amended (August 11, 2003) *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Nestle Waters of North America Inc. d/b/a Poland Spring Water Co.*

5

2.2   "Agreement" means this Final Class Action Settlement Agreement, including all Exhibits.

2.3   "Class Counsel" means Attorney Robert M. Foote, Esq. of FOOTE, MEYERS, MIELKE & FLOWERS, LLC and Attorney Kathleen C. Chavez, Esq. of the CHAVEZ LAW FIRM.

2.4   "Class Representative" means KENNETH RAMSEY, both individually, and in his capacity as class representative for the putative class against Defendant, and in his capacity as class representative for the Settlement Class as provided for in paragraph 8.1.

2.5   "Complaint" means the Complaints filed in this Action against Defendant.

2.6   "Counsel for Defendant" means the law firms of Orloff, Lowenbach, Stifelman & Siegel, P.A. and Farella Braun & Martel LLP.

2.7   "Court" means the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois.

2.8   "Defendant" means NESTLE WATERS NORTH AMERICA INC. d/b/a POLAND SPRING WATER CO.

2.9   "Effective Date" means the first date by which all the events and conditions specified in paragraph 13 of this Agreement have been met and have occurred.

2.10   "Final Judgment" means the Final Judgment and Order of Dismissal of the Class Action provided for in paragraphs 10.1 through 10.12.

2.11   "Notice of Proposed Settlement" means the Notice of Pendency and Proposed Settlement Class Action and Settlement Hearing provided for in paragraph 9.8.

2.12   "Parties" means the Class Representative, on behalf of himself, and members of the Settlement Class, and the Defendant.

2.13   "Person" means a natural person, individual, corporation, association, partnership, trust, and any other type of legal business entity and their spouses, heirs, predecessors, successors, representatives or assignees.

2.14   "Preliminary Order" means the order certifying the Settlement Class, approving the Notice of Proposed Settlement, and setting the Final Settlement Hearing, as provided for in paragraphs 9.1 through 9.16.

2.15   "Related Persons" means the Defendant's past or present directors, officers, employees, partnerships and partners, principals, agents, controlling shareholders, any entity in which the Defendant has a controlling interest, or which directly or indirectly has a controlling interest in Defendant, attorneys, accountants, auditors, advisors, experts, consultants, insurers, co-insurers and reinsurers, predecessors, successors, partners, subsidiaries, divisions, assigns, joint ventures and joint venturers, related or affiliated entities, individuals or entities who are landowners from whom Defendant has obtained water, suppliers of bulk water, and all others acting in concert with Defendant.

2.16   "Released Claims" means without limitation any and all claims, actions, demands, rights, liabilities, suits, causes of action, (including, but not limited to, all causes of action for unjust enrichment, constructive trust, breach of contract, fraud, misrepresentation, suppression, concealment, breach of warranty, violation of any state or federal consumer protection or unfair trade practices statutes, including, but not limited to, the Illinois Consumer Fraud Act, the Connecticut Unfair Trade Practices Act, the Massachusetts general law G.93A, the New Jersey Consumer Fraud Act, the Florida Deceptive and Unfair Trade Practices Act, and the Alabama Deceptive Trade Practices and Consumer Protection Act), claims for damages, claims for injunctive relief, claims for disgorgement of monies, claims for declaratory relief, claims for equitable relief, of every nature and description whatsoever, including Unknown Claims, as defined below,

7

that were asserted or that could or might have been asserted in any pleading or amended pleading by, or on behalf of the Class Representatives or Settlement Class, or by any of the other Settlement Class Members against Defendant or its Related Persons, based upon, arising from, or related to the facts alleged in such pleadings, including, but not limited to:  (1) the labeling and advertising of Poland Spring brand bottled water products as stating or implying that the water is "spring water" or "natural"; (2) the labeling and advertising of Poland Spring brand bottled water products as stating or implying that the water comes from sources "deep in the woods of Maine" and/or are "exceptionally well-protected by nature"; (3) the labeling and advertising of Poland Spring brand bottled water products as stating or implying that the water comes from, is or near the town of Poland, Maine; (4)  the labeling or advertising of Poland Spring brand bottled water products as stating or implying that the water is more pure or healthful by virtue of being spring water, than it actually is; (5) the labeling or advertising of Poland Spring brand bottled water products as stating or implying that it comes from the same aquifer or spring as the original Poland  Spring water source that existed in 1845; and/or (6) the facts, transactions, events, occurrences, disclosures, statements, acts or omissions or failures to act which were or could have been alleged in the Action or in any similar action based upon the same facts.

2.17   "Released Persons" means Nestle Waters North America, Inc. d/b/a Poland Spring Water Co., Poland Spring Water Co., and all Related Persons.

2.18   "Releasor" means, without limitation, the Plaintiff, and each and all of the Settlement Class Members whose claims are released pursuant to Section 11 of this Agreement.

2.19   "Settlement Class" means:

"All persons and/or entities who have purchased and/or consumed Poland Spring brand of bottled water and/or Poland Spring brand of spring water

8

products within the United States of America any time during the period January 1, 1996 to the present. Excluded from the class are Defendants, their subsidiaries and affiliates, and any officers and directors thereof, as well as any judge presiding over this action, the judge's spouse and immediate family."

2.20  "Settlement Class Member" means a person who fits within the definition of Settlement Class (and that person's attorneys, legal representatives, successors, spouses, heirs, executors, administrators, and assigns who are acting on behalf of that person).

2.21  "Settlement Hearing" means the hearing or hearings to determine: (1) whether the settlement of the Action should be approved as fair, reasonable and adequate; (2) whether a Final Judgment as provided in Section 10 of this Agreement should be entered; (3) whether a final order certifying the Settlement Class should be approved; and (4) whether the application of Class Counsel for an award of attorneys' fees, costs, and expenses pursuant to Section 12 of this Agreement should be approved, as provided for in paragraph 9.9.

2.22  "Settling Parties" means, collectively, the Defendant and the Class Representatives on behalf of themselves and Settlement Class Members.

2.23  "Unknown Claims" means any Claims which any Class Representative or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this Agreement. With respect to any and all Released Claims against the Released Persons, the Parties stipulate and agree that, the Class Representative shall expressly waive and relinquish, and the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have,

9

expressly waived and relinquished, to the fullest extent permitted by law any claim that was or could have been alleged within Plaintiff's Class Action Complaint. The Class Representative and the other Settlement Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the Released Claims, but hereby stipulate and agree that upon the entry of the Final Judgment and Order of Dismissal, the Class Representative fully, finally and forever settles and releases, and each other Settlement Class Member shall be deemed to, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims against the Released Persons, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Settling Parties acknowledge that the foregoing waiver was bargained for and is a material element of the Agreement.

### 3.    BENEFITS OF THE SETTLEMENT

3.1    Class Counsel have made a thorough investigation of the facts and circumstances surrounding the allegations made in the Complaint. Class Counsel have engaged in extensive investigation and discovery of the claims underlying this Action, including propounding document requests and interrogatories, taking extensive interviews and examination/cross-examination of Defendant employees, taking extensive interviews and examination/cross-examination of potential witnesses, providing and receiving expert disclosures and reports, and making extensive spring site, plant, property and bottling/shipping facility inspections.

10

3.2    In the course of discovery, plaintiff conducted site investigations of all Poland Spring sites, investigated and evaluated the geology of the sites and their surroundings in the State of Maine, many of which are located in remote areas. Plaintiff's investigation included reviews of professional literature and information concerning the geology, hydrogeology and topography of the site locations. Plaintiff also reviewed tests to assess water characteristics and chemical consistency and performed analyses of the results of the chemical breakdown of the water samples.

3.3    Class Counsel have reviewed and analyzed publicly available information and investigated the law applicable to their claims and to the defenses raised by Defendant. Class Counsel has also extensively reviewed, analyzed, compared and contrasted the instant action with the facts, law and resolution of a recently settled class action case against the same Defendant, alleging nearly identical claims, related to two other of Defendant's brands of spring water commonly known as "Arrowhead Brand Mountain Spring Water" and "Calistoga Brand Mountain Spring Water".

3.4    Class Counsel believe that it is in the best interest of the Class Members that this Action be settled on the terms and conditions set forth in this Agreement. Class Counsel reached that conclusion after evaluating the factual and legal issues in the Action, the benefits that the Settlement Class Members will receive as a result of the Action, and the risks and uncertainties of continued litigation, the expense that would be necessary to prosecute the Action through trial and through any appeals that might be taken, and the likelihood of success at trial.

4.    NO ADMISSION OF WRONGDOING AND LIABILITY

4.1    Neither this Agreement, nor any of its terms and provisions, nor the Final Judgment and Order of Dismissal, shall constitute an admission by the Defendant of any liability or wrongdoing whatsoever, nor is this Agreement a finding of the validity or invalidity of any allegations in the Complaint or of any of the Released Claims or a

11

finding of any wrongdoing by the Defendant.  Neither this Agreement nor the Final Judgment shall be used or construed as an admission, concession, or presumption or inference of any fault, liability or wrongdoing by any Person.  Neither the Final Judgment, this Agreement, the fact of settlement and the settlement proceedings, nor the settlement negotiations, nor any related documents or facts, shall be offered or received in evidence against any Party for any purpose in any proceeding other than (i) in such proceedings as may be necessary to consummate or enforce this Agreement, or (ii) in any action against or by the Released Persons, or any of them, to support a defense of *res judicata*, collateral estoppel, release, or other theory of claim preclusion, issue preclusion, or similar defense.

## 5.   MONETARY RELIEF

5.1     The Parties agree that it is not practicable to attempt to identify and locate each consumer who consumed and/or purchased Poland Spring brand bottled water and/or Poland Spring brand bottled water products during the class period or to determine how much of the products each consumer purchased.  The monetary relief in this case is therefore to be distributed as a fluid recovery fund, or under the doctrine of *cy pres*, but only as expressly set forth herein.

5.2     Defendant shall make total charitable donations in the amount of two million seven hundred and fifty thousand dollars ($2,750,000.00) in equal installments over a period of five years, running from the Effective Date.  Defendant shall make said charitable donations in the amount of five hundred and fifty thousand dollars ($550,000.00) per year for five years, running from the Effective Date of this Agreement.  These donations can be made in money or in kind.  If donations are made in kind by contributions of water products, the value of the donation for purposes of this section shall be the average retail price of the products as determined by independent industry

reports or similar information.   If Class Counsel objects to the value claimed by Defendant, the value of any in kind donation shall be made by Judge Charles Renfrew.

5.3      The charitable donations identified in paragraph 5.2 shall be made to any U.S. charitable, educational, governmental or non-profit organization that promotes or engages in disaster relief (e.g., American Red Cross), watershed protection/environmental conservation (e.g., Sierra Club/Nature Conservancy), or human health/community support (e.g., American Heart Association).   Upon request, but no more frequently than on an annual basis, Defendant shall report such donations to plaintiffs' counsel.

5.3.1   Each year, Plaintiff shall designate, consistent with paragraph 5.3, one or more organizations to receive twenty-five percent (25%) of the charitable donations described in paragraph 5.2.   Each year,   Defendant shall designate, consistent with paragraph 5.3, one or more organizations to receive seventy-five percent (75%) of the charitable donations described in paragraph 5. 2.   Both parties shall notify each other and Judge Renfrew of those designations and allocations within 120 days of the Effective Date and thereafter, annually on or before the anniversary of the Effective Date.   Each party shall have a period of 10 days to object to this designation.   If either party desires to modify the designations after the designation period provided for in this paragraph, said party shall notify the other party and Judge Renfrew of its desire to do so and the other party shall have a period of 10 days to object to this proposed modification.   Any disputes regarding the designation of charitable organizations shall be submitted to Judge Renfrew or his successor in accordance with the procedures set forth in paragraph 14.4, and Judge Renfrew shall have complete authority to decide all issues regarding the designations provided for in this paragraph.

5.4      Defendant shall provide to consumers, in the manner provided in this section, product discounts on Poland Spring Water products from its then current list

13

price for direct sales to consumers, or provide directly to consumers product discount coupons, which may include, among other things, "point-of-sale" coupons. The cumulative face value of these discounts or coupons over the five year period shall total eight million fifty thousand dollars ($8,050,000.00), or one million six hundred and ten thousand dollars ($1,610,000.00) per year for five years running from the Effective Date. Defendant agrees that if the cumulative annual redemption amount is less than four hundred thousand dollars ($400,000.00) per year for each year of the five year period, then Defendant shall make additional donations to the organizations specified in Section 5.3 of this Agreement in the amount of the difference between four hundred thousand dollars ($400,000.00) per year and the actual amount of redeemed coupons and discounts obtained. Any mail-in coupon or rebate shall not be considered as part of these requirements unless redeemed.

5.4.1   Defendant may offer consumers who receive home or office delivery of Poland Spring Water products discount coupons which shall be the greater of ten percent (10%) of the retail value of the product or fifty cents (50¢);

5.4.2   Defendant may offer consumers who receive home or office delivery of Poland Spring Water products free spring water products;

5.4.3   Defendant may offer consumers who receive home or office delivery of Poland Spring Water products discounts on invoices;

5.4.4   Defendant may distribute to consumers discount coupons for Poland Spring Water products which shall be the greater of ten percent (10%) of the retail value of the product or twenty-five cents (25¢);

5.4.5   Defendant may offer to consumers at retail establishments discount coupons on Poland Spring Water products in an amount which shall be the greater of ten percent (10%) of the retail value of the product or twenty-five cents (25¢);

14

5.4.6  Defendant may offer to consumers a free product sample with the purchase of Poland Spring Water products (e.g., buy five bottles and receive one additional bottle for no additional cost); or

5.4.7  Defendant will offer no less than ten percent (10%) of the product discounts described in paragraph 5.4 to consumers who purchase Poland Spring Water products from retail establishments. Defendants will provide to class members who are currently receiving home and office delivery of Poland Spring Water products a product coupon, discount, and/or free product sample within one (1) year of the Effective Date of this Agreement.

5.5    The donations and product discounts or coupons described in paragraphs 5.1 through 5.4 are the only monetary relief Defendant shall pay or cause to be paid in connection with the settlement of the Released Claims other than to satisfy an award of attorneys fees, costs and expenses as provided for in Section 12, below.

6.    DEFENDANT'S CONTINUED USE OF THE TERM "SPRING WATER" AND USE OF SPRING WATER DERIVED FROM ITS CURRENT SPRING SOURCES

6.1    Plaintiff acknowledges that Defendant currently  includes on its Poland Spring Water product labels the identity and location of the sources that provide the spring water.  Defendant agrees to continue providing information regarding identity and location of spring water sources on its labeling for a period of five (5) years from the effective date of this Agreement.

6.2    The Parties agree that Defendant shall be permitted to continue to bottle, label and sell Poland Spring brand bottled water as "spring water" using all of the spring water sources it has used since January 1, 1996. Nothing in this Settlement Agreement shall require that Defendant relabel its Poland Spring brand spring water products as

15

anything other than spring water or alter its spring water advertising in any way with respect to the spring water sources it has used since January 1, 1996.

      6.3    Defendant agrees that for a period of five (5) years from the Effective Date, it will not extract water from its Poland Spring facility that exceeds 350 million gallons per year, which amount is less than the amount set forth in the permit issued by the State of Maine.

      6.4    Defendant agrees that over the next five (5) years, it will acquire new spring sources by purchase, lease or water contract within the state of Maine to meet increasing production demands of its Poland Spring Water.

      6.5    Defendant agrees that it has not and will not for a period of five (5) years from the Effective Date obtain water from any source outside of the state of Maine for its Poland Spring brand bottled water products.

      6.6    Defendant agrees that for a period of five (5) years from the Effective Date, to notify Class Counsel and Judge Renfrew of any de-certifications, investigations and/or failure to meet the requirements for certification of "spring water" by any local, state or federal government.

## 7.    LONG TERM MONITORING

      7.1    As a condition of the settlement of this Action, Defendant will increase its long term monitoring of all of its spring water resources in Maine.  The long term monitoring requirements set forth in this section go beyond that which is required by local, state and/or federal law, and thus provide additional protection for consumers.

      7.2    Defendant shall monitor springs and accept or reject water as provided in this section for a period of five (5) years commencing from the Effective Date of this Agreement. "Reject" shall mean not using rejected water in Defendant's spring water products.

16

7.3     Monitoring of source water turbidity by plants.   Defendant shall Reject water in the following circumstances.   Defendant shall monitor and record turbidity levels for each tanker load received from the Garden Spring (in Poland, Maine) or Pure Mountain/Evergreen Spring (in Fryeburg, Maine) spring water sources.   Turbidity shall be measured by taking a sample from each tanker load and delivering that sample to the bottling plant's quality control laboratory on-site for analysis.   The turbidity shall be measured and recorded in a database.   Defendant shall obtain data for at least ninety percent (90%) of all incoming tanker loads as measured on an annual basis.   These records shall be available for inspection by Judge Renfrew or a representative of plaintiffs on request but not more frequently than quarterly.

7.4     Criteria for "rejecting" source water by plants.   Where the turbidity levels exceed 1.0 nephelometric turbidity units (NTU), and the average turbidity for a four tanker load average is greater than the average turbidity for the previous day by twenty five percent (25%) (plus or minus), subsequent loads will be rejected until the turbidity falls below 1.0 nephelometric turbidity units (NTU). For example, where the average turbidity on a day exceeds 1.0 NTU, and four consecutive loads from a source have an average turbidity greater or less than the previous day's average turbidity by twenty five percent (25%) (e.g., day 1 average = 1.1 NTU and four loads on day 2 average = 1.28 NTU), Defendant would Reject all loads from that source until the turbidity falls below 1.0 NTU, subject to paragraphs 7.5 and 7.6 below.

7.5     Requirement of correlation with storm event.   Defendant may accept and need not Reject a tanker load based on the criteria in paragraph 7.4 if the measured changes in turbidity are not directly correlated with a storm event (defined as greater than 0.5 inches of rain over a 36 hour period, as measured by the nearest weather station) that occurred within 36 hours of the collection of water showing the change in turbidity.

17

7.6     **Procedure for appeal.** Defendant may accept a tanker load and challenge the application of paragraph 7.4 according to the following procedure. Within two weeks of the decision to accept a load that does not comply with paragraph 7.4, Defendant submits a written statement to Class Counsel that explains why Defendant believes that the water accepted was not under the direct influence of surface water, as defined by 40 C.F.R. § 141.2. Class Counsel must file a written rebuttal within two weeks of receiving Defendant's written statement. In preparing this rebuttal, Class Counsel, including designated representatives, will be given access to the records compiled under paragraph 7.3 within one week of the submission of Defendant's written statement. Judge Renfrew shall then review the written submissions and provide a determination of whether Defendant was entitled to accept the load. If Judge Renfrew determines that Defendant should have rejected the load as "under the direct influence of surface water" as defined by 40 C.F.R. 141.2, Defendant shall be liable for an amount equal to the after tax profit on the amount of water received in the disputed load or loads. The amount shall be paid as a charitable donation pursuant to the other provisions of the settlement agreement. Under no circumstances shall water that Defendant need not Reject under paragraph 7.5 be considered "under the direct influence of surface water."

7.7     **Monitoring of rain patterns.** Defendant shall install, within six (6) months following final approval of this settlement, install rain gauges at three locations: within the town of Fryeburg, Maine, within Defendant's property located in Hollis, Maine, and at Defendant's property located in Poland Spring, Maine. These rain gauges will be used to provide the weather data with respect to these sites for purposes of this Long Term Monitoring Program. In determining the application of paragraph 7.5, the "nearest weather station" for the Garden Spring site shall be the weather station located under this paragraph at the Poland Spring site.

18

7.8    **On-site monitoring of turbidity.**  Defendant shall install, within six (6) months following final approval of this settlement, turbidity monitors at the Poland Spring, Maine site and at the Hollis, Maine site.  The turbidity monitors will be placed at such a position to enable them to measure the turbidity of the water being collected for bottling at all of the boreholes being used on the site.  If it is not possible to place a single turbidity monitor to measure the turbidity of the composite of all water being collected for bottling at the site, Defendant shall install whatever number of turbidity monitors are required so that no water enters the plant from any individual borehole without passing a turbidity monitor.  The monitoring shall be continuous except for maintenance and repair activities.  A datalogger shall record the turbidity level on an hourly basis.

7.9    **Turbidity by-pass at certain sites.**  In the event that turbidity levels measured pursuant to paragraph 7.8 exceed by twenty five percent (25%) the average turbidity for the previous 36 hours, and the turbidity average for the previous 36 hours and the level measured are both greater than 1.0 nephelometric turbidity units (NTU), Defendant will Reject the water so that it is not used for  Defendant's spring water products until the turbidity level falls below 1.0 NTU.  Defendant need not Reject the water based on the criteria in the previous sentence if the change in turbidity is not directly correlated with a storm event (defined as greater than 0.5 inches of rain over a 36 hour period, as measured by the rain gauge established pursuant to paragraph 7.7) that occurred within 36 hours of the change in turbidity.

7.10  **Procedure for appeal.**  Defendant can continue to use water that it would otherwise Reject pursuant to paragraph 7.9 and/or challenge the application of paragraph 7.4 according to the following procedure.  Within two weeks of the decision to accept water that does not comply with paragraph 7.9, Defendant can submit a written statement explaining why it believes that the water accepted was not under the direct influence of surface water, as defined by 40 C.F.R. § 141.2.  Plaintiffs' designated representative will

19

then be allowed to respond within two weeks with a written rebuttal. In preparing this rebuttal, Class Counsel, including designated representatives, will be given access to the records compiled under paragraph 7.8 within one week of the submission of Defendant's written statement. Judge Renfrew shall then review the written submissions and provide determination of whether Defendant was entitled to accept the water. If Judge Renfrew determines that Defendant should have Rejected the water as "under the direct influence of surface water" as defined by 40 C.F.R. 141.2, Defendant will pay an amount equal to the after tax profit on the amount of water received in the disputed load or loads. The amount will be paid as a charitable donation pursuant to the terms of the settlement agreement. Under no circumstances shall water that need not be Rejected under paragraph 7.9 be considered "under the direct influence of surface water."

7.11    Microscopic particulate monitoring.    Defendant will perform Microscopic Particulate Analyses ("MPAs") at each of the four sites it currently collects spring water from in the State of Maine: Poland Spring (located in Poland Spring), Garden Spring (located in Poland), Evergreen Spring aka Pure Mountain Spring (located in Fryeburg), and Clear Spring (located in Hollis). The MPAs will be taken on each individual borehole at each site, except that at Poland Spring and Clear Spring the MPA may be taken on a composite basis due to the large number of boreholes on site. The results of these tests will be made available to the plaintiffs' representative on demand following receipt of the laboratory results by Defendant, within two weeks of the demand. The MPAs for each of these locations will be performed twice a year. Defendant will use good faith efforts to have the first test of the year be completed during the period February 1 to April 30 (the "Spring season test"), and the second test of the year be completed during the period August 1 to October 31 (the "Fall season test").

7.12    Results of first test; second test. In the event that either a Spring season test or Fall season test shows "high risk" of surface water influence as measured under

20

the Environmental Protection Agency Consensus Method for Microscopic Particulate Analysis, Defendant will perform a second test within two (2) weeks of receiving the results. If that test also shows "high risk" of surface water influence, the situation will be treated in accordance with paragraph 7.13 below. If that test does not show "high risk" of surface water influence, the previous result will be considered to be the result of testing error, and will be disregarded.

7.13    Effect of two "high risk" MPAs. If the second MPA performed pursuant to paragraph 7.12 shows "high risk," Defendant will Reject the water that is collected within one week of a storm event (defined as greater than 0.5 inches of rain over a 36 hour period, as measured by the nearest weather station as established by paragraph 7.7 above) from that source for the next twelve (12) months. Defendant may use and need not Reject the water from that source if there has been no storm event during the previous seven (7) days. This paragraph shall not apply if Defendant subsequently conducts an MPA test within seven (7) days of a storm event and that MPA test shows a result of "moderate" or "low" risk of surface water influence.

7.14    Procedure for appeal. Defendant can also utilize a source and challenge the application of paragraph 7.13 according to the following procedure. Within two (2) weeks of the decision not to Reject a load that does not comply with paragraph 7.13, Defendant can submit a written statement explaining why it believes that the water accepted was not under the direct influence of surface water, as defined by 40 C.F.R. § 141.2. Plaintiffs' designated representative will then be allowed to respond within two (2) weeks with a written rebuttal. In preparing this rebuttal, the plaintiffs' designated representative will be given access to the records compiled under paragraph 7.11 within one (1) week of the submission of Defendant's written statement. Judge Renfrew shall then review the written submissions and provide a determination of whether Defendant was entitled to accept the water. If Judge Renfrew determines that Defendant should

21

have Rejected the water from that source as "under the direct influence of surface water" as defined by 40 C.F.R. § 141.2, Defendant shall pay an amount equal to the after tax profit on the amount of water received in the disputed load or loads. The amount will be paid as a charitable donation pursuant to the provisions of the Agreement. Under no circumstances will water that need not be rejected under the provisions of paragraphs 7.12 and 7.13 be considered "under the direct influence of surface water."

7.15    Duration of long term monitoring and MPA monitoring requirements. The provisions of the long term monitoring program set forth in paragraphs 7.1 - 7.14 above shall be in effect for five (5) years from the Effective Date.

7.16    General dispute resolution provision.    If Class Counsel contest Defendant's compliance with the Rules of Section 7, Class Counsel shall provide written notice to Defendant at the office of its general counsel. Defendant will then be required to respond to this written notice by explaining the reasons for violation, or why it contends no violation occurred. Any disputes about whether a violation occurred, or whether Defendant acted reasonably in violating the rule, will be determined according to the following procedure. Judge Renfrew shall review the plaintiffs' written notice and Defendant's response, and any additional materials submitted by the parties. Plaintiffs' representative will have the burden of establishing, by a preponderance of the evidence, that a violation occurred, and that such violation was not substantially justified consistent with the principles set out in the above rules. If Judge Renfrew determines that Defendant violated the rules without substantial justification, he may impose a payment requirement of up to the amount of after-tax profit that is attributable to the violation. The amount will be paid as a charitable donation pursuant to the provisions of this Agreement. The rules in this paragraph shall not apply to an appeal.

7.17    None of the terms of this Section shall be construed to create or imply a definition of "direct influence of surface water" other than as set forth in 40 C.F.R. §

22

141.2.  The agreement to Reject water under certain conditions as set forth in this Agreement does not constitute an admission or concession that such water is a fact under the direct influence of surface water.

### B.    CERTIFICATION OF SETTLEMENT CLASS

8.1    For settlement purposes only, the Parties stipulate that the Class Representative is an adequate representative of the Settlement Class, that the putative class is so numerous that joinder is impossible, that common issues predominate over individual or unique issues, and the Parties shall request, as part of the Preliminary Approval Order, that the Court enter an order certifying the Settlement Class, and appointing Plaintiff as representative of the Settlement Class.

8.2    Defendant does not consent to certification of the Settlement Class for any purpose other than to effectuate the Settlement and dismiss the Action.  If this Agreement is terminated pursuant to its terms, the Effective Date does not occur, or for any reason the Settlement described in this Agreement is not effectuated, any order certifying the Settlement Class shall be vacated upon notice of termination of the Settlement to the Court, and the Action shall proceed as though the Settlement Class had never been certified, without prejudice to the Parties to either request or oppose class certification.

### 9.    ORDER PRELIMINARILY APPROVING SETTLEMENT, APPROVING NOTICE OF PROPOSED SETTLEMENT, AND SETTING SETTLEMENT HEARING

9.1    The Parties agree to apply to the Court for entry of a Preliminary Order, substantially in the form of *Exhibit A* to this Agreement, as soon as practicable after the execution of this Agreement.  The Preliminary Order shall contain the provisions set forth in paragraphs 9.2 through 9.16.

9.2    The Preliminary Order shall adopt the definitions set forth in paragraphs 2.1 through 2.23 of this Agreement.

23

9.3     The Preliminary Order shall preliminarily approve this Agreement, and each of the releases and other terms set forth herein, as falling within the range of possible approval and meriting submission to the Settlement Class Members for consideration.

9.4     The Preliminary Order shall provisionally certify the Settlement Class as:

"All persons and/or entities who have purchased and/or consumed Poland Spring brand of bottled water and/or Poland Spring brand of spring water products within the United States of America any time during the period January 1, 1996 to the present.  Excluded from the class are Defendants, their subsidiaries and affiliates, and any officers and directors thereof, as well as any judge presiding over this action, the judge's spouse and immediate family."

The Preliminary Order shall also provisionally designate KENNETH RAMSEY as Class Representative.  The Preliminary Order shall also provisionally designate Attorney Robert M. Foote of FOOTE, MEYERS, MIELKE & FLOWERS, LLC and Attorney Kathleen C. Chavez of CHAVEZ LAW FIRM as Class Counsel.

9.5     The Preliminary Order shall appoint L. STEPHENS TILGHMAN  of Tilghman & Co., P.C. as Notice Plan Administrator, and shall provide for the implementation of the Notice Plan ("Notice Plan") as set forth in the Affidavit of Steven Tilghman attached hereto as *Exhibit B.*

9.6     The Preliminary Order shall require that Class Counsel shall publish, at Defendant's expense, but limited to the amounts listed in the Notice Plan, in the manner set forth in the Notice Plan, a form of summary notice of the proposed settlement ("Summary Notice"), substantially in the form attached hereto as *Exhibit C.*  The Preliminary Order shall require that Class Counsel, at Defendant's expense, mail by first class a copy of the long form of notice ("Long Notice") substantially in the form attached

24

further order of the Court, except as may be necessary to implement the settlement of the Action or comply with the terms of this Agreement.

9.14   The Preliminary Order shall bar and enjoin all Releasors from commencing or prosecuting any direct or representative action, or any action in any other capacity, asserting or relating to any of the Released Claims, unless and until this Agreement is terminated according to its terms. The Preliminary Order shall provide that following the issuance of the Final Approval, the Court shall retain continuing jurisdiction over the subject matter of the Action, the Class Representative, the Settlement Class Members, and the Defendant to administer the matters set forth in this Agreement. The order shall provide that in the Final Approval, the Court shall appoint Judge Renfrew as Special Master to decide any and all disputes arising under or related to this Agreement as provided for in paragraph 14.4.

9.15   The Preliminary Order shall provide that the Final Judgment will permanently bar and enjoin all Releasors from commencing or prosecuting any direct or representative action, or any action in any other capacity, asserting or relating to any of the Released Claims.

9.16   The Preliminary Order shall provide that the Court may, for good cause, extend any of the deadlines set forth in the order without further notice to the Settlement Class.

10.   FINAL JUDGMENT AND ORDER OF DISMISSAL OF THE ACTION

10.1   Class Counsel and Counsel for Defendant agree to apply to the Court for entry of a Final Judgment and Order of Dismissal of the Action, substantially in the form of *Exhibit D* to this Agreement, at the conclusion of the Court's consideration of the issues to be determined at the Settlement Hearing provided for in paragraph 9.8. The Final Judgment shall contain the provisions set forth in paragraphs 10.2 through 10.12.

27

10.2   The Final Judgment shall adopt the definitions set forth in paragraphs 2.1 through 2.23 of this Agreement.

10.3   The Final Judgment shall provide that the Court has continuing jurisdiction over the subject matter of the Action, the Class Representative, the Settlement Class Members, and the Defendant to administer the matters set forth in this Agreement.

10.4   The Final Judgment shall find that the publication of the Summary Notice and mailing of the Long Notice as provided for in the Preliminary Order constituted the best notice practicable under the circumstances to all persons within the definition of the Settlement Class, and fully complied with Illinois law, the United States Constitution, and any other applicable law. The Final Judgment shall certify the Settlement Class.

10.5   The Final Judgment shall approve the settlement of the Action set forth in this Agreement, including the respective contributions of the Defendant, each of the releases and other terms, set forth herein, as fair, reasonable, and adequate to the Parties. The Final Judgment shall order the Parties to consummate the settlement in accordance with its terms as set forth in this Agreement.

10.6   The Final Judgment shall dismiss the Action, and all claims contained therein, with prejudice to the Plaintiff and all Settlement Class Members.

10.7   The Final Judgment shall provide that all Releasors shall conclusively be deemed to have released and forever discharged the Released Persons from all Released Claims.

10.8   The Final Judgment shall provide that all Releasors shall conclusively be deemed to have acknowledged that the Released Claims include all claims, rights, demands, causes of action, liabilities, or suits, including Unknown Claims, as of the Effective Date. These persons nonetheless release all such claims.

10.9   The Final Judgment shall permanently bar and enjoin all Releasors from commencing or prosecuting any direct or representative action, or any action in any other capacity, asserting or relating to any of the Released Claims.

10.10   The Final Judgment shall provide that the Court reserves exclusive and continuing jurisdiction over the Action, the Class Representative, the Settlement Class Members, the Defendant and this Agreement.  The Final Judgment shall appoint Judge Renfrew as Special Master to decide any and all disputes arising under or related to this Agreement as provided for in paragraph 14.4

10.11   The Final Judgment shall provide that neither the Final Judgment, nor this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be:  (1) construed as an admission or concession by Defendant of the truth of any of the allegations in the complaint, or of any liability, fault, or wrongdoing of any kind; or (2) referred to, offered as evidence, or received in evidence in any pending or future civil, criminal, or administrative action or proceeding, except in a proceeding to enforce the Final Judgment, or to defend against the assertion of the Released Claims, or as otherwise required by law.

10.12   The Final Judgment shall provide that, within thirty (30) days of the Final Judgment, Class Counsel shall return to Counsel for Defendant the originals and all copies of all documents produced to the Class Representatives by Defendant or by Defendant's Counsel during the course of discovery in the Action.

11.   **RELEASES.**

11.1   As of the Effective Date, the Class Representative hereby fully, finally and forever releases, relinquishes and discharges all Released Claims (including "Unknown Claims") against the Defendant and each and all of the Released Persons.

11.2   As of the Effective Date, each and all Settlement Class Members shall be deemed to have fully, finally and forever released, relinquished and discharged all

29

Released Claims (including "Unknown Claims") against the Defendant and each and all of Released Persons.

11.3   As of the Effective Date, the Defendant hereby fully, finally and forever releases, relinquishes and discharges all Released Claims (including "Unknown Claims") against the Class Representative and their counsel.

## 12.   ATTORNEYS' FEES, COSTS AND EXPENSES

12.1   The Class Representative or Class Counsel may apply to the Court for: (1) an award of attorneys' fees; plus (2) reimbursement of any costs and expenses incurred in connection with the Action pursuant to paragraph 9.9 above.  The application shall be considered separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement set forth in this Agreement.  Nothing regarding the Court's decision on the application for attorneys' fees, costs, and expenses shall operate to terminate or cancel this Agreement, or have any effect on the finality of the Final Approval and order of dismissal.

12.2   Class Counsel shall request that the Court award a specific amount to Class Counsel for their attorneys' fees and the amount they should be reimbursed for their actual costs and expenses, including expert fees.  The Defendant has agreed not to object to a fee petition that does not exceed the amount of one million three hundred and fifty thousand dollars ($1,350,000.00) to be paid to Class Counsel.  The Defendant has agreed not to object to a costs and expense petition that does not exceed the amount of seventy thousand dollars ($70,000.00) to be paid to Class Counsel for reimbursement of costs and expenses incurred in the litigation of this matter.

## 13.   EFFECTIVE DATE OF THE SETTLEMENT AGREEMENT

13.1   The Final Judgment of the Class Action shall become effective and final on the first date by which all of the events set forth in paragraphs 13.2 through 13.11 have occurred.

30

13.2    Class Counsel and Counsel for Defendant have executed this Agreement.

13.3    The Court has entered the Preliminary Order as provided for in paragraphs 9.1 through 9.16.

13.4    The Court has held the Settlement Hearing as provided for in paragraph 9.8.

13.5    The Court has entered the Final Judgment as provided for in paragraphs 10.1 through 10.12.

13.6    The time to appeal from the Final Judgment, has expired without any appeal having been perfected, thirty days (30) after entry of Final Judgment.

13.7    If any appeal is taken from the Final Judgment or any interim order in the Action, the appeal has either been dismissed or has been affirmed.

13.8    If a ruling or decision is entered by an appellate court with respect to the Final Judgment or any interim order in the Action, the time to petition for a writ of certiorari with respect to the ruling or decision has expired.

13.9    If a ruling or decision is entered by an appellate court with respect to the Final Judgment or any interim order in the Action, the time to petition for review by the Illinois Supreme Court with respect to the ruling or decision has expired; or if filed, such a petition has been denied or dismissed; or, if filed and granted, has resulted in affirming the judgment or order.

13.10    If a petition for a writ of certiorari with respect to the Final Judgment or any interim order in the Action is filed, the petition has been denied or dismissed, or, if granted, has resulted in affirming the judgment or order.

13.11    Any proceeding or order, or any appeal or petition for writ of certiorari pertaining solely to an application for attorney's fees, costs or expenses shall not in any way delay or preclude the Final Judgment from becoming Effective.

31

14.   OTHER TERMS

14.1   The Parties agree to exercise their best mutual efforts to accomplish the terms and conditions of the Agreement.

14.2   This Agreement constitutes the entire settlement among the Parties and supersedes any prior agreements or understandings between them relating to the settlement of the Action.

14.3   The Agreement may be amended or modified only by a written instrument signed by Class Counsel and Counsel for Defendant. Amendments and modifications may be made without notice to the Settlement Class unless the Court requires notice.

14.4   The Agreement and exhibits shall be subject to, governed by, and constituted and enforced pursuant to the laws of the State of Illinois, without reference to its conflicts of law provisions. The parties agree that any disputes arising out of, in connection with, or related to this Settlement Agreement shall be submitted for binding arbitration to the Hon. Charles Renfrew (retired). The parties agree that any decision made by Judge Renfrew shall be final and binding on the Plaintiff, the Settlement Class and the Defendant. In the event that Judge Renfrew is not available or is unwilling to decide any dispute submitted to him, the parties agree that they shall use good faith efforts to agree on an alternate retired Federal Judge to decide the dispute. In the event that the parties are unable to decide on such individual, they agree to submit the matter to JAMS for appointment of such individual.

14.5   The exhibits to the Agreement are an integral part of the settlement and are hereby incorporated and made a part of the Agreement.

14.6   Counsel for Defendant represent that they have the full authority of the Defendant to execute the Agreement.

14.7    The Agreement may be executed in one or more counterparts, which together shall be deemed one original agreement. Execution via facsimile shall be acceptable to bind a party as an original.

14.8    The Parties agree that any rule of construction to the effect that any ambiguities are to be construed against the drafting parties shall not be employed in the interpretation of this Agreement.

14.9    The Parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Action.  The settlement compromises claims which are contested and shall not be deemed an admission by any Party as to the merits of any claim or defense.

IN WITNESS WHEREOF, the Parties, and their respective counsel, have executed this Settlement

Agreement as of **8/20/2003**

CLASS REPRESENTATIVE

By: _____
KENNETH RAMSEY

NESTLE WATERS NORTH AMERICA INC.

By: _____
J. MARK EVANS
Vice President, General Counsel & Secretary

FOOTE, MEYERS, MIELKE & FLOWERS, LLC

BY: _____
ROBERT M. FOOTE, ESQ.

CHAVEZ LAW FIRM

BY: _____
KATHLEEN C. CHAVEZ, ESQ.

ORLOFF, LOWENBACH, STIFELMAN & SIEGEL

BY: _____
JEFFREY M. GARROD, ESQ.

FARELLA, BRAUN & MANTEL, LLP

BY: _____
THOMAS MAYHEW, ESQ.

Jeffrey M. Garrod, Esq.
ORLOFF, LOWENBACH, STIFELMAN & SIEGEL
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 622-3073

Thomas Mayhew, Esq.
FARELLA, BRAUN & MANTEL, LLP
Russ Building
235 Montgomery Street
San Francisco, CA 94104
(415) 954-4480

34





**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

RECEIVED

SEP 19 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Application to Quash Subpoena On:          )
                                          )
ROBERT M. FOOTE and                       )
KATHLEEN C. CHAVEZ,                        )   Case No. _____
_____    )
For a Case Pending in the Southern District )
of Florida:                               )
                                          )
SCOTT MARAVILLA, on behalf of             )
himself and others similarly situated,    )
                                          )
                    v.                    )
                                          )
NESTLÉ WATERS NORTH AMERICA, INC. )
Case No. 03-22021-CIV-Hoeveler/Bandstra   )
(S.D. Florida, Miami)                     )

**03C 6674**

**JUDGE MAROVICH**

**MAGISTRATE JUDGE KEYS**

**FILE COPY**

## MOTION TO QUASH UNDER RULE 45

NOW COME Petitioners Robert M. Foote and Kathleen C. Chavez pursuant to

Rule 45(C)(2)(B) and (3)(A) and files this Motion to Quash and Objections  (Exhibit A) to the

subpoena and document schedule served on plaintiffs (Exhibit B).

The subpoena and document request were served on September 17 at 3:10 in the

afternoon requiring the production of documents and depositions on Wednesday, September 24

(four business days).  Plaintiffs' motion to quash should be granted because:

1.     Robert M. Foote and Kathleen C. Chavez are attorneys who have

negotiated a settlement of a class case, <u>Kenneth Ramsey v. Nestlé Waters North America, Inc.</u>

<u>d/b/a Poland Spring Water Co.</u>, Case No. 03-CHK- 817 (Kane County, Illinois).

2.     Information sought in connection with that case should be sought in that

action and discovery permitted only in limited instances.

3.      Indeed, federal courts have routinely denied similar efforts to obtain access to discovery from other class action cases.  For example, *In re: Potash Antitrust Litigation*, 162 F.R.D. 559 (D. Minn. 1995), an interregional cooperative sought "to be permitted to appear so as to assist its constituent members in making an informed decision on whether to opt out, opt in, or otherwise participate in the class action" and sought access to all pleadings, discovery, and other papers which had been or would be filed, served, exchanged or otherwise produced in the matter, including responses to discovery requests and deposition transcripts and documents subject to the confidentiality order.  *Id.* at 560-61.  The court denied the motion, citing a concern that "counsel for the class, as well as counsel for the Defendant, could be overwhelmed with discovery and information requests by innumerable potential class members . . . ."  *Id.* at 561; *see also Vollmer v. Publishers Clearing House*, 248, F.3d 698, 707 (7th Cir. 2001) (affirming district court's denial of proposed intervenors' motion to intervene in a class action to obtain discovery in order to conclude whether to opt out, participate in, or object to a proposed settlement); *In re: Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 363 (D.D.C. 2001) (potential class members who had not yet decided whether or not to opt out were not entitled to permissively intervene in order to pursue limited discovery from class counsel concerning adequacy of settlement fund, where putative intervenors did not articulate a particular claim or defense of their own nor any prejudice that would result from their having to decide whether or not to opt-out).

4.      To the extent that Florida plaintiffs seek discovery to obtain information concerning the Ramsey settlement, they have been provided sufficient information concerning that settlement.  See Exhibit C hereto.  Plaintiffs in the Florida action have not cited any need for or deficiency in the information provided to the class members concerning the settlement and

any issues concerning such questions should be addressed by the Court presiding over that matter.

5.     The subpoena does not allow a reasonable amount of time for compliance.

6.     The document request and contemplated deposition relates to a class action settlement and necessarily involves information privileged, work product, and confidential information, commercial information, legal strategy, all in the preparation of a settlement.

7.     The document request and the contemplated deposition treats the attorneys as "experts" who should disclose conversations, meetings, work product and other information gathered as part of their legal activity in representing a class; the deposition and document request necessarily includes work product confidential and privileged material and the disclosure of the attorneys' strategy regarding the preparation of the settlement agreement.

WHEREFORE, Petitioners respectfully request that its motion be granted and the subpoena quashed.

Respectfully submitted,

ROBERT M. FOOTE and
KATHLEEN C. CHAVEZ

By:     _Edw. Foote (nc o)_
One of their attorneys

Edward L. Foote
WINSTON & STRAWN
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5601

-3-

# CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he served a copy of the foregoing Motion to Quash under Rule 45 by fax and U.S. Mail to:

Ben Barnow
One N. LaSalle Street
Suite 4600
Chicago, IL  60602

Lance A. Harke
Harke & Clasby
155 S. Miami Avenue
Suite 600
Miami, FL  33130

on this 19th day of September, 2003.

_____
Edward L. Foote

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Application to Quash Subpoena On:     )
                                             )

ROBERT M. FOOTE and            )
KATHLEEN C. CHAVEZ,           )    Case No. _____
_____ )

For a Case Pending in the Southern District   )
of Florida:                                  )
                                             )

SCOTT MARAVILLA, on behalf of      )
himself and others similarly situated,     )
                                             )

                  v.                    )
                                             )

NESTLÉ WATERS NORTH AMERICA, INC. )
Case No. 03-22021-CIV-Hoeveler/Bandstra   )
(S.D. Florida, Miami)                     )

## <u>OBJECTIONS UNDER RULE 45</u>

        Pursuant to Rule 45(c)(2)(B), Robert M. Foote and Kathleen C. Chavez object to

the subpoena and Subpoena Duces Tecum on the following grounds:

             The subpoena fails to allow reasonable time for compliance in that only three

working days have been provided from the service of the subpoena to the production of

documents and a contemplated deposition. The subpoena also is an unprecedented attempt to

discover privileged material that forms the basis of a court settlement. Further, the subpoena and

Subpoena Duces Tecum requires the disclosure of confidential commercial information and

requires the disclosure of legal and strategy opinions of an "unretained expert."

             The parties subpoenaed are attorneys who have been instrumental in settling a

case. The alleged deponents object to disclosing confidential and privileged matter and the

substance of conferences, facts and communications that were evaluated in preparing a

settlement agreement.

Respectfully submitted,

ROBERT M. FOOTE and
KATHLEEN C. CHAVEZ

By:

Edward L. Foote
WINSTON & STRAWN
35 W. Wacker Drive
Chicago, IL  60601
(312) 558-5601

# EXHIBIT B

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SCOTT MARAVILLA, on behalf of himself and others similarly situated,<br><br>    v.<br><br>NESTLÉ WATERS NORTH AMERICA, INC., | **SUBPOENA DUCES TECUM IN A CIVIL CASE**<br>Case pending in the Southern District of Florida, Miami<br>CASE NUMBER:    03-22021-CIV-Hoeveler/Bandstra |

**TO:**    Kathleen C. Chavez
        The Chavez Law Firm
        12 S 5th Street #A
        Geneva, IL 60134

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| | |
|---|---|
| | **COURTROOM**<br><br>**DATE AND TIME** |

■ YOU ARE COMMANDED to appear at the place, date and time specified below to testify at the taking of a deposition in the above case.

| | |
|---|---|
| Sonntag Suburban Reporting Service<br>1035 E State Street #G<br>Geneva, IL 60134 | **DATE AND TIME**<br>September 24, 2003<br>10:00 a.m. EDT |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below.

| | |
|---|---|
| See Schedule A attached. | **DATE AND TIME**<br>September 24, 2003<br>at 9:00 a.m. EDT |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| | |
|---|---|
| | **DATE AND TIME** |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| | |
|---|---|
| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>                   , Attorney for Plaintiff | DATE<br>September  11 , 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER: Lance A. Harke, P.A., Harke & Clasby LLP, 155 South Miami Ave., Suite 600, Miami, Florida, 33130, Tel: (305) 536-8222

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after serve of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Schedule A

1.  All documents, including, but not limited to correspondence, electronic mails, memoranda, expert reports, meeting minutes, and reports, received by the following persons:

    a.  Robert M. Foote; and/or
    b.  any attorneys or employees of Foote, Meyers, Meilke, & Flowers, LLC; and/or
    c.  Kathleen C. Chavez; and/or
    d.  any attorneys or employees of the Chavez Law Firm; and/or
    e.  All persons representing the Plaintiffs in the matter of <u>Kenneth Ramsey v. Nestle Waters North America, Inc. d/b/a Poland Spring Water Co.,</u> Case No 03-CHK 817 (Kane County, Illinois) (hereinafter "Ramsey Filing").

    (collectively "Ramsey Attorneys") as a result of any informal or formal discovery related to the Ramsey Filing.

2.  All documents reviewed by any of the Ramsey Attorneys that were received from Nestle Waters North America, Inc. d/b/a Poland Spring Water Co., its divisions, departments, subsidiaries, affiliates, predecessors, partners, present or former officers, directors, owners, agents, shareholders, employees, attorneys, representatives, and/or all other persons acting or purporting to act on its behalf, as well as each partnership in which it is a partner (collectively "Poland Springs") relating to the Ramsey Filing.

3.  All documents regarding or evidencing any on-site investigations of the spring sites referred to in the settlement agreement (hereinafter "spring sites"), Poland Spring's property, bottling plants and water treatment procedures, conducted in the Ramsey Filing, including all travel records, log entries, day book entries, receipts, and the like.

4.  All documents, including but not limited to interview notes, reports, audio or video recordings, electronic mails, agendas, meeting minutes, and/or correspondence regarding or evidencing the extensive interviews by any of the Ramsey Attorneys, or their representatives, of Poland Springs employees, including but not limited to the Vice-President of Corporate Affairs, Group Marketing Manager, the Director of Supply Chain, the Natural Resource Manager, the Community Relations Manager, the Director of Health and Environmental Affairs, any Hydro-geologists, the Plant Managers at the Hollis and Poland Spring bottling plants, any bottling plant employees, and any other witnesses. Please include documents sufficient to show precise names of the employees interviewed, and documents evidencing (1) that these individuals were made available for an unlimited amount of time and (2) the amount of time that they were interviewed and deposed.

5. All documents regarding any experts consulted or retained relating to the Ramsey Filing, including, but not limited to any expert reports generated, expert studies conducted, expert disclosures made, documents showing any expert opinions, documents created during any expert investigations, any correspondence with experts, documents sufficient to show the qualifications of any experts consulted or retained, documents reviewed by any experts and the compensation of any expert.

6. Any data reviewed by any of the Ramsey Attorneys that is "generally available to the public" which relates to the Ramsey Filing.

7. All documents sufficient to show the amount of attorney's fees claimed earned and costs incurred by the Ramsey Attorneys, including but not limited to time-sheets, billing statements, and costs receipts from any of the Ramsey Attorneys regarding the Ramsey Filing.

8. The retainer agreement with Kenneth Ramsey in Ramsey Filing.

9. All pleadings in the Ramsey Filing, including, but not limited to the operative complaint and all drafts or past versions of the Complaint, the Answer and any amended Answer, all discovery requests and responses, any dispositive motions, and any other motions or memoranda filed with the Court or sent between the Parties.

10. All documents regarding any meetings and/or communications relating to the settlement in the Ramsey Filing, including, but not limited to draft settlement agreements, letters, electronic mails, and audio or video recordings.

11. All documents regarding any mediation between the parties in the Ramsey Filing, including documents shown to, or filed with, the mediator.

12. All documents regarding any pre-suit negotiations between the parties in the Ramsey Filing.

13. All documents regarding the July 30, 2003 communications between the Plaintiff and Poland Springs regarding settlement and the structure for settlement.

14. All documents regarding the communications between the Plaintiff and Poland Springs regarding settlement, the structure for settlement, and the detailed monitoring plan proposed by the Defendant, including but not limited to the August 1, 2003 communication.

15. All documents regarding the inspections conducted on of all of Poland Spring's spring sites and its Maine plants made in conjunction with the Ramsey filing, including but not limited the to August 5-7, 2003 inspections.

16.   All documents regarding the settlement negotiations, including but not limited those allegedly occurring from August 13 through August 20, 2003, including but not limited to the following:

A.   the August 13, 2003 agreement by the parties in the Ramsey Filing to monetary relief for the class, and the August 13, 2003 proposal from Poland Springs regarding injunctive relief;

B.   the Ramsey Filing Plaintiff's August 14, 2003 response to Poland Springs's injunctive relief proposal which requested several substantive changes;

C.   Poland Springs's August 15, 2003 response to the Ramsey Plaintiff's proposed changes;

D.   the August 18, 2003 agreement by the parties to all substantive provisions of the Settlement Agreement, and

E.   the August 20, 2003 executed settlement agreement.

17.   All drafts of any settlement agreements in the Ramsey Filing.

18.   All documents produced in conjunction with the Ramsey Filing, including those produced from July 31, 2003 to August 18, 2003, regarding information related to spring sites, spring site monitoring, financial data regarding Poland Springs's sales and revenues.

19.   All documents regarding any reports, opinions, studies conducted, correspondence with, and/or documents sufficient to identify the Ramsey Filing Plaintiff's forensic economist.

20.   All documents regarding the Honorable Charles B. Renfrew and his involvement in the Ramsey Filing.

21.   All documents regarding any communications between the Ramsey Attorneys and Harley Tropin, Esq. regarding Poland Springs and the Ramsey Filing.

22.   All documents regarding any communications between the Ramsey Attorneys and any attorney or employee from the firm of Winston & Strawn LLP regarding Poland Springs and/or the Ramsey Filing.

23.   Any and all evidence of dates, times, and places of meetings with counsel for Poland Springs or with representatives of Poland Springs.

24.   All documents evidencing the dates, times and places of any statements or depositions taken in the Ramsey Filing, and sufficient to show who was present for each statement or deposition, as well as copies of all transcripts and/or notes from each statement or deposition.

25.   All documents regarding any communications with Jan Schlichtman, Esq. or his law firm, agents, representatives, and/or clients.

# EXHIBIT C

## IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL
## CIRCUIT COURT, KANE COUNTY, ILLINOIS

| | |
|---|---|
| **KENNETH RAMSEY,**<br>**on behalf of himself and all others similarly**<br>**situated,**<br><br>          **Plaintiffs,**<br><br>     **v.**<br><br><br>**NESTLE WATERS NORTH AMERICA INC.**<br>**d/b/a POLAND SPRING WATER CO.**<br>         **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>) **Case No.  03 CHK 817**<br>)<br>)**Judge Michael J. Colwell**<br>)<br>)<br>) |

### NOTICE OF PROPOSED CLASS ACTION SETTLEMENT AND
### SETTLEMENT HEARING

      **TO:  ALL PERSONS AND/OR ENTITIES WHO HAVE**
**PURCHASED AND/OR CONSUMED POLAND SPRING**
**BRAND OF BOTTLED WATER AND/OR POLAND SPRING**
**BRAND OF SPRING WATER PRODUCTS WITHIN THE**
**UNITED STATES OF AMERICA ANY TIME DURING THE**
**PERIOD JANUARY 1, 1996 TO THE PRESENT.**

THIS IS NOT NOTICE OF A LAWSUIT AGAINST YOU.  You have received this Notice because you have been identified as a potential class member in a class action that is being settled. It is important that you read this Proposed Class Action Settlement and Settlement Hearing Notice ("Notice") thoroughly because you have certain rights that may be affected by the settlement of this class action.

Nestle Waters North America Inc. d/b/a Poland Spring Water Co. ("Defendant") is a producer of Poland Spring brand of spring water and spring water products ("Poland Spring Water"). This class action involves claims by Plaintiff, on behalf of himself and all others similarly situated, seeking recovery of money damages and equitable relief for the purchase and consumption of Poland Spring Water.

Plaintiff alleges that Defendant engages in false, fraudulent, deceptive and misleading actions in connection with the labeling, marketing and sales of its Poland Spring Water, that the Poland Spring Water is not actually "spring water" and that Defendant does not protect its spring sources and spring water.

Plaintiff alleged the following five counts: (1) Common Law Fraud; (2) Statutory Fraud (violations of Connecticut Unfair Trade Practices Act, Illinois Consumer Fraud and Deceptive Business Practices Act and all other similar state consumer protection laws, including, but not limited to the laws of New Jersey, Massachusetts, Florida and Alabama); (3) Unjust Enrichment; (4) Breach of Contract; and (5) Breach of Implied Warranty of Good Faith and Fair Dealing.

The parties entered into a Class Action Settlement Agreement on August 20, 2003. The Court has ordered that a settlement hearing be held on October 20, 2003, at 9:30 a.m. before the Honorable Judge Michael J. Colwell, Circuit Court Judge, or any Judge residing in his stead, at 100 S. Third Street, Room 110, Geneva, IL 60134. Section II of this Notice provides detailed information about the terms of the proposed settlement.

If you have objections to the terms of the settlement, you must file and serve your objections in the manner described in Section IV of this Notice. You must file your objection with the Clerk of Court not later than October 10, 2003. You may also come to the Settlement Hearing, but you do not have to come to the Settlement Hearing to object.

You may choose to exclude yourself from the Class and thereby not to receive any benefits from the settlement and not to release any claims you may have. To exclude yourself from the Class, you must file a request for exclusion with the Clerk of the Court not later than October 10, 2003 in accordance with the provisions of Section III of this Notice. You do not have to come to the Settlement Hearing to exclude yourself from the Class.

## I.   NATURE OF THE ACTION

**A.   Background**

1.   On July 29, 2003, *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Nestle Waters North America Inc. d/b/a Poland Spring Water Co., 03 CHK 817 (Kane County, Illinois)* was filed in the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois.   On August 11, 2003, Plaintiff filed his First Amended Class Action Complaint.   Both complaints were nationwide class action complaints.

2.   In summary, Plaintiff alleges that Defendant engages in numerous false, fraudulent, deceptive and misleading actions in connection with the labeling, marketing and sales of its Poland Spring Water.   Plaintiff's allegations include that Defendant: i) falsely labels and advertises its bottled water as "spring water"; (ii) misleads the public as to the geologic and geographic sources of its "spring" water; and (iii) falsely labels and advertises its bottled water as "natural" spring water, all for the purpose of deceiving the public into believing they are buying premium water.

3.   Plaintiff alleges the following five counts: (1) Common Law Fraud;  (2) Statutory Fraud (violations of Connecticut Unfair Trade Practices Act, Illinois Consumer Fraud and Deceptive Business Practices Act and all other similar state consumer protection laws, i ncluding, b ut n ot l imited t o, N ew Je rsey, M assachusetts, F lorida and Alabama); (3) Unjust Enrichment;  (4) Breach of Contract;  and (5) Breach of Implied Warranty of Good Faith and Fair Dealing.

4.   Plaintiff alleges that Poland Spring Water: (1) is not "spring water"; (2) is not located "deep in the woods of Maine"; (3)  comes from sources other than spring sources located within the state of Maine;   (4) is not from "pristine and protected sources"; (5) is not "naturally p urified"; (6)  c omes from spring sources contaminated with toxic chemicals or under the direct threat of contamination;  and (7) is not utterly

safe.  Plaintiff also alleges that Defendants cannot be trusted to take care of the "natural resources."

5.      Plaintiff seeks injunctive relief, disgorgement and money damages to redress Defendant's unlawful behavior.

6.      On August 20, 2003, Plaintiff and Defendant entered into a Settlement Agreement.

7.      On August 20, 2003, the Court entered a Preliminary Approval Order preliminarily granting certification of the Class for purposes of settlement only and approving the mailing of this Notice.  Members of the Class are advised that they can be excluded from participating in the Settlement with Defendant by filing an exclusion request on or before October 10, 2003.

8.      Defendant has denied and continues to deny each and every claim and contention alleged by the Class.  Defendant has nonetheless concluded that the further conduct of the Action would be protracted, expensive and contrary to the interests of Defendant.  Accordingly, Defendant has determined that it is desirable for the Action to be settled in the manner and upon the terms and conditions set forth in the Class Action Settlement Agreement.

9.      Based on their evaluation of the facts and law and a weighing of risks and benefits, Class Counsel have determined that the settlement set forth in the Class Action Settlement Agreement is fair and reasonable and in the best interests of the Class Representative and of the Class Members.

**B.      Settlement Class Definition**

The Settlement Class is defined as:

ALL PERSONS AND/OR ENTITIES WHO HAVE PURCHASED AND/OR CONSUMED POLAND SPRING BRAND OF BOTTLED WATER AND/OR POLAND SPRING BRAND OF SPRING WATER PRODUCTS WITHIN THE UNITED STATES OF AMERICA ANY TIME DURING THE PERIOD JANUARY 1, 1996 TO THE PRESENT.

## II.    SUMMARY OF THE PROPOSED SETTLEMENT

### 1.    Class Relief

A.    Class Counsel conducted substantial discovery, reviewed Defendants' documents, conducted on-site investigations of the spring sites, Defendants' property, bottling plants and water treatment procedures, conducted extensive interviews of Defendants' employees including the vice-president of Corporate Affairs, Group Marketing Manager, the Director of Supply Chain, the Natural Resource Manager, the Community Relations Manager, the Director of Health and Environmental Affairs, Hydrogeologists, the Plant Managers at the Hollis and Poland Spring bottling plants, bottling plant employees, and witnesses, consulted with expert witnesses, discussed expert opinions, reports and investigations with Defendants and reviewed documents and data generally available to the public.

B.    Plaintiff and Defendant engaged in settlement discussions throughout the months of July and August, 2003. Plaintiff and Defendant proceeded to mediation. A settlement was reached in this matter on August 20, 2003.

C.    The August 20, 2003 settlement provided relief for a nationwide class of consumers and/or purchasers of Poland Spring Water within the United States of America any time during the period January 1, 1996 to the present.

D.    The Parties agree that it is not practicable to attempt to identify and locate every consumer who consumed and/or purchased Poland Spring Water during the class period or to determine how much of the products each consumer purchased. The monetary relief in this case is therefore to be distributed as a fluid recovery fund, or under the doctrine of *cy pres*, but only as expressly set forth herein. This monetary relief will include benefits to Poland Spring home and office customers.

E.    **A Brief Summary of the Long Term Water Monitoring is as follows**

(detailed explanation of the Long Term Water Monitoring is provided in the August 20, 2003 Settlement Agreement on file with the Court):

1.    As a condition of the settlement of this Action, Defendant will increase its long term monitoring of all of its spring water resources in Maine. The long term monitoring requirements set forth in this section go beyond that which is required by local, state and/or federal law, and thus provide additional protection for consumers.

2.    Defendant shall monitor springs and accept or reject water as provided in this section for a period of five (5) years commencing from the Effective Date of the Settlement Agreement. "Reject" shall mean not using rejected water in Defendant's spring water products.

3.    Defendant shall monitor and record turbidity levels for each tanker load received from the Garden Spring (in Poland, Maine) or Pure Mountain/Evergreen Spring (in Fryeburg, Maine) spring water sources. Where the turbidity levels exceed 1.0 nephelometric turbidity units (NTU), and the average turbidity for a four tanker load average is greater than the average turbidity for the previous day by 25% (plus or minus), subsequent loads will be rejected until the turbidity falls below 1.0 nephelometric turbidity units (NTU). Defendant may accept and need not Reject a tanker load if the measured changes in turbidity are not directly correlated with a storm event (defined as greater than 0.5 inches of rain over a 36 hour period, as measured by the nearest weather station) that occurred within 36 hours of the collection of water showing the change in turbidity. Defendant may accept a tanker load and challenge the application of paragraph 3 according to provisions set forth in detail in the Settlement Agreement.

4.    Defendant shall install, within six months of the Effective Date of this settlement, rain gauges at three locations: within the town of Fryeburg, Maine, within Defendant's property located in Hollis, Maine, and at Defendant's property

located in Poland Spring, Maine.  These rain gauges will be used to provide the weather data with respect to these sites for purposes of this Long Term Monitoring Program.

       5.      Defendant shall install, within six months of the Effective Date of this settlement, turbidity monitors at the Poland Spring, Maine site and at the Hollis, Maine site.  The turbidity monitors will be placed at such a position to enable them to measure the turbidity of the water being collected for bottling at all of the boreholes being used on the site.

       6.      Defendant will perform Microscopic Particulate Analyses ("MPAs") at each of the four sites it currently collects spring water from in the State of Maine:  Poland Spring (located in Poland Spring), Garden Spring (located in Poland), Evergreen Spring aka Pure Mountain Spring (located in Fryeburg), and Clear Spring (located in Hollis).

       F.      Defendant will provide discounts and coupons to consumers over a five year period of time in an amount totaling eight million fifty thousand dollars ($8,050,000.00) total.  As part of this settlement, Defendant will provide to those Class Members who are current Poland Spring home and office customers a product coupon, discount, and/or free product sample within one (1) year of the Effective Date of this Agreement.

       Defendants will provide one million six hundred and ten thousand dollars ($1,610,000.00) of said discounts and coupons per year for each of the five years.  If the cumulative annual redemption amount is less than four hundred thousand dollars ($400,000.00) per year for each year during the five year period, then Defendant shall make additional donations to charitable organizations in the amount of the difference between four hundred thousand dollars ($400,000.00) per year and the actual amount of redeemed coupons and discounts obtained.  Any mail-in coupon or rebate shall not be considered as part of these requirements unless redeemed.

G.     Defendant will make charitable donations in the amount of two million seven hundred and fifty thousand dollars ($2,750,000.00) cumulative over a period of five years. Each year, Plaintiff shall designate as recipients one or more organizations to receive twenty-five percent (25%) of the charitable donations described in paragraph 5.2 of the Settlement Agreement. Each year, Defendant shall designate as recipients one or more organizations to receive seventy-five percent (75%) of the charitable donations.

H.     Defendant agrees that for each of the next five (5) years it will not extract water from its Poland Spring facility that exceeds 350 million gallons per year, which amount is less than the amount set forth in the permit issued by the State of Maine.

I.     Defendant agrees that over the next five (5) years, it will acquire new spring sources by purchase, lease or water contract within the state of Maine to meet increasing production demands of its Poland Spring Water.

J.     Defendant expressly affirms that all Poland Spring Water has been and is derived from permitted spring sources within the state of Maine. Defendant further agrees that for the five (5) year period beginning from the Effective Date of the Settlement Agreement it will not obtain water from any source outside of Maine for its Poland Spring Water.

K.     Defendant agrees to continue providing information regarding the identity of its spring water sources on its labeling for a period of five (5) years from the effective date of this Agreement.

L.     Defendant agrees to notify Class Counsel and Judge Renfrew of any de-certifications, investigations or failure to meet the requirements for certification of "spring water" by any local, state or federal government, during the next five (5) years.

M.     Retired Federal Judge Charles Renfrew will arbitrate any disputes arising under the Settlement Agreement.

2. **ATTORNEYS' FEES, COSTS and EXPENSES**

A.     Plaintiff has filed a petition for the award of attorneys' fees in the following amounts:

| Attorney | Firm | Amount |
|---|---|---|
| Robert M. Foote, Esq. | Foote, Meyers, Mielke & Flowers, LLC | $810,000.00 |
| Kathleen C. Chavez | Chavez Law Firm | $540,000.00 |

The Defendant has agreed not to object to such a petition for attorneys' fees that do not exceed one million three hundred fifty thousand dollars ($1,350,000).

Attorneys' fees shall be paid by the Defendant in addition to all other relief provided to the Class.

B.     Plaintiff has filed a petition for the award of costs and expenses in an amount that fairly and adequately reimburses Class Counsel for expenses incurred in connection with the prosecution of this matter. The defendant has agreed not to object to such a petition for costs and expenses that do not exceed the amount of seventy thousand dollars ($70,000.00).  Costs and expenses shall be paid by Defendant in addition to all other relief provided to the Class.

3. **AWARD TO CLASS REPRESENTATIVE**

A.     Plaintiff has filed a petition for the compensation to the Class Plaintiff in the amount of twelve thousand dollars ($12,000.00).  The amount requested in the petition is based on the active role that Class Plaintiff has played in this litigation. Defendant does not object to this amount. The compensation to the Class Plaintiff will be paid by Defendant in addition to all other relief provided to the Class.

III.   **PROCEDURE FOR REQUESTING EXCLUSION FROM THE CLASS ACTION AND NOT PARTICIPATING IN THE SETTLEMENT OR BEING BOUND BY THE COURT JUDGMENTS**

A.     If you do not wish to be included in the Class and you do not wish to participate in the proposed settlement described in this Notice, you must request to be

excluded.  To do so, you must file with the Kane County Circuit Clerk at P. O. Box 112, Geneva, IL 60134, a written request to be excluded no later than October 10, 2003.  In order for the exclusion request to be valid, the written request must include the following:

      (1)    The title of this action: *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Nestle Waters North America Inc. d/b/a Poland Spring Water Co., 03 CHK 817* (Kane County, Illinois);

      (2)    the name and address of the Class Member (Person or entity that purchased and/or consumed Poland Spring brand bottled water and/or Poland Spring brand of spring water products); and

      (3)    a statement that the Class Member wishes to be excluded from the Settlement Class.  The exclusion request must be signed by the class member.

    B.    Any Class Member who submits a valid and timely Exclusion Request with the Kane County Circuit Clerk shall have no rights under the Settlement Agreement, shall not share in the Settlement Benefit, and shall not be bound by the Settlement agreement or the Final Judgment and Order of Dismissal.

    C.    All Class Members who do not request exclusion in the manner set forth in Section III(A) above shall be bound by the Settlement Agreement and Final Judgment and Order of Dismissal.

## IV.   PROCEDURE FOR FILING OF OBJECTIONS TO THE CLASS ACTION SETTLEMENT

    A.    Any objections to the Class Action Settlement, the benefits provided to the Class pursuant to the Settlement, the compensation of the Class Representative, or the Requests for Attorneys Fees, costs and expenses must be filed with the Kane County Circuit Clerk, P.O. Box 112, Geneva, Illinois 60134, and served upon Counsel as

designated below no later than October 10, 2003. In addition to the written objection, all

supporting documentation must also be filed with the Kane County Circuit Clerk and

Counsel. Counsel must be served by October 10, 2003, at the following addresses:

>Robert M. Foote/Kathleen C. Chavez
>FOOTE, MEYERS, MIELKE & FLOWERS, LLC
>416 South Second Street
>Geneva, Illinois 60134

>Jeffrey M. Garrod
>Orloff, Lowenbach, Stifelman & Siegel, P.A.
>101 Eisenhower Parkway
>Roseland, New Jersey 07068-1082

All objections must include the following:

(1)    The title of this action: *Kenneth Ramsey, on behalf of himself and all others similarly situated v. Nestle Waters North America Inc. d/b/a Poland Spring Water Co., 03 CHK 817* (Kane County, Illinois);

(2)    the name and address of the Class Member (Person or entity that purchased and/or consumed Poland Spring brand bottled water) and/or Poland Spring brand of spring water products; and

(3)    a statement detailing the basis for and objections to the Class Action Settlement.

B.    In order to object and be heard at the Settlement Hearing, you must file your written objections in accordance with Paragraph IV (A) above and serve a copy of said objection along with any and all supporting documentation upon Counsel at the above-address by October 10, 2003. Any Class Member who does not object in the manner provided in Paragraph IV(A) above shall be deemed to have waived such objection and shall forever be foreclosed from objecting to the fairness, reasonableness, or adequacy of the proposed settlement or to the award of attorney's fees or

reimbursement of costs and expenses.

C.     The delivery of oral objections at the Settlement Hearing and/or filing written comments or objections to the proposed settlement does NOT constitute a valid and timely request to be excluded from the settlement.  In order to be excluded from the settlement and not bound by the Final Order and Judgment, a Class Member must submit a valid and timely Exclusion Request as described in Section III of this Notice.

**V. FINAL HEARING.**  The Court has ordered that a Settlement Hearing be held on October 20, 2003, at 9:30 a.m. before the Honorable Judge Michael J. Colwell, Circuit Court Judge, or any Judge residing in his stead, at 100 S. Third Street, Room 110, Geneva, IL 60134.  The Court will determine whether to approve the proposed settlement agreement.  It is not necessary for you to appear at the hearing, although you have the right to do so.  The Court may adjourn or continue the Settlement Hearing without further notice to the Settlement Class.

**VI.     OTHER INFORMATION.**  All capitalized terms used herein have the same meaning as defined in the Settlement Agreement.  The full proposed Settlement Agreement and Proposed Final Judgment and Order of Dismissal are on file with the Clerk of the Court, and you may inspect it at the Circuit Clerk's Office at 540 South Randall Road, St. Charles, Illinois 60174, at any time during normal business hours, Monday through Friday.

If you have questions after you have read this Notice or want to inspect the full Proposed Settlement Agreement, you may check the Web Site at: www.noticeclass.com/SpringWaterSettlement or write Spring Water Settlement, PO Box 12864, Birmingham, AL 35202-2864.

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE.**

Dated: August 20, 2003

Clerk of Court
Circuit Court
Kane County, Illinois

**ORLOFF, LOWENBACH, STIFELMAN & SIEGEL**
A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW
101 EISENHOWER PARKWAY
ROSELAND, NEW JERSEY 07068-1082

(973) 622-6200 • FAX: (973) 622-3073
E-MAIL: attorneys@olss.com
www.olss.com

JOEL D. SIEGEL*
FRANK L. STIFELMAN*
LAURENCE B. ORLOFF†
STANLEY SCHWARTZ*
JEFFREY M. GARROD*
FLOYD SHAPIRO†
SANDERS M. CHATTMAN
ALAN F. KORNSTEIN*
SAMUEL FELDMAN*
EDMUND A. MIKALAUSKAS
SUSAN M. HOLZMAN*
MICHAEL S. HARATZ*
WILLIAM J. ADELSON*
EILEEN A. LINDSAY
EUGENIA YUDANIN*

• MEMBER NJ & NY BARS
† MEMBER NJ, NY & FL BARS
▲ MEMBER NJ, NY & PA BARS
* MEMBER NJ, NY & DC BARS
◊ MEMBER NJ, NY & MA BARS

GERALYN G. HUMPHREY▲
CRAIG A. OLLENSCHLEGER
PHILIP C. CORBO*
MATTHEW P. BENNETT*
ALISSA L. EPS† N◊
DEBORAH M. TYLER*
ADAM M. HABERFIELD▲
PHILIP E. MAZUR

COUNSEL
MURRY D. BROCHIN*

OF COUNSEL
RALPH M. LOWENBACH*
BERNARD SCHENKLER*

REFER TO FILE NO.

32605-85

September 19, 2003

*Via Federal Express*
Lance A. Harke, Esq.
Harke & Clasby LLP
155 South Miami Ave.
Suite 600
Miami, FL   33130

Re:   **Scott Maravilla v. Nestle Waters North America, Inc.**
      **03-22021-Civ-Hoeveler/Bandstra**

Dear Mr. Harke:

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, this letter sets forth the objections to the subpoena duces tecum dated September 11, 2003 which you caused to be issued by the United States District Court for the District of New Jersey requesting that I appear for my deposition and produce documents on September 24, 2003. for the following reasons, I object to the subpoena:

1.      The subpoena is not directed to discovery that is relevant to the issues pending in the Maravilla case. The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party". Koch Materials Co. v. Shore Slurry Seal, Inc., 208 F.R.D. 109, 116 (D.N.J. 2002). Discovery is permitted if it is "reasonably calculated to lead to the discovery of admissible evidence", but the information sought must at least be "relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Your subpoena is directed to a settlement in the lawsuit pending in the Circuit Court for the Sixteenth Judicial Circuit Court, Kane County, Illinois, *Kenneth Ramsey v. Nestlé Waters North America Inc., d/b/a Poland Spring Water Co.*, Case No. 03-CHK817 ("Illinois State Court Action"). The Illinois State Court Action simply is not relevant to any issue

**ORLOFF, LOWENBACH, STIFELMAN & SIEGEL**
A PROFESSIONAL CORPORATION

Lance A. Harke, Esq.                    -2-                    September 19, 2003

pending in the Florida federal court action and the discovery you seek does not even satisfy that preliminary requirement for taking discovery. Your subpoena seeks discovery outside the scope of discovery permitted by the Federal Rules of Civil Procedure.

      2.     You cannot depose adversary counsel. You are obviously aware that I am lead counsel for the defendant Nestlé Waters North America Inc. ("NWNA") in the Maravilla action. The general rule of law is that you cannot depose your adversary counsel unless you make a very special showing of need (assuming the information is even relevant). Your client has not and cannot satisfy the heightened standard required to justify deposing adverse counsel. "[T]he harassing practice of deposing opposing counsel . . . appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578, 130 F.R.D. 348, 353 (D.N.J. 1990)(citing Shelton v. America Motor Corp., 805 F.2d 1323, 1330 (8th Cir. 1987)). Accordingly, a party seeking to depose adverse counsel must demonstrate an elevated need, and that that need cannot be met in another, less intrusive manner. Johnston Dev. Group., 130 F.R.D. at 353; see Arcuri v. Trump Taj Mahal, 154 F.R.D. 97, 110 (D.N.J. 1994)(deposition of adverse counsel not permitted where information available from "two alternative, duplicate sources").

      Far from satisfying the standard of demonstrating a heightened need, your client cannot demonstrate any need at all because the information sought is in no way relevant to the Florida federal court action.

      Even if a party can satisfy that standard, however, a deposition of adverse counsel will be forbidden if allowing the deposition would cause "harm to the party's representational rights". Johnston Dev. Group, 130 F.R.D. at 353. Because I am not a witness with regard to any facts relevant to the Florida federal court action, allowing my deposition would harm the representational rights of my client. See, Arcuri, 154 F.R.D. at 110 (deposition of adverse counsel not permitted where counsel was "anything but fact witness[]" and had no information "beyond the specific opinion and advice provided to their client").

      Because your client cannot meet the standard imposed with regard to deposing adverse counsel, you are not entitled to take my deposition.

**ORLOFF, LOWENBACH, STIFELMAN & SIEGEL**
A PROFESSIONAL CORPORATION

Lance A. Harke, Esq.                              -3-                    September 19, 2003

       3.    The subpoena is an improper attempt to have the Florida federal court intrude upon the Illinois State Court Action.  This is a clear violation of the rules of comity within the federal system.  "Comity consists of a proper respect for state functions, and a 'sensitivity to the legitimate interests of both State and National Governments, ... in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.'" Bally Mfg. Corp. v. Casino Control Com., 534 F. Supp. 1213, 1216 (D.N.J. 1982)(quoting Younger v. Harris, 401 U.S. 37, 44 (1971)).  Intervention by the federal court into the discovery process in the Illinois state court action cannot be justified because the proceedings in the Illinois state court action are irrelevant to the federal court action.

       4.    The subpoena was not properly served pursuant to the requirement of Fed. R. Civ. Pr. 45(b)(1) as no fee or mileage was tendered.

       5.    Service of the subpoena on September 17, 2003 requiring the production of a vast number of documents and a deposition on September 24, 2003 is unreasonable as it did not allow a reasonable time for compliance.

       6.    Your failure to take reasonable steps to avoid imposing undue burden and expense is contrary to Fed. R. Civ. Pr. 44(c)(1).

       7.    The accompanying document requests seek a number of documents that are protected by the attorney-client privilege and the work product privilege.  In addition, many requests seek documents and information relating to the confidential mediation that took place between my client and plaintiff in the Illinois State Court Action.  The following general objections are also made:

       (a)    I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands seek to impose an obligation to employ means of discovery which are outside the scope of the Federal Rules of Civil Procedure.

       (b)    I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands seek documents that are not in my possession or control.

       (c)    I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands are

**ORLOFF, LOWENBACH, STIFELMAN & SIEGEL**

A PROFESSIONAL CORPORATION

Lance A. Harke, Esq.                    -4-                    September 19, 2003

vague, overbroad, unduly burdensome, irrelevant to the issues in the above subject lawsuit, and seek disclosure of information which is not reasonably calculated to lead to the production of admissible evidence.

(d)     I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands seek disclosure of proprietary knowledge and/or business information.

(e)     I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands may be construed as seeking to elicit the disclosure of information or a communication which is subject to a claim of privilege, including, without limitation, the attorney-client and attorney work product privileges.

(f)     I object to each and every instruction, definition and document demand to the extent that the instructions, definitions and demands seek documents that are not in my possession or control.

In the event that the court finds that you are entitled to enforce this subpoena, we reserve our right to object to each specific document request.

Be advised that we will seek fees and costs as permitted by Fed. R. Civ. Pr. 11 and 45(c)(1) with respect to any attempt by you to enforce this subpoena. In addition, I am advised that attorney Robert M. Foote will be objecting or moving to quash a similar subpoena that you served on him. To the extent Mr. Foote objects to the production of documents we are compelled to withhold production pending resolution of that motion to quash.

Very truly yours,

JEFFREY M. GARROD

cc:    Harley S. Tropin, Esq.
       Edward Foote, Esq.




# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

SCOTT MARAVILLA,
a Florida Resident, on behalf of himself and

                    CASE NO. 03-22021-CIV-
                    HOEVELER

all others similarly situated,

        Plaintiffs,

                    Magistrate Judge Bandstra

        v.

NESTLÉ WATERS NORTH AMERICA INC.,
a foreign corporation,

        Defendant.

## DEFENDANT'S MOTION FOR A STAY PENDING RULING BY THE MULTIDISTRICT PANEL AND FOR AN EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### Relief Sought

Defendant Nestlé Waters North America, Inc. (at times, "NWNA" or "Defendant") hereby files its motion seeking entry of an order (a) staying this action pending determination by the Judicial Panel on Multidistrict Litigation (at times, the "MDL Panel") for transfer and consolidation of the various federal court actions brought against NWNA, subject to this Court determining any issue relating to subject matter jurisdiction; and (b) directing that, in light of the stay of this action set forth in part (a) above, no response from Defendant on Plaintiff's Motion for Class Certification shall be filed pending further Order of this Court. Alternatively, in the event that the Court denies Defendant's application for a stay pending determination by the MDL Panel of the motion by NWNA to transfer and consolidate, NWNA requests that the Court extend its

time to respond to plaintiff's motion for class certification to thirty (30) days from the date of an Order entered by the Court on this application for entry of a stay.

### Procedural History

On or about July 8, 2003, Plaintiff Scott Maravilla ("Plaintiff" or "Maravilla"), on behalf of himself and all others similarly situated, filed a Class Action Complaint for violations of the Florida Deceptive and Unfair Trade Practices Act and unjust enrichment ("Complaint"). The Complaint is one of three class action complaints that were filed against Defendant in the Florida state courts involving identical or virtually identical allegations. The other two are class actions brought by Ticia Joseph and Monica Bliss-Weick (collectively, the "Florida class actions").

On or about August 14, 2003, Defendant filed its Notice of Pendency of Other Action and Motion to Transfer. By Order of Transfer dated September 2, 2003, the related Florida class actions (brought by Ticia Joseph and Monica Bliss-Weick) were consolidated with this action and transferred to this Court. Monica Bliss-Weick has since moved to voluntarily dismiss her complaint, which motion has been granted by the Court.

On August 15, 2003, in connection with a motion by NWNA for transfer and consolidation of various federal class actions, the Florida class actions and other related cases were assigned a case number before the MDL Panel (MDL Docket No. 1569).

On or about August 15, 2003, Maravilla filed a motion to remand the case to the Florida state court. On or about September 4, 2003, plaintiff filed a Notice that he was voluntarily withdrawing his motion to remand. There is presently pending, however, a motion by Ticia Joseph to remand her action to the Florida state court. Although NWNA is opposing the motion by Ticia Joseph to remand (Defendant's answering papers were filed and served on September 15, 2003, pursuant to extension granted by the Court),

- 2 -

there is no reason to doubt (notwithstanding Maravilla's withdrawal of his motion to remand) that this case would also be remanded to Florida state court in the event that the Court were to grant Ticia Joseph's motion to remand.

On September 3, 2003, less than two months after the Complaint was filed, Plaintiff filed his Motion for Class Certification and Incorporated Memorandum of Law ("Motion for Class Certification"). On September 8, 2003, Defendant filed an Answer (with Affirmative Defenses) to the Complaint.[1]

Due to the complex nature of this case, it is premature for a class to be certified at this time. The Defendant respectfully requests that this Court (a) grant the requested stay (for the reasons set forth in the accompanying Memorandum of Law) and (b) in the event that the requested stay is granted, direct that Defendant shall not file answering papers on Plaintiff's Motion for Class Certification pending further Order of the Court. Alternatively, in the event that the Court were to deny NWNA's motion for a stay, NWNA requests that the Court grant an extension of time in which Defendant has to respond to Plaintiff's Motion for Class Certification until thirty (30) days from the ruling on Defendant's Motion for Stay.

---

[1] Maravilla's counsel filed a motion for default on or about September 3, 2003, without prior warning, because an answer to the complaint had not been filed on or before August 29, 2003, notwithstanding that he knew from other motions filed by defendant and communications with defendant's counsel that these actions would be vigorously defended. When Maravilla's counsel was told that his motion would be opposed and that an answer would be filed immediately (and it was), he declined the request to withdraw his motion. Even after the answer was filed and served on or about September 9, 2003, Maravilla's counsel proceeded two days later to file reply papers on his motion for entry of default.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

## Argument

This consolidated action is comprised of two separate putative class actions, which are the subject of a pending motion before the MDL Panel for transfer and consolidation. Due to the complex nature of these related cases, the costs of duplicative discovery and the risks of inconsistent determinations on pretrial motions, including motions for class certification, Defendant seeks a stay of these proceedings (subject to the Court determining any issues as to subject matter jurisdiction).

It is premature at this time for Defendant to respond to Plaintiff's Motion for Class Certification for several reasons. First, there is a substantial likelihood that the Court will not retain jurisdiction of this case (beyond determining any issues relating to subject matter jurisdiction) given the pending MDL motion to transfer and consolidate, and given that factors favoring transfer to the District of Connecticut are substantial. In any event, even if transfer and consolidation were, by directive of the MDL Panel, to proceed in this Court, a stay is necessary and appropriate in order to avoid duplicative discovery and inconsistent pretrial determinations, including, most notably, determinations on issues of class certification.

Second, there is presently pending in the action by Ticia Joseph consolidated herewith a motion to remand. Presumably, if that motion is granted, this case would also be remanded to Florida state court. The matter of class certification should not be addressed given the existing issues as to subject matter jurisdiction of this Court.

Third, the issues in the Florida class actions and the other class actions, including those related to class certification, are substantial and complex. The Complaint has only recently been filed and the parties are shortly commencing the process of discussing a joint scheduling report for submission to the Court. Clearly Defendant is entitled to take

-4-

discovery on the matter of class certification before filing a response to Plaintiff's Motion for Class Certification will be an undue burden on Defendant.

Fourth, as set forth in Defendant's Notice of Filing dated September 11, 2003, the Settlement Agreement filed in the case styled *Plaintiffs, v. Poland Spring Water Co., and Nestlé Waters North America Inc.,*" Case No. 03-CHK 0817 (Michael J. Colwell), if approved by the court, will resolve the claims asserted in this lawsuit.  If the Settlement Agreement is approved, a response to Plaintiff's Motion for Class Certification will be moot.

### Conclusion

Due to the procedural status of this case and the related class action cases, it is premature for Defendant to respond to Plaintiff's Motion for Class Certification at this time.  Defendant should not be required to file a response unless the Court denies its motion for a stay, and in such event, no response should be required until thirty (30) days after entry of an Order denying the stay.

**WHEREFORE,** Defendant Nestlé Waters North America, Inc. respectfully requests that this Court grant its application for a stay and direct that no response to Plaintiff's Motion for Class Certification should be filed pending further Order of the Court.  For the Court's convenience, Defendant has attached a proposed order granting Defendant's Motion.

- 5 -

## CERTIFICATION

Pursuant to Local Rule 7.1(A)(3)(a), undersigned counsel has made a good faith effort to resolve by agreement the issues raised in this motion but has been unable to do so. Plaintiff has refused to agree to any extension of time whatsoever.

Dated:  September 15, 2003

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for Defendant
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Tel: (305) 372-1800
Fax: (305) 372-2508

By: _____
David P. Milian
Florida Bar No. 844421
Harley S. Tropin
Florida Bar No. 241253
Carmen Contreras-Martinez
Florida Bar No. 0093475

-and-

Jeffery M Garrod, Esq.
Michael S. Haratz, Esq.
ORLOFF, LOWENBACH, STIFELMAN,
  & SIEGEL, P.A.
Counsel for Defendant
Nestlé Waters North America Inc.
101 Eisenhower Parkway
Roseland, New Jersey 07068
Tel: (973) 622-6200/Fax:(973) 622-3073

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

CASE NO. 03-2202   IV-HOEVELER/Bandstra

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was faxed and mailed this _15_ day of September, 2003, to: Lance Harke, Esq., Harke & Clasby, LLP, 155 South Miami Avenue, Suite 600, Miami, FL 33130.

By: _____

David P. Milian
Florida Bar No. 844421

3221/101/229257.1

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

SCOTT MARAVILLA,
a Florida Resident, on behalf of himself and
all others similarly situated,

                Plaintiffs,

        v.

NESTLÉ WATERS NORTH AMERICA INC.,
a foreign corporation,

                Defendant.

Case No. 03-CIV-22021
HOEVELER)

Magistrate Judge Bandstra

## ORDER GRANTING DEFENDANT'S MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATIONAND FOR GRANT OF A STAY PENDING RULING BY THE MULTIDISTRICT PANEL

THIS MATTER having been considered by the Court upon Defendant's

Motion for Extension of Time in Which to Respond to Plaintiff's Motion for Class

Certification and For Grant of a Stay Pending Ruling By The Multidistrict Panel,

and the Court having reviewed the motion and good cause appearing, it is

ORDERED AND ADJUDGED as follows:

1.    Defendant's Motion for a Stay of these proceedings is granted.  This

action is hereby stayed pending entry by an Order by the Judicial Panel on

Multidistrict Litigation with regard to transfer and consolidation, except, however,

that the Court reserves the right to address any issue relating to subject matter

jurisdiction.

2.      Defendant's motion for an extension of time by which to respond to Plaintiff's Motion for Class Certification is **GRANTED**.  In light of the stay of this action set forth in Paragraph 1 above, no response from Defendant on Plaintiff's Motion for Class Certification shall be filed pending further Order of this Court.

**DONE AND ORDERED** in Chambers at Miami-Dade County, Florida this _____ day of September, 2003.

_____
**THE HONORABLE WILLIAM M. HOEVELER**
Senior United States District Court Judge

Copies furnished to:

Counsel of record on the attached Service List
5222/101/729256.1

## SERVICE LIST

Harley S. Tropin, Esq.
David P. Milian, Esq.
Carmen Contreras-Martinez, Esq.
Kozyak Tropin & Throckmorton, P.A.
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2335
Tel: (305) 372-1800
Fax: (305) 372-3508

Jeffrey M. Garrod, Esq.
Michael S. Haratz, Esq.
Orloff Lowenbach Stifelman, et al.
101 Eisenhower Parkway
Roseland, New Jersey 07068
Tel: (973) 622-6200
Fax:(973) 622-3073

Lance A. Harke, Esq.,
Harke & Clasby, LLP
155 South Miami Avenue
Suite 600
Miami, FL 33130.
Tel: (305) 536-8220
Fax: (305) 536-8229





# UNITED STATED DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

**MDL No. 1334,**
Master File No. 00-1334-MD-MORENO

**IN RE: MANAGED CARE LITIGATION**

**THIS DOCUMENT RELATES TO
PROVIDER TRACK CASES**

**COPY**

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

The Provider Plaintiff Class, in order to preserve the ability of this Court to render meaningful relief on the claims before it, respectfully requests this Court to enter an injunction against CIGNA, and all those acting in concert or conjunction with CIGNA, to prevent CIGNA from pursuing settlement of the claims at issue in this action in any other forum without the express approval and involvement of this Court. In particular, Plaintiffs seek to enjoin CIGNA from consummating the Settlement which is the subject of the plaintiffs' Petition to Enforce Settlement Agreement in *Kaiser v. CIGNA*, Civil Action Number: 00-L-480, pending in the Circuit Court of Madison County Illinois. (Exhibit One).[1]    In support of this Motion, Plaintiffs set forth the following:

### MEMORANDUM IN SUPPORT OF MOTION

1.    This Motion presents the ultimate example of when this Court should use the

---

[1]    The Madison County Plaintiffs did not serve the Plaintiffs in this MDL Proceeding with their Petition. The Petition references Exhibits that were filed under seal. Movants do not have all of those Exhibits and have not attached them to this Motion.

1

26.  All Writs Act to protect its jurisdiction.  Apparently, CIGNA has undertaken settlement

negotiations with class counsel in a Madison County, Illinois state court action ("Madison

County Plaintiffs") alleging only state law breach of contract claims relating to one CIGNA

product, and in the context of that limited case, has attempted to settle substantially all of the

claims certified in this case, including even the federal RICO conspiracy claims.[2]  In an attempt

to have the settlement approved in a federal forum of choice, counsel for the Madison County

Plaintiffs filed five separate cases in the same federal district in Illinois.  When counsel for the

Plaintiff Class in this case gave notice to the MDL Panel of these pending related actions,

26  counsel for the Madison County Plaintiffs voluntarily dismissed all five actions.  Now, in another

effort to avoid the Court selected by the MDL Panel to handle this litigation, the Madison County

Plaintiffs have filed a motion to enforce a settlement that would deprive this Court of its

jurisdiction over CIGNA.  CIGNA should not be allowed to cooperate in any such effort to settle

the claims brought in this Court.  This Court should affirmatively stop any such attempt to

deprive it of its jurisdiction.

### BACKGROUND

**Procedural History of the Provider Track of MDL 1334**

2.  In 1999 a number of federal lawsuits were filed throughout the country by physicians

---

[2]  There is no question that the Madison County Plaintiffs are attempting to settle the claims before this Court.  The Petition to Enforce Settlement admits at ¶ 4 that CIGNA's counsel told *Kaiser* counsel that any settlement must constitute a "nationwide, global settlement agreement that would include a release of Provider claims alleged in an MDL proceeding pending before the Honorable Federico A. Moreno...."  And the release in the draft settlement agreement is clearly aimed at claims before this Court which are not before the Madison County Court -- it purports to release claims arising from "any allegation that [CIGNA] ha[s] conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations,.."-- even though the *Kaiser* case alleges only a breach of contract cause of action.

2

against insurers alleging various causes of action and facts about improper reimbursement practices. On December 16, 1999, Humana moved before the Judicial Panel on Multidistrict Litigation for an order consolidating these various actions for pre-trial proceedings. On April 13, 2000, the Judicial Panel ordered the consolidation of these actions and their transfer to this Court as MDL Docket No. 1334: "Centralization under Section 1407 in the Southern District of Florida will serve the convenience of the parties and the witnesses and **promote the just and efficient conduct of this litigation...**" (Emphasis added). As a result of this transfer and this Court's July 27, 2000 Order, Plaintiffs in this action filed an Amended Class Action Complaint on August 14, 2000 against CIGNA, Humana, Aetna, Foundation, PacifiCare, Prudential, United, and WellPoint.

3.     The Amended Complaint alleged, among other thing, causes of action for violations of the federal RICO statute, breach of contract, unjust enrichment, and violations of various state prompt pay statutes. The Defendants filed motions to dismiss. By Order of March 2, 2001, this Court denied most of these motions and granted portions of the motions relating to RICO without prejudice and with leave to file an amended complaint. A Consolidated, Amended, Class Action Complaint was filed on March 26, 2001.

4.     Plaintiffs filed their motion for class certification in this proceeding on October 20, 2000 after the parties had been allowed to conduct limited class discovery. In support of this motion Plaintiffs submitted extensive exhibits including depositions, documents, and the affidavits of a number of experts and other witnesses. On May 7, 2001, this Court held an exhaustive hearing on the issues of class certification. Shortly after this hearing, the Eleventh Circuit stayed proceedings in the Provider Track of this litigation pending resolution of the Defendants' appeal relating to this Court's arbitration order. The Eleventh Circuit affirmed this Court's arbitration order and the stay

3

expired. *In re Managed Care Litigation,* 285 F.3d 971 (11th Cir. 2002).

     5.     After the Eleventh Circuit's stay was lifted, this Court ordered the parties to submit additional materials relating to class certification and the effect of intervening decisions.   On September 26, 2002 the Court entered an Order certifying the following provider classes:

> **The Global Class:** All medical doctors who provided services to any person insured by any Defendant from August 4, 1990 to September 30, 2002.

> **National Subclass:** Medical doctors who provided services to any person insured by a Defendant, when the doctor has a claim against such Defendant and is not bound to arbitrate  the claim.

> **California Subclass:** Medical doctors who provided services to any person insured in California by any Defendant when the doctor was not bound to arbitrate the claim being asserted.

The class and subclasses are not limited by the contractual relationship of a physician with one of the Defendants and is certified as to the Plaintiffs' claims under RICO, claims of breach of contract, quantum meruit, unjust enrichment, state prompt pay claims, and claims under the California Business and Professions Code Section 17200.

**Procedural History of *Kaiser v. Cigna***

     6.     *Kaiser, et al., v. CIGNA, et. al,* Case No: 00-L-480, was filed on May 26, 2000  in the Circuit Court of Madison County, Illinois.   The complaint against CIGNA and CIGNA's affiliated companies alleges breach of contract and purports to be brought on behalf of a class of physicians who provided services to CIGNA insureds pursuant to a Preferred Provider Organization ("PPO") and who were subject to a "Physician Agreement" from May 1, 1990 to the date of certification.   A copy of the *Kaiser* complaint is attached as Exhibit 2.

     7.     On March 29, 2001, *the Circuit Court of Madison County, Illinois conducted a class*

4

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

certification hearing in the *Kaiser* action. On that same day, the court entered an order certifying the following nationwide class:

> A physician or health care provider who, from May 26, 1990 to the present (1) executed a Preferred Provider Organization (PPO) fee-for-service agreement with CIGNA; (2) submitted claims for covered services and/or supplies pursuant to said agreement; and (3) whose claims were audited by CIGNA's ClaimCheck computer software program prior to any payment.

The Order is attached as Exhibit 3. Notice has been given to this class of providers, which is a far narrower class than the settlement class that counsel in the Madison County, Illinois action seeks to enforce.

8.   On July 3, 2001, CIGNA filed suit against some of the named parties in the *Kaiser* action in Federal Court by failing to name the non-diverse plaintiffs from *Kaiser*. In that action CIGNA sought to enforce arbitration provisions contained in a great number of the physician contracts in the *Kaiser* class. The District Court for the Northern District of Illinois dismissed the action based upon the *Colorado River* abstention doctrine. CIGNA appealed that order to the Seventh Circuit. The Seventh Circuit held that under the circumstances the District Court was correct in abstaining to hear the case at that time, but that the District Court should have stayed the action rather than dismissing it. *CIGNA Healthcare of St Louis, Inc. v. Kaiser*, 294 F.3d 849 (7th Cir. 2002). The Seventh Circuit stated that this would allow the District Court to re-visit the issue if the Illinois State Court failed to consider CIGNA's motion to compel arbitration: "This is all speculation; it is enough that we emphasize–and we do emphasize– that if down the road the state court judge proves unwilling or unable to enforce CIGNA's valid rights if any to arbitration and CIGNA cannot get prompt relief from the state appellate courts, it can ask the district judge to lift the stay; and under the posited conditions, which were not the conditions when he ruled, CIGNA

5

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

would receive a sympathetic hearing." *CIGNA Healthcare*, 294 F. 3d at 855.

9.      On March 14, 2002, the United States Court of Appeals for the Eleventh Circuit affirmed this Court's ruling on arbitration, *In re Managed Care Litigation*, 285 F.3d 971 (11th Cir. 2002), clearing the way for this Court to proceed with this multi-district litigation.  As explained in the petition by Illinois counsel, shortly thereafter, "in-house counsel for CIGNA HealthCare and Defendants' counsel of record [in the *Kaiser* action (Brian Boyle)], approached *Kaiser* class counsel to resume settlement negotiations. . . ." Petition to Enforce Settlement ¶ 1 (Exhibit One).[3]

**CIGNA Has Attempted to Subvert the MDL Mandate and the Jurisdiction of This Court**

10.      The document the Madison County Plaintiffs seek to enforce is an unexecuted draft settlement agreement which, pursuant to its terms, was to have no effect if final approval was not granted in federal court and was never to be entered in Illinois state court.  In order to effectuate the settlement, the Madison County Plaintiffs filed *Childers v. Healthsource, et al.*, Civil Action Number: 02-CV-513 and four other actions against CIGNA (including one in which Kaiser was once again the named plaintiff) in the United States District Court for the Southern District of Illinois. However, counsel for the Madison County Plaintiffs voluntarily dismissed all of these actions after the actions were identified in a Notification of Potential "Tag-Along Actions" filed with the MDL

---

[3]      This action on the part of Mr. Boyle is particularly noteworthy given his partner's statements on the administration of justice in Madison County: "'There is mounting evidence that what happens in these cases is that the class does not get anything,' said John H. Beisner, a lawyer at O'Melveny & Myers...'It's a capital transfer from defendants to plaintiffs' lawyers.'" *Court Has Dubious Record As a Class-Action Leader*, New York Times, August 15, 2002. (Exhibit 4) (O'Melveny & Myers, counsel to Humana and WellPoint in this case, is CIGNA's counsel in the Madison County case.) In fact, in a hearing before this Court, counsel for CIGNA made the following statement about the Madison County Court: "That Judge handles issues in the manner in which the plaintiff wants the Judge to handle them, I am told." (Transcript of June 4, 2001 Hearing, p. 64).

6

Panel. (Exhibit 5).[4] Accordingly, the draft settlement agreement was neither consummated nor filed with the federal court. The draft document purported to release claims on a nationwide basis including the conspiracy and aiding and abetting claims pending before this Court against CIGNA. According to comments appearing in the Wall Street Journal on October 28, 2002, CIGNA continues to negotiate with Cates. (Exhibit 7). Despite the fact that the settlement agreement by its own terms was to have no effect absent federal court approval, plaintiffs in the *Kaiser* action have now filed a motion seeking to enforce the terms of the unexecuted settlement agreement in state court in Madison County, Illinois.

11.     Class counsel for Plaintiffs in this action have been negotiating with CIGNA in an attempt to reach a satisfactory settlement agreement. While it would not be appropriate to divulge the content of those negotiations, the purported Madison County settlement agreement is deficient in a number of respects. Class Counsel are discussing these deficiencies with CIGNA.[5]    The physicians representing the Class in this case, and the plaintiff medical associations, are not willing to settle without significant improvement in the terms of the settlement proposed in the Madison County Court.

---

[4]     The letter of Kaiser counsel to Class Counsel in this case informing them of these dismissals, and the dismissals, are attached as Exhibit 6.

[5]     Counsel for the Provider Class in this MDL Proceeding disagree with a number of statements made in the Petition, but since those disagreements are not material to the Movants' entitlement to relief, they will not be aired here. Nevertheless, to the extent that the Madison County Plaintiffs seek to leave the impression that the Plaintiffs or counsel for the Provider Class in this MDL Proceeding have ever sought or agreed to settle claims of doctors without any compensation (see ¶ 12 of the Petition), the Madison County Plaintiffs are wrong. The "concept piece" referenced in ¶ 12 of the Petition was prepared by attorneys for Cigna, not counsel for the Provide Class, who responded by insisting that there be meaningful compensation.

7

## ARGUMENT

12.     This Court has the power to enjoin any party over which it has personal jurisdiction

from pursing or settling the claims which are at issue in this action in any other forum[6]. *See, e.g.,*

*In re Lease Oil Antitrust Litigation,* 48 F.Supp. 2d 699 (S.D. Tex. 1998), affirmed 200 F.3d 317 (5th

Cir. 2000); *Newby v. Enron,* 302 F.3d 295, 300-301 (5th Cir. 2002)("It is a given that the district

court, with jurisdiction over *Newby,* had subject matter jurisdiction to preserve and protect its

jurisdiction"); *In re Baldwin-United Corporation;* 770 F.2d 328, 335 (2nd Cir. 1985)(The All Writs

Act empowers a federal court to issue an injunction against actions in state court "even before a

federal judgment is reached..."); *Hillman v. Webley,* 115 F.3d 1461, 1469 (10th Cir. 1997); see also,

*U.S. v. New York Tel. Co.,* 434 U.S. 159, 172, 985 S.Ct. 364, 372, 54 L.Ed.2d 376 (1877).[7] While

the general rule is that *in personam* actions should be allowed to concurrently proceed in federal and

state court without interference from either, an injunction is proper "where 'the state court action

threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation.' *Winkler*

*v. Eli Lilly & Co.,* 101 F.3d 1196, 1202 (7th Cir. 1996). In other words, the state action must not

simply threaten to reach judgment first, it must interfere with the federal court's own path to

judgment." *In re Diet Drugs,* 282 F.3d 220, 234 (3rd Cir. 2002). The obvious intent of enforcing

the unconsummated settlement in Madison County, Illinois is to interfere with this Court's

---

[6]     The All Writs Act provides that "[t]he Supreme Court and ll courts established by Acts
of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions." 28
U.S.C. §1651(a).

[7]     Movants do not request that this Court enjoin the Kaiser state court litigation, and do not
request that this Court prevent CIGNA from defending or litigating any action currently pending in any
court; rather, the focus of this Motion is to prevent CIGNA from settling the claims at issue in this MDL
proceeding without the approval of this Court.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

jurisdiction and to impede resolution of the claims in this Court.

13.    CIGNA's settlement of the claims pending before this Court in the *Kaiser* action has the potential of not only disrupting, but destroying the jurisdiction of this Court over CIGNA. The CIGNA settlement sought to be enforced in the Illinois state court purportedly disposes of all claims related to CIGNA's course of conduct regarding physician reimbursement and contracting and would severely undermine or extinguish the jurisdiction of this Court over CIGNA for the claims now pending.[8] This purported settlement ignores the fact that the federal class certified before this Court seeks much broader relief and is a much more encompassing class, and is an effort to thwart the MDL Panel which asked this Court to consider and manage these cases.

14.    At least one other district court in multidistrict litigation faced with facts similar to these has enjoined defendants from pursing settlement in other courts and has been affirmed by the Fifth Circuit. *See, In re Lease Oil Antitrust Litigation,* 48 F.Supp.2d 699 (S.D. Tex. 1998), affirmed 200 F.3d 317 (5th Cir. 2000). The court in the *Lease Oil* action gained jurisdiction over the consolidated cases pursuant to a transfer order of the Judicial Panel on Multidistrict litigation in January of 1998. Those cases were the continuation of an action originally filed in April of 1996 against 39 oil companies alleging violations of federal antitrust laws.

15.    In September of 1996 a similar action alleging violations of state antitrust laws was filed in an Alabama state court. In May of 1997, prior to the MDL consolidation, Mobil and counsel in the Alabama action announced the terms of a nationwide settlement of all federal and state claims for $15 million (with more than 40% of that amount guaranteed as attorney fees). *Lease Oil* at 701-

---

[8]    This is precisely the kind of situation that the All Writs Act gives the Court the power to correct.

9

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

702. The Texas district court noted that this sum paled in comparison to the settlement of claims against Texaco in the State of Louisiana alone for $400 million. *Id.*   The Texas district court was asked to enter an injunction to prevent all parties before it from entering any settlement agreement which would release or purport to release any claims pending before it without its approval.

16.   The first factor the court considered in *Lease Oil* was the strength of the respective claims at issue. The court found that even at that preliminary stage the federal claims were stronger than the pending state claims based upon differences between state and federal antitrust laws. *Lease Oil* at 702.   As the *Lease Oil* court recognized, when this occurs, it creates a situation prone to abuse:

> The very fact that the claims are quite possibly weaker in *Lovelace* renders the state court case prone to an inadequate, or possibly even collusive, settlement: since the plaintiffs in Alabama state court are in a relatively weak bargaining position, those plaintiffs might be motivated to accept a settlement which reflects only the value of their lesser claims, rather than the value of the exclusive federal claims.   Moreover, the state court litigants might be motivated to settle the exclusive federal claims at the same time and possibly for a bargain price since the exclusive federal claims are worthless to the state court plaintiffs, except for purposes of settlement.   In these circumstances, the self-interest of the state court litigants themselves might drive the case towards an inadequate settlement which even the most fastidious court might feel itself bound to approve when both parties are insisting that it is a fair resolution.   For this simple reason, it has been recognized that, when there are parallel federal and state cases, "[i]f the federal claims are stronger than the state claims, a global settlement in state court is not proper.   The dangers of a 'hijacking' of the federal claims are too high, and the state's interest is too low, to justify state court approval of a global settlement that is opposed by the federal plaintiff."   Marcel Kahan and Linda Silberman, *Matsushita and Beyond:   The Role of State Courts in Class Actions Involving Exclusive Federal Claims*, 1996 Supreme Court Rev. 219, 260-61 (1996).

*Id.* 702-703.

17.   Likewise, the claims at issue in this litigation are far broader and the relief more encompassing than the breach of contract claims currently pending in the *Kaiser* action. Furthermore, the class certified in the *Kaiser* action is a mere subset of the class certified before this

10

Court. Hence, the situation at hand mirrors exactly what the state court lawyers in the *Lease Oil*

action attempted to do -- seek enforcement of an inadequate settlement in a later filed, weaker, state

court action.

18.     Federal courts have been conferred with extraordinary powers pursuant to the All

Writs Act. 28 U.S.C. §1651(a). This section provides: "The Supreme Court and all courts

established by this Act of Congress may issue all writs necessary or appropriate in aid of their

respective jurisdictions and agreeable to the usages and principles of law." While these powers have

been limited both by statute and caselaw, the Act is a very powerful tool when used to retain

jurisdiction and administer justice:

> For example, the Supreme Court has recognized that, even when jurisdiction only potentially
> exists, the Act grants courts the power to "issue status quo [injunctive] orders to ensure that
> once its jurisdiction is shown to exist, the court will be in a position to exercise it." *ITT*
> *Community*, 569 F.2d at 1359, n. 19 (citing *FTC v. Dean Foods Co.,* 384 U.S. 597, 86 S.Ct.
> 1738, 1742-43, 16 L.Ed.2d 802 (1966)). Similarly, when the Act authorizes protective action,
> a court may enjoin not only parties to the action, but non- parties as well. In those
> circumstances, the Supreme Court has stated that "[t]he power conferred by the Act extends,
> under appropriate circumstances, to persons who, though not parties to the original action
> or engaged in wrongdoing, are in a position to frustrate the implementation of a court order
> or the proper administration of justice, and encompasses even those who have not taken any
> affirmative action to hinder justice". *New York Telephone,* 98 S.Ct. at 373.

48 F.Supp.2d at 704. *See also, ITT Community Development Corp. v. Barton,* 569 F.2d 1351, 1359

(5th Cir. 1978)("The All Writs Act also empowers a federal court to employ procedures necessary

to promote the resolution of issues in a case properly before it. This power is limited, however, to

the facilitation of the court's effort to manage the case to judgment.")

19.     The power of this Court to enjoin entire actions in state courts even before there is

a federal judgment has been recognized: "Even before a federal judgment is reached, however, the

preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131  •  TEL. (305) 372-1800

injunction against actions in state court. Such 'federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.' *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970)(dicta)" *In re Baldwin-United Corp.* at 335. This power is even broader than the relief currently sought by the Plaintiffs in this action.

20.     The breadth of this power is unmistakable and requires the Court to enjoin CIGNA, and all those acting in concert with CIGNA, from undercutting the jurisdiction of this Court and the mandates of the MDL Panel. The purpose of entering the requested injunction is clear. The action before this Court encompasses Federal RICO claims. Unlike federal antitrust claims, RICO has concurrent jurisdiction in federal and state courts. *Tafflin v. Levitt*, 110 S.Ct. 792 (1990). However, the analysis conducted by the *Lease Oil* case is the same:

> Here, the Court clearly exercises jurisdiction over the claims and the parties, and simply must take preliminary action to protect its jurisdiction over the exclusively federal antitrust claims: **the Court needs to act in order to prevent the parties before it from possibly pursuing an inadequate or collusive settlement in state courts which would release the apparently stronger claims in the instant case.** In sum, both the "nature of the case" and the "legitimacy of the ends" warrant action by this Court under the Act. *ITT Community* 569 F.2d at 1358-59. The MDL case features exclusive federal claims which entitle a prevailing plaintiff to treble damages. 15 U.S.C. §§ 15(a). The antitrust allegations raise complex legal issues and will entail extensive discovery, and the resolution of the case will impact the rights of thousands of royalty owners across the nation and could have a significant financial impact on the entire oil industry. If an effort by the defendants to reach an inadequate or collusive settlement in state courts is "left unchecked," then this court will be absolutely prevented from "bring[ing] the litigation to its natural conclusion." *ITT Community*, 569 F.2d at 1359. For these reasons, the All Writs Act authorizes this Court to enter an injunctive order against the parties in order to preserve its jurisdiction over this MDL litigation.

48 F.Supp.2d at 704.   Here, as in *Lease Oil*, the federal claims are stronger, broader, and provide for the recovery of treble damages.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

## CONCLUSION

21.     Plaintiffs respectfully request this Court to enter a preliminary injunction against CIGNA, and all those acting in concert or conjunction with CIGNA, enjoining them from entering, negotiating, executing, or enforcing any settlement of any claims presented in this action without the express approval of this Court.

Respectfully submitted this 5-th day of November, 2002.

Archie C. Lamb, Jr.
LAW OFFICES OF ARCHIE LAMB
2017 Second Avenue North, 2nd Floor
Birmingham, Alabama 35203
Tel: 205-324-4644
Co-Lead Counsel for Provider Plaintiffs

Aaron Podhurst
PODHURST ORSECK JOSEFSBERG,
EATON MEADOW OLIN & PERWIN
25 West Flagler Street, Suite 800
Miami, Florida 33130
Tel: 305-358-2800
Liaison Counsel for Plaintiffs

Nicholas B. Roth
EYSTER KEY TUBB WEAVER & ROTH
402 E. Moulton Street
Decatur, Alabama 35601
Tel: 256-353-6761

Jeffery A. Mobley
LOWE MOBLEY & LOWE
1210 - 21st Street
Haleyville, Alabama 35565
Tel: 205-486-5296

Mark Gray
GRAY & WEISS
1200 PNC Plaza
Louisville, Kentucky 40202

KOZYAK TROPIN & THROCKMORTON
200 S. Biscayne Boulevard, Suite 2800
Miami, Florida 33131
Tel: 305-372-1800 / Fax: 305-372-3508
Co-Lead Counsel for the Provider Plaintiffs

Harley S. Tropin  (Fla. Bar No. 241253)
Janet L. Humphreys  (Fla. Bar No. 607258)
Adam M. Moskowitz  (Fla. Bar No. 984289)

Dennis G. Pantazis
GORDON SILBERMAN WIGGINS & CHILDS
1400 SouthTrust Tower, 420 20th Street North
Birmingham, Alabama 35203
Tel: 205-328-0640

Joe Whatley, Jr.
WHATLEY DRAKE
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel: 205-328-9576

J. Mark White
WHITE DUNN & BOOKER
2025 3rd Avenue North, Suite 600
Birmingham, Alabama 35203
Tel: 205-323-1888

13

Robert Foote
FOOTE & MEYERS
13 South 7th Street
Geneva, Illinois 60134

Guido Saveri and R. Alexander Saveri
CADIO ZIRPOLI
One Embarcadero Center, Suite 1020
San Francisco, California 94111-3600

Jay Waller, Esq.
CAMPBELL WALLER & McCALLUM
2100-A Southbridge Parkway, Suite 450
Birmingham, Alabama 35209

Kenneth S. Canfield, Esq.
DOFFERMYRE SHIELDS CANFIELD
   KNOWLES & DEVINE
1355 Peachtree Street, Suite 1600
Atlanta, Georgia 30309

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail on this 5th day of November, 2002, to all parties of record listed on the Court's Service List dated September 27, 2002.

2957/101/214529.1

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE: MANAGED CARE LITIGATION

MDL NO. 1334

MASTER FILE NO.
00-1334-MD-MORENO

THIS DOCUMENT RELATES ONLY TO
PROVIDER TRACK CASES

## PROVIDER PLAINTIFFS' REPLY
## AND SUPPLEMENTAL AUTHORITY IN SUPPORT
## OF AMENDED MOTION FOR PRELIMINARY INJUNCTION

Provider Plaintiffs submit this memorandum in reply to CIGNA's opposition to Provider

Plaintiffs' amended motion for preliminary injunction.[1] An injunction prohibiting CIGNA and those

acting in concert with it from proceeding with settlement in the Southern District of Illinois is both

merited and well within the legal authority of this Court.

Despite CIGNA's protestations, CIGNA's current dilemma is of its own making.   The

conflicting class certification orders from which CIGNA seeks relief are the direct result of CIGNA's

forum shopping and its efforts to avoid the jurisdiction of this Court and the orders of the Judicial Panel

on Multidistrict Litigation ("MDL Panel"). Without apology, CIGNA demands that it be allowed "to

have its cake and eat it too." As CIGNA admits, it contemplated settlement of this action in federal

court as opposed to state court in Illinois.  The benefit to CIGNA of settlement in federal court is the

ability of the federal court to enjoin absent class members pursuant to its authority under the All Writs

---

[1]  Plaintiffs do not address CIGNA's limited comments on sanctions but will, as this Court suggested,
file a separate sanctions motion.

1

Act.[2] Yet while CIGNA depends on this injunctive power of the Illinois federal district court, it denies that this Court has power to enjoin it in other federal proceedings it colluded to create.

In arguing against this Court's injunctive power, CIGNA suggests that this Court's ability to act is proscribed by the procedural mechanisms of the MDL process -- a process CIGNA has steadfastly disregarded and flagrantly abused. CIGNA's argument, however, deliberately misses the point. Plaintiffs do not ask this Court to transfer the *Kaiser* action. Plaintiffs ask this Court to enjoin the parties to *Kaiser v. CIGNA* over which this Court has jurisdiction. This Court's power to enjoin the parties to that action pursuant to the All Writs Act is beyond question.

The MDL Panel consolidated this complex, multi-defendant litigation in this Court. During the pendency of this action, this Court has developed expertise and has expended considerable time and resources on the progression of this case. The Court has ruled on numerous complex motions including motions to dismiss, motions to compel arbitration and motions for class certification. The Court has entered an order certifying a nationwide class against defendants including CIGNA. Only after this Court certified the class did CIGNA collude with the Madison County Plaintiffs to create jurisdiction in another federal forum and attempt to settle the claims pending in this action.

**CIGNA's Responses to Plaintiffs' Factual Presentation are Specious**

The timeline presented and filed by Plaintiffs at the injunction hearing, and particularly the transcript of the investor relations call which is Exhibit I to that timeline, demonstrate that CIGNA has left no stone unturned in its efforts to ensure that this Court would be deprived of the opportunity to review CIGNA's proposed settlement with the *Kaiser* plaintiffs. Indeed, after reviewing CIGNA's extraordinary procedural maneuvers, this Court reached the obvious conclusion – that "everything was

---

[2]  *See* Settlement Agreement, ¶ 15.10 and Exhibit 6 to Settlement Agreement -proposed Order Granting Final Approval, ¶¶ 10, 18.

2

done rapidly before the Southern District of Illinois in order to avoid whatever I would do here?"..."It is to avoid me, to avoid me." (12/3/2002 Hearing Transcript, pp.68-70)

CIGNA denied this, but had no good answer to the Court's questions about deliberately avoiding the scrutiny of this Court, or why it did not notify Provider Plaintiffs' counsel or this Court of its plan to attempt precipitous approval of the *Kaiser* settlement. Repeatedly CIGNA excused its conduct by saying that notification of the impending settlement hearing to this Court or Provider Plaintiffs' counsel would have violated SEC regulations: "...until there is a proper release by CIGNA, which is a public company, you cannot have information leaking out to the public if it is a material nature or you have violated the Securities & Exchange Commission rules and regulations and the securities laws... Your Honor, I didn't give you any more confidential inside information than I gave anybody else." (12/3/2002 Hearing Transcript, pp.63-64, 90-91) This argument defies common sense, and CIGNA's Notice of Filing Papers Filed With the United States District Court for the Southern District of Illinois on 12/02/02 establishes it as a farce.

The Notice of Filing contains the following documents which discuss the proposed settlement: a declaration of the Washington State Medical Association dated August 20, 2002, a statement of the Missouri State Medical Association posted on its web site as of August 21, 2002, a message from the Illinois State Medical Society to its members dated August 21, 2001, and a letter from the Montana Medical Association dated November 7, 2002. Each of these documents demonstrates that these medical societies had been fully briefed on the details of the proposed settlement, and at least two show that the information had been sent to the society's members or posted on its website. As such, CIGNA's protestation that notifying this Court, the MDL, or Provider Plaintiffs about the immediate settlement hearing in *Kaiser* would violate SEC regulations is absurd. As of November, 2002, the only thing not revealed publicly about the proposed settlement was that CIGNA had a plot to circumvent

3

MDL transfer and avoid the scrutiny of this Court by achieving amendment, removal, and preliminary settlement approval in a three day period, without notice to this Court, the MDL Panel, or the Provider Plaintiffs. Conspicuously missing from CIGNA's voluminous papers is the citation to any SEC regulation providing that giving notice of a preliminary settlement hearing for a settlement whose terms have long been publicly disclosed would violate any duty of confidentiality.[3]    CIGNA similarly had no answer for its violation of the MDL transfer orders in this case by its failure to notify the MDL Panel of a potential tag-along action immediately upon removal of the *Kaiser* case. The reason for this failure – that CIGNA wanted to delay notification until after preliminary settlement approval -- was intuited by this Court at the December 3 hearing: "You are going to say you can't do anything. You are going to tell the Multi-District Panel this is a settled case." (12/3/2002 Hearing Transcript, p. 70). This conclusion has now been confirmed by CIGNA's belated notification to the MDL Panel. On December 6, 2002, 11 days after CIGNA collusively created federal jurisdiction and removed the *Kaiser* case, CIGNA notified the MDL Panel of the potential tag-along action, in the form of a letter brief arguing that the Panel could not transfer a case in which a settlement had been reached. (Exhibit A)

　　　　CIGNA did have an answer, albeit equivocal, to one of the Court's questions. With respect to the settlement open house planned by *Kaiser* plaintiffs' counsel at the upcoming American Medical

---

[3]　　　CIGNA argues that Provider Plaintiffs cannot be surprised by the precipitous approval of the *Kaiser* settlement in Illinois federal district court, because Provider Plaintiffs have known since August of CIGNA's position that any settlement must be approved in federal district court. (CIGNA's Memorandum Opposing Plaintiffs' Amended Motion for Preliminary Injunction, n.4) Provider Plaintiffs were indeed aware of CIGNA's position that any settlement must be approved in federal court and must include a release of all claims pending before this Court against CIGNA. Provider Plaintiffs therefore took the position that the federal district court to approve any settlement, if an acceptable settlement could be negotiated, was this Court. The surprise occurred after we attempted to negotiate additional relief, rather than accepting the sweetheart deal CIGNA presented us. CIGNA then circumvented us and this Court by a) amending the *Kaiser* complaint to include the federal RICO claims made in this case, b) removing the amended *Kaiser* case, and c) achieving preliminary approval of the settlement, all within three business days without notice to the Provider Plaintiffs, this Court, or the MDL Panel.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

Association meeting, this Court asked: "You are saying you could speak with Judy Cates and say 'You know what? This Judge can't decide this issue by Saturday, December 7th. Can you hold off on that and not do anything?'" CIGNA's counsel answered: "Your Honor, I will certainly pass that along." He then qualified: "I don't know whether they will agree or not." (12/3/2001 Hearing Transcript, p. 109) As the attached statement of the general counsel of the Texas Medical Association establishes, this Court's request was ignored. (Wilcox Statement, Exhibit B) At the AMA meeting, the *Kaiser* settlement "open house" went forward, and the *Kaiser* settlement is being advocated to attendees in several forums, without regard to the issues before this Court. Indeed, *Kaiser* plaintiffs' counsel have given interviews touting their "hospitality suite" at the AMA meeting, in which they hope to "persuade[] [doctors] to accept the agreement," and have commented to the press that this Court "gave no indication he was upset that the unexpected Illinois actions would supercede the Cigna cases in Miami." (Exhibit C) The *Kaiser* plaintiffs' disregard of this Court's request is of a piece with CIGNA's unseemly haste to push through its sweetheart settlement without the scrutiny of this Court.

   The unrefuted facts surrounding approval of the *Kaiser* settlement, CIGNA's comments in the investor relations phone call, CIGNA's belated notification to the MDL Panel of the newly created tag-along action, and the disregard given this Court's request that the settlement "open house" not proceed send a strong, arrogant message to this Court and the MDL Panel: "We colluded and conspired to settle claims pending only in MDL 1334 without Judge Moreno ever having a chance to review the settlement, and we did it so quickly that the MDL Panel did not have time to transfer the case and this Court did not have time to rule on the injunction request pending before it. We snookered you, and there's nothing you can do about it." As the following legal analysis demonstrates, CIGNA is wrong.

## MEMORANDUM OF LAW

   In addition to contesting the incontestible principle that a federal district court has the authority

5

to enjoin parties from proceeding with parallel litigation in another federal district court, CIGNA raises two new arguments. First, CIGNA raises the Menendez defense[4]–it says that it should not be enjoined because it will then be subject to competing federal district court orders. The law unequivocally holds, however, that CIGNA, having gone behind the back of this Court on the eve of the preliminary injunction hearing to obtain an order in the *Kaiser* case that directly conflicts with the relief this Court was being asked to grant in the December 3 hearing, cannot complain about being subject to conflicting orders. Second, CIGNA argues for the first time that Plaintiffs must meet the test for preliminary injunction established under Rule 65 of the Federal Rules of Civil Procedure. CIGNA is wrong, and its failure to raise this issue in its initial response to the Injunction Motion, or in oral argument, demonstrates its knowledge that these requirements do not apply to the injunction at issue here.

**This Court Unquestionably Has the Power to Issue the Requested Injunction**

Without question, a federal district court has the authority to enjoin parties from proceeding with parallel litigation in another federal district court.   *Kerotest Mfg. Co. v. C-O-Two File Equipment Co.*, 342 U.S. 180, 72 S.Ct. 219 (1952)("He is given an equal start in the race to the courthouse, not a headstart. If he is forehanded, subsequent suits against him by the patentee can within the trial court's discretion be enjoined pending determination of the declaratory judgment suit, and a judgment in his favor bars suits against his customers.") *See also American Horse Protection Assoc. v. Lyng*, 690 F. Supp. 40, 42 (D.D.C. 1988), citing *Kerotest*.[5] A federal court's power to enjoin parties derives from

---

[4]  The reference to the Menendez defense relates to children who have murdered their parents throwing themselves on the mercy of the court because they are orphans.

[5]  In *American Horse Protection Assoc. v. Lyng*, 690 F. Supp. 40 (D.D.C. 1988), the District Court exercised the authority to enjoin other federal litigation in nonpatent related litigation. After the D.C. Court had developed expertise in the area, parties attempted to bring parallel litigation in the federal court in Tennessee. The D.C. Court exercised its discretion to issue a preliminary injunction against the parties engaging in the parallel litigation. Here, this Court has not only developed similar expertise but has also been selected by the MDL Panel to handle this litigation.

6

the All Writs Act which provides that "[t]he Supreme Court and all courts established by Acts of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. §1651(a). The Act "empowers federal courts to fashion extraordinary remedies when the need arises...." *Pennsylvania Bureau of Correction v. United States Marshals Service*, 474 U.S. 34, 43, 106 S.Ct. 355, 361 (1985). "Uninterruptedly from the first Judiciary Act...to the present day...the courts of the United States have had powers of an auxiliary nature 'to issue all writs not specifically provided by statute, which may be necessary for the exercise of their respective jurisdictions. Federal courts are authorized to " issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone Co.*, 434 U.S. 159, 172-73, 98 S.Ct. 364, 372 (1977). "The Court has consistently applied the Act flexibly in conformity with these principles. Although § 262 of the Judicial Code, the predecessor to § 1651, did not expressly authorize courts, as does § 1651, to issue writs 'appropriate' to the proper exercise of their jurisdiction but only 'necessary' writs, *Adams* held that these supplemental powers are not limited to those situations where it is 'necessary' to issue the writ or order 'in the sense that the court could not otherwise physically discharge its appellate duties.'" *United States v. New York Telephone Co.*, 434 U.S. 159, 173, 98 S.Ct. 364, 372-73 (1977). "Unless appropriately confined by Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States ex rel McCann*, 317 U.S. 269, 273, 63 S.Ct. 236, 238, 87 L.Ed. 268 (1942).

A federal court's ability to enjoin parties is much more constrained if the second filed action is pending before a state court, due to the applicability of the Anti-Injunction Act. The Anti-Injunction Act, which reflects federalism concerns, states: "A court of the United States may not grant an

7

injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or

where necessary in aid of its jurisdiction or to protect or effectuate its judgments." 28 U.S.C. § 2283.

Because CIGNA and those acting in concert with CIGNA are currently before a federal court rather than

a state court, this Court's authority is not limited by the provisions of the Anti-Injunction Act. "The

Anti-Injunction Act embodies limitations on the broad equitable powers of federal courts to issue writs,

as authorized in the All Writs Statute. ...The Anti-Injunction Act simply imposes additional limitations

on federal court power to enjoin state court proceedings." 17A *Moore's Federal Practice* § 121.31

(Matthew Bender 3d ed.).  Throughout its argument, CIGNA ignores the effect of these additional

limitations.

Issues relating to parallel litigation routinely arise in the context of competing federal and state

actions.  For a variety of reasons, such issues are much less common within the federal court system.

Although the cases are less prevalent, there is substantial precedent for resolving the issues created by

the filing of parallel cases in more than one federal court.

The Sixth Circuit recently addressed the principles which guide federal courts presented with

parallel cases which are pending concurrently in different federal courts:

> When a federal court is presented with...a duplicative suit, it may exercise its discretion
> to stay the suit before it, to allow both suits to proceed, or, **in some circumstances, to
> enjoin the parties from proceeding in the other suit.** *See Kerotest Mfg. Co. v. C-O-
> Two Fire Equip. Co.*, 342 U.S. 180, 183-84, 72 S.Ct. 219, 221-22, 96 L.Ed. 200
> (1952)....**In weighing these options, courts often proceed...under the rule of thumb
> that the entire action should be decided by the court in which an action was first
> filed.** *See, e.g., West Gulf Maritime Ass'n v. ILA Deep Sea Local* 24, 751 F.2d 721, 729
> (5th Cir. 1985). However, a court abuses its discretion when it enjoins a party from
> proceeding in another suit that is not truly duplicative of the suit before it...."[T]he
> issues 'must have such an identity that a determination in one action leaves little or
> nothing to determine in the other.'" *Congress Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d
> 686, 689 (1st Cir. 1994.)

*Smith v. Securities Exchange Commission*, 129 F.3d 356, 361 (6th Cir. 1996)(emphasis supplied).  The

8

former Fifth Circuit has long adhered to the first filed rule:

> Rarely has a conflict arisen between two federal courts in a civil case. With regard to conflicts between state and federal courts, which occur frequently, the rule is so well settled as to be considered elementary. There is no logical reason why it should differ as to Federal Courts....When a state court and a court of the United States may each take jurisdiction of a matter, the tribunal where jurisdiction first attaches holds it, to the exclusion of the other, until its duty is fully performed and the jurisdiction involved is exhausted; and this rule applies alike in both civil and criminal cases.'

> We consider the just stated rule applies with equal force in conflicts between federal courts in civil cases where the jurisdiction is concurrent. While the federal courts in Georgia and Tennessee had concurrent jurisdiction over the parties and the subject matter of the suit, it is beyond dispute that the jurisdiction of federal court in Georgia first attached. We find no abuse of discretion in the refusal of that court to permit plaintiff to dismiss the suit. **It necessarily follows that that court, having prior jurisdiction of the cause, as between plaintiff and defendant, was authorized to issue an interlocutory injunction to preserve its jurisdiction.**

*In re Georgia Power Co.*, 89 F.2d 218, 221 (5th Cir. 1937)(emphasis supplied).[6]

As the defendants, including CIGNA have previously argued to this Court, the Eleventh Circuit continues to adhere to the "first filed" rule. **"In absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case.... It should make no difference whether the competing courts are both federal courts or a state and federal court with undisputed concurrent jurisdiction."** *Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982), citing *Mann Mfg. Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971)(emphasis supplied).[7]

The Fifth Circuit Court of Appeals also still adheres to the "general rule that the court in

---

[6]   This case is binding authority in the Eleventh Circuit. The Eleventh Circuit has adopted all decisions of the former Fifth Circuit handed down prior to October 1, 1981, as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc).

[7]   While the considerations regarding priority of actions is the same whether the parallel actions involve a state court action and a federal action or concurrent federal actions, as set forth above, the federal district court's ability to enjoin the parties is much more constrained if the second filed action is pending before a state court due to the applicability of the Anti-Injunction Act.

9

which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Limited v. Syntek Finance Corp.*, 121 F.3d 947, 950 (5th Cir. 1997), citing *West Gulf Maritime Ass'n v. ILA Deep Sea Local* 24, 751 F.2d 721, 728 (5th Cir. 1985) and *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971)(emphasis supplied). "**The discretionary power of the federal court in which the first-filed action is pending to enjoin the parties from proceeding with a later-filed action in another federal court is firmly established.**" *Northwest Airlines v. American Airlines*, 989 F.2d 1002, 1004 (8th Cir. 1993). *See also National Equipment Rental, Ltd. v. A. L. Fowler, D.O.*, 287 F.2d 43, 45 (2nd Cir. 1961)("The bulk of authority supports the position that **when a case is brought in one federal district court, and the case so embraces essentially the same transactions as those in a case pending in another federal district court, the latter court may enjoin the suitor in the more recently commenced case from taking any further action in the prosecution of that case**")(emphasis supplied); *Equal Employment Opportunity Commission v. University of Pennsylvania*, 850 F.2d 969, 971, 979 (3rd Cir. 1988)("**The first-filed rule...gives a court the power' to enjoin the subsequent prosecution involving the same parties and the same issues already before another district court....[I]nvocation of the rule will usually be the norm, not the exception**")(emphasis supplied); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)("**When a district court has jurisdiction over all parties involved, it may enjoin later filed actions**")(emphasis supplied); *Speed Products Co. v. Tinnerman Products*, 171 F.2d 727, 729 (D.C. Cir. 1948)("Where two cases between the same parties on the same causes of action are commenced in two different Federal courts, **the one which is commenced first is to be allowed to proceed to its conclusion first, and an**

10

injunction to accomplish this is proper")(emphasis supplied).[5] *See also American Horse Protection Association v. Lyng*, 690 F. Supp. 40 (D.D.C. 1988), in which the district court enjoined a later-filed action. In discussing *American Horse Protection Association v. Lyng*, the United States Court of Appeals for the District of Columbia the Court recognized the logic of the decision and noted that "[t]he district court there enjoined the prosecution, in another federal court, of a later-filed suit raising closely related issues arising out of the same facts, in which is saw an 'attempt[] to divest [it] of the jurisdiction that it clearly has over the issues raised in the [second action]." *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1213 (D.C. App. 1989). The Court noted that "American Horse is clearly a creature of its context, in which two federal courts entertained jurisdiction over claims arising out of essentially the same facts." *Sea Containers Ltd.*, 890 F.2d at 1213. Pursuant to the first filed rule, this Court has the authority to enjoin the parties to *Kaiser v. CIGNA*, a subsequently filed action, from pursuing the action, even in the absence of other factors supporting that injunction.

This action involves additional considerations which warrant imposition of an injunction. Courts have consistently recognized that an MDL court entertaining complex issues has the authority to be particularly vigilant and protective of its jurisdiction. "A principal purpose of § 1407 is to allow one judge to take control of complex proceedings...." *In the Matter of Orthopedic Bone Screw Products Liability Litigation*, 79 F.3d 46, 48 (7th Cir. 1996). The Court's power pursuant to the All Writ's Act reflects an understanding of the necessarily complex and broad issues with which MDL Courts are entrusted and is sufficient to warrant the Court taking action even in the more restrictive context where the parties are proceeding in parallel state court actions. The Seventh Circuit has specifically recognized the necessity for a multidistrict court to exercise its power pursuant to the All Writs Act to

---

[5] The Seventh Circuit does not adhere to the first filed rule but considers this factor on a case by case basis. *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 750 (7th Cir. 1987).

11

protect its jurisdiction, even in the context of enjoining a state court action::

> Ordinarily, the "aid of jurisdiction" exception to the Anti-Injunction Act applies only to parallel state in rem rather than in personam actions....There are, however, exceptions to this rule, most notably school desegregation cases, where conflicting orders from different courts would only serve to make ongoing federal oversight unmanageable....Other courts have extended the exception to consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation. *Id*; *Carlough v. Amchem Products, Inc.*, 10 F.3d 189, 197 (3d Cir. 1993); *In re Baldwin-United Corp.*, 770 F.2d 328, 336 (2d Cir. 1985); *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1332, 1334-35 (5th Cir. 1981). We agree that the "necessary in aid of jurisdiction" exception should be construed "to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory." Martin H. Redish, *The Anti-Injunction Statute Reconsidered*, 44 U.Chi.L.Rev. 717, 754 (1977)....The district courts' power to control multidistrict litigation is established by statute, 28 U.S.C. § 1407, and as we have already noted, that with that power comes the duty to exercise it as efficiently as possible....Indeed, an express purpose of consolidating multidistrict litigation for discovery is to conserve judicial resources by avoiding duplicative rulings....Where a litigant's success in a parallel state court action would make a nullity of the district court's ruling, and render ineffective its efforts effectively to manage the complex litigation at hand, injunctive relief is proper.

*Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996). *See also In re Diet Drugs*, 282 F.3d 220 (3rd Cir. 2002)("Implicit in *Carlough* is the recognition that maintaining "the federal court's flexibility and authority to decide" such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti-Injunction Act); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)("[T]he Anti-Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings."); *See also In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 93 F.Supp.2d 876 (M.D. Tenn. 2000); *In re Lease Oil Antitrust*, 48 F.Supp.2d 200 (S.D. Tex. 1998)("If an effort by the defendants to reach an inadequate or collusive settlement in state court is 'left unchecked', then this court will be absolutely prevented from 'bring[ing] the litigation to its natural conclusion.'...For these reasons the All Writs Act authorizes this Court to enter an injunctive order against the parties in order to preserve its jurisdiction

12

over this MDL litigation."); *Georgine v. Amchem Products, Inc.*, 1994 WL 590611 (E.D. Pa. 1994)(Enjoining class members from initiating or maintaining claims encompassed by the court's certification order).

Several courts, including the Eleventh Circuit, have analogized the development of a complex consolidated class action to other types of cases in which the prosecution of parallel actions is entirely impermissible, such as actions in rem: "[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered....' This lengthy, complicated litigation is the 'virtual equivalent of a res.'" *Battle v. Liberty National Life Insurance Co.*, 877 F.2d 877, 882 (11th Cir. 1989). *In re Diet Drugs* 282 F.3d 220, 235 (3rd Cir. 2002)("In several cases, courts have analogized complex litigation cases to actions in rem.") *In re Baldwin-United,* 770 F2d 328, 337 (2d Cir 1985)("[T]he district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control."). The in rem comparison reflects concerns the reality that conflicting orders are particularly devastating in this type of complex litigation. *See Baldwin-United,* 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts" quoting 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, §§ 4225, at 105 n. 8 (Supp.1985)).[9]

---

[9]      In oral argument before this Court CIGNA relied upon *In re Charles Schwab & Co., Inc.*, 2000 U.S. Dist LEXIS 5101 (MDL Apr. 14, 2000), for the proposition that this Court should defer to the settlement presented to the district court in Illinois. However, that case is vastly distinguishable. The district court opinion, unlike the MDL opinion in that action, addresses an argument that the settlement was collusive but rejects the argument, finding that there was no evidence of collusion and that the case had been "vigorously fought in the state courts" for five years. Notably, the court also rejected the argument that the amendments made to the complaint were improper because they were done "to accommodate the settlement." The court disagreed, noting that "all the matters in the class definition had been in the litigation from the beginning." This stands in stark contrast to the *Kaiser* case, which was amended to drastically expand the scope of the case to include claims that were never the subject of litigation in state court.

13

As set forth in Plaintiffs' initial motion to enjoin, this Court has the authority, pursuant to the All Writ's Act, to enjoin the parties to the *Kaiser* action while the action was pending in Illinois State Court. Removal of this action to federal court eliminated any argument that this Court's power to enter an injunction pursuant to the All Writ's Act is encumbered by the requirements of the Anti-Injunction Act. The Anti-Injunction Act is now inapplicable and the All Writ's Act empowers this Court to act to protect its jurisdiction.

As set forth above, the existence of an MDL action is a factor supporting injunction of a state court action where parallel actions are pending in federal and state courts. The establishment of an MDL court is not only a factor to be considered but is determinative of the priority of actions within the federal court system. Allowing the parties to subvert this Court's jurisdiction would frustrate one of the core purposes for establishing multidistrict litigation procedures:

> Another major purpose of § 1407 transfers – to promote the just and efficient conduct of the litigation – focuses on facilitating the resolution of overlapping or conflicting class actions. The panel has stressed this factor in several decisions, in recognition that uniformity of class action treatment is facilitated by transferring all competing class actions to a single transferee forum. In this fashion, not only may a single court determine class rulings or litigation involving common questions, but it also can determine appropriate class representatives, and liaison or lead counsel for the conduct of the litigation, at least in the pretrial phases, in an orderly and efficient manner.

2 *Newberg on Class Actions* §9.15 (3rd ed. Shepard's/McGraw Hill).

---

While it is correct that the MDL Panel vacated the conditional transfer order in *Schwab*, there is nothing in the MDL opinion indicating that anyone suggested the settlement might be collusive or was entered into in order to deprive the court in which the MDL actions were proceeding of jurisdiction over claims being litigated in that court. Therefore, there is nothing in the MDL opinion that would suggest that the Panel would have refused to transfer the actions if such an accusation had been made. In contrast, the *In re Lease Oil* opinion makes clear the MDL Panel transferred a case that was already the subject of a settlement agreement. *In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d 699 (S.D. Tex. 1998). As previously stated, once the transferee in *In re Lease Oil*, court received the cases, it issued, *sua sponte*, an order temporarily enjoining all parties to the proceedings from settling any federal claims at issue in the MDL proceedings so that the court could make sure none of the claims were being settled without adequate consideration.

14

The MDL Panel has consistently recognized that one of the compelling reasons for consolidation of actions in one federal district court is the avoidance of inconsistent class determinations. *In re Convenient Food Mart Franchise Litigation*, 350 F. Supp. 1166, 1167 (Jud.Pan.Mult.Lit. 1972); *In re Sugar Industry Antitrust Litigation*, 395 F. Supp. 1271, 1273 (Jud.Pan.Mult.Lit.1975); *In re Folding Carton Antitrust Litigation*, 415 F. Supp. 384, 386 (Jud.Pan.Mult.Lit. 1976); *In re Braniff Airways, Inc. Employment Practices Litigation*, 411 F.Supp. 798, 799 (Jud.Pan.Mult.Lit. 1976); *In re Litigation Arising From the Termination of the Retirement Plan for Employees of Fireman's Fund Insurance Co.*, 422 F. Supp. 287, 290 (Jud. Pan. Mult.Lit. 1976).

The MDL Panel consolidated in this Court this complex action involving numerous defendants who allegedly conspired and aided and abetted each other. This Court has the power, pursuant to the All Writ's Act, to enjoin the parties to the *Kaiser* action in aid of this Court's jurisdiction, not only as a federal district court but as the court delegated responsibility for this litigation by the MDL Panel. By statute, the United States District Court for the Southern District of Illinois is the not the proper venue for resolution of this litigation. The MDL Panel established this Court as the proper venue for matters relating to this litigation.

Despite the establishment of an MDL court to handle this litigation, inconsistent federal class certification orders have, in fact, been entered as the result of the *Kaiser* parties' actions. This Court's power to enjoin the parties to that action is reinforced by the parties' attempts to frustrate this Court September 26, 2002 class certification order. "When a district court has properly exercised its jurisdiction in entering an order, it is empowered to issue writs in aid of its jurisdiction to persons in a position to frustrate the order." 19 *Moore's Federal Practice*, § 204.05 (Matthew Bender 3d ed.). The United States Supreme Court "has repeatedly recognized the power of a federal court to issue such

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL. (305) 372-1800

commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained...." *United States v. New York Telephone Co.*, 434 U.S. 159, 171, 98 S.Ct. 364, 372 (1977). At least one Circuit has recently recognized and applied this principle in affirming a district court's order enjoining a party's attempt to obtain relief in an alternative forum to "end run" the district court's previous order:

> On appeal, Belvedere contends the district court could not order Belvedere to withdraw its Customs application, arguing the relevant federal regulations permit Belvedere to seek relief before Customs on its infringement claims despite having already presented these claims to the district court.....Contrary to Belvedere's view, we conclude the district court acted properly under the authority granted it by the All Writs Act to "issue all writs necessary or appropriate in aid of [its]... jurisdiction." 28 U.S.C. § 1651(a)(1994). Here, Belvedere initially chose to invoke the district court's jurisdiction by filing its motion for a temporary restraining order. Belvedere then attempted to make an end run around the district court's refusal to grant the interim relief Belvedere sought in a case over which the district court continued to have jurisdiction by going back to Customs and asking Customs to do what the district court would not. In these circumstances, the district court could order Belvedere to withdraw its pending Customs application to "prevent the frustration of [the] order[] it ha[d] previously issued in its exercise of jurisdiction otherwise obtained."

*Phillips Beverage Co. v. Belvedere, S.A.*, 204 F.3d 805, 806 (8th Cir. 2000). In fact, a court's authority under the All Writ's Act "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. New York Telephone Company*, 434 U.S. 159, 174, 98 S.Ct. 364, (1977). This Court has the authority, pursuant to the All Writ's Act, to enjoin CIGNA and those acting in concert with CIGNA from frustrating this Court's class certification order.

A federal court's power and ability to act are especially strong where, as here, the parties to be enjoined have indulged in forum shopping:

> **Litigants who engage in forum-shopping, or otherwise take advantage of our dual court system for the special purpose of evading the authority of a federal court,**

16

have the potential "to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R.R.*, 398 U.S. at 295, 90 S.Ct. At 1747. Indeed, although an injunction is an extraordinary relief, where such abuses exist, failure to issue an injunction may create the very "needless friction between state and federal courts" which the Anti-Injunction Act was designed to prevent. *Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.*, 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940)....For these reasons, we hold that the Anti-Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings, including pre-trial rulings like discovery orders, so long as the injunctions are narrowly crafted to prevent specific abuses which threaten the court's ability to manage the litigation effectively and responsibly.

*Winkler v. Eil Lilly & Co.*, 101 F.3d 1196, 1203 (7th Cir. 1996)(emphasis supplied).

## CIGNA's Invocation of the Menendez Defense is Meritless.

Having collusively, and with deliberate secrecy, procured an order from the Illinois district court which conflicts with the relief requested of this Court in the Injunction Motion, or at the December 3 hearing, CIGNA cannot be heard to complain about being subject to conflicting obligations. The principle that a party which deliberately makes itself unable to comply with a court order cannot complain about its position is firmly established in numerous cases involving contempt proceedings against a party for violation of a court order. The general principle is:

Inability to comply with an order is ordinarily a complete defense to a charge of contempt. An exception exists when the person charged is responsible for the inability to comply.

*United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980)(citations omitted) *Accord, Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1522 (11th Cir. 1986)("Thus, where the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceedings.")

Both of the above cases dealt with a party's failure to comply with an order to produce documents by divesting itself of the documents before the date of production. The doctrine applies equally, however, when a party has deliberately procured conflicting orders so as to make it impossible

17

to comply with one of the orders. In *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 762 (9th Cir. 1996), the estate of deposed dictator Ferdinand Marcos sold certain artworks pursuant to a settlement and consent order providing for the sale and distribution of the art, despite the existence of an injunction in another case against selling assets. When charged with contempt, the estate claimed as a defense that it was required to dispose of the assets under the consent order. The federal district court held the estate in contempt, and the Ninth Circuit affirmed, noting that the estate did not inform the judge who entered the consent judgement about the pending injunction, and holding that compliance with the consensual settlement order could not excuse compliance with the injunction against sale of assets.

Similarly, in *Hopper v. Hopper*, 559 So.2d 403 (Fla. 4th DCA 1990), a divorced parent defended against contempt charges on the grounds that he was the subject of competing court orders. The Florida appellate court, citing Eleventh Circuit authority, noted that the defense of inability to comply with court orders is not available to a party who has created the inability to comply by obtaining competing court orders. Upholding a contempt finding, the court stated:

> In the present case appellant did have the ability to comply with the orders of the Florida court, and the Texas order was obtained upon appellant's own motion. While appellant characterizes this as an "emergency" foundationed upon concern for the children's welfare, the alleged emergency could have been presented to the Florida court. Instead, appellant chose to seek relief in Texas and refused to comply with the orders entered in Florida. ... since appellant could have sought such protection in Florida, but chose to deliberately pursue relief in another forum while declining to comply with the orders of the Florida court, it was within the authority of the Florida court to adjudge appellant to be in contempt of court.

*Id.* at 405.

In this case, the pleadings before the Illinois district court and the transcript of the preliminary approval hearing establish that CIGNA did not inform that judge of the pendency of the Injunction Motion or the imminent hearing on that motion. CIGNA then consented to an order which directly

18

conflicted with the relief sought in the Injunction Motion. As in *Hopper*, CIGNA could have, and should have, brought the issue of preliminary approval of its *Kaiser* settlement before this Court. Instead, CIGNA deliberately, secretly went before another court to create conflicting court orders so that it could claim inability to comply with any order this Court might enter on the Injunction Motion. CIGNA cannot throw itself on the mercy of the Court as an orphan, having caused the demise of its parents. CIGNA created this situation, and cannot use the existence of the consensual Illinois order as a defense to entry of an order enjoining it from proceeding with that settlement.

**The Injunction Requested Here is Not Subject to the Requirements of Rule 65, But if it Were, Those Requirements are Easily Met**

As CIGNA implicitly recognized by not raising the issue in its Memorandum of Law in Response to Plaintiffs' Motion for Preliminary Injunction, the requirements of Rule 65 do not apply to the injunction requested here. The case Defendants cite for the legal proposition that Plaintiffs must comply with Rule 65 of the Federal Rules of Civil Procedure does not, in fact, support that proposition. In *Florida Medical Association, Inc. v. U.S. Department of Health, Education and Welfare*, 601 F.2d 199 (5th Cir. 1979), the Fifth Circuit rejected a district court's use of the All Writ's Act where the injunctive relief sought was not ancillary to the court's jurisdiction but instead was the sole relief sought by the plaintiff. "Issuance of an 'ancillary writ of injunction' is simply not ancillary to a suit which was brought for the sole purpose of obtaining relief. Thus, application of the doctrine in this case is inappropriate, and cannot be used to avoid the clear charge of the Rules." *Florida Medical Association*, 601 F.2d at 202.

Accordingly, CIGNA has cited no authority to suggest that the requisites of Rule 65 of the Federal Rules of Civil Procedure must be satisfied, and Rule 65 has no logical application here. Rule 65 applies to requests for injunctive relief in which a plaintiff seeks to preserve the status quo until a

19

merits determination of its case -- in effect the plaintiff is seeking on a preliminary basis the ultimate

relief requested in the lawsuit.  To justify such early relief, the plaintiff must prove several factors,

including predominantly likelihood of success on the merits.  The injunctive relief sought here relates

not to the merits of the case, but to the jurisdiction in which those merits will be decided.  In this

context, the Rule 65 factors simply make no sense. Even if the factors are recast as CIGNA would have

them, so that, for instance, the first issue is not likelihood of success on the merits of the case but

likelihood of success on the injunction issue, the Rule 65 standards for injunctive relief are easily

satisfied in this action.

### 1.  Likelihood of Success on the Merits

The district court in *American Horse Protection Association v. Lyng*, 690 F. Supp. 40 (D.D.C.

1988) found this requirement to be easily satisfied when considering an injunction against parties who

were proceeding in parallel litigation in another federal court.  Because the court's painstaking

application of this factor in *American Horse Protection Association* is directly applicable and very

instructive, Plaintiffs quote at length from the Court's analysis regarding this factor:

> It is clear that a federal court can enjoin the prosecution of an action where
> the same issues are presented in another federal court. *Kerotest Manufacturing Co.
> v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952)....In
> this Circuit, the factors central to the issue of enjoining the prosecution of a later-
> filed action in another district relate to the conservation of judicial resources and
> comprehensive disposition of litigation. *Columbia Plaza Corp. v. Security National
> Bank*, 525 F.2d 620, 627-28 (D.C. Cir. 1975). These factors include: the identity of the
> parties; the risk of inconsistent adjudications; the location of counsel familiar with the
> litigation; how far advanced each action is; and, in general "equitable considerations
> genuinely relevant to the ends of justice," relating to the expeditious determination of
> the case without "unnecessary multiplication of litigation." *Id.* at 626-29.  *See also
> Kentucky Fried Chicken v. Diversified Packaging*, 552 F.2d 601, 603 (5th Cir.
> 1977)(suggesting that the familiarity of the judge in prior proceedings is an added
> factor, particularly where complicated issues are involved); *Martin v. Graybar
> Electric Co.*, 266 F.2d 202, 204 (7th Cir. 1959)(suggesting that the party filing later
> in time should be enjoined from further prosecution of his suit).  Additionally, the

20

common origin of the two actions weighs in favor of a matter being adjudicated in a single forum. *Columbia Plaza Corp.*, 525 F.2d at 626.

In the matter at hand, these considerations weigh heavily in favor of this Court remaining the forum in which the comprehensive disposition of the litigation should be accomplished. If not identical, **the issues presented in the Tennessee litigation are inextricably intertwined with the litigation here....The parties are essentially the same in both actions....**

Additionally, there is a **grave risk of inconsistent adjudications**, in that this Court has already indicated that it "will not stay the hand of the Secretary" in carrying out his administrative duties, but would allow a motion for a stay to be renewed at the time the rules are available for consideration. Furthermore, this action is extremely advanced. **There exists a substantial body of law of the case, both in this Court's decision and in the decision by the Court of Appeals prior to remand.**

The nature of the complaint filed by the Breeders' and Exhibitors' Association in Tennessee also supports the need for this Court to be the forum for the comprehensive disposition of the litigation....The seat of the federal government is here, the situs of the Secretary's actions is here, as is the administrative record developed in the promulgation of the Interim Rule. The choice of Tennessee by the Breeders' and Exhibitors' Association has more than a faint semblance of **forum shopping aimed at evading the denial of relief from this Court and the United States Court of Appeals for the District of Columbia Circuit....**

In the case at hand, the Breeders' and Exhibitors' Association is **attempting to divest this Court of the jurisdiction that it clearly has over the issues raised in the Tennessee litigation. Those issues are inextricably intertwined with this litigation. It presents the very real threat of vexation of the other parties to this action, as well as an attempt to evade the decisions of the courts of this jurisdiction. The Court will not condone the efforts of the Breeders' and Exhibitors' Association to evade its jurisdiction and its prior rulings. The Court holds that the plaintiff has established the likelihood of success on the merits.**

*American Horse Protection Association v. Lyng*, 690 F. Supp. 40, 42-44 (D.D.C. 1988)(emphasis

supplied).

As previously discussed, this Court, which not only has the first filed action but which is the

Court selected by the MDL Panel, has the ability to enjoin the parties to *Kaiser v. CIGNA*. CIGNA and

those in concert with CIGNA have utilized forum shopping in an effort to divest this Court of jurisdiction. Such efforts should not be rewarded. The separate question of whether the MDL Panel will transfer the *Kaiser* action once it has been enjoined is irrelevant to the analysis of this issue.

**2.     Plaintiffs and Class Members Will Suffer Irreparable Harm if the Requested Injunction is Not Entered**

Plaintiffs and this Court have invested a monumental amount of time and effort in pursuing this litigation. If CIGNA is allowed to evade the jurisdiction of this Court to proceed with a reverse auction settlement, Plaintiffs and the class they represent will be irreparably harmed. Beyond question, the adequacy of the settlement of Plaintiffs' and Class Members' claims should be determined by this Court, which was invested by the MDL Panel with that responsibility. Moreover, the harm suffered by Plaintiffs and class members will not be limited to claims against CIGNA but will extend to all claims consolidated before this Court. Other Defendants will doubtless argue that the CIGNA settlement, regardless of its inadequacies, sets the standard for settlement. The *Kaiser* settlement will have the practical effect of limiting and hindering settlement of the encompassing issues before this Court, and of impeding the mediation already ordered by this Court. The *Kaiser* settlement denies Plaintiffs and Class Members even the possibility of industry-wide, coordinated or comprehensive relief which can be accomplished through multidistrict litigation.[10] This result can be accomplished through no other mechanism suggested by CIGNA. This Court is the only forum which can offer Plaintiffs the opportunity to achieve such relief.

**3.     The Balance of Hardships and Considerations Regarding the Public Interest Weigh In Favor of An Injunction.**

---

[10]   The proposed final order releases not only Class Members' claims but also any claims by co-conspirators for contribution and indemnity. (Settlement Agreement, Exhibit 6, ¶ 11.) The release of these claims will affect this litigation and all parties to this litigation. This Court is the proper court to determine the appropriateness and the effect of any such release.

22

As previously discussed, the current situation is of CIGNA's own making. Therefore, CIGNA should be estopped from complaining regarding any potential hardship which may result from a preliminary injunction in this action. Regardless, the injunction in this action will place CIGNA in no worse position than it was in before it attempted to evade the jurisdiction of this Court and orders of the MDL Panel. The settlement agreement in *Kaiser v. CIGNA* is very clear that the settlement agreement will be dissolved and that no duties will result from the agreement if final approval is not granted by the United States District Court for the Southern District of Illinois. Accordingly, CIGNA will not suffer any appreciable hardship as a result of the injunction sought in this action.[11]

On the other hand, if the injunction is not entered, the public interest will suffer dramatically. The MDL Panel centralized this litigation in this Court. The *Kaiser* parties engaged in blatant forum shopping in order to avoid and nullify the jurisdiction of this Court. If parties are allowed to manipulate and orchestrate the federal court system to their own ends in the manner CIGNA attempts, then public confidence in the federal court system will suffer and the efficacy of multidistrict litigation will be negated.

## CONCLUSION

This Court has the authority to enter a preliminary injunction enjoining CIGNA, and all those acting in concert or conjunction with CIGNA, from proceeding with any litigation in *Kaiser et al v. CIGNA Corp. et al*, Civil Action No. 02-1179-GPM, and/or from proceeding in any manner with the

---

[11] If CIGNA's concern is that enjoining the *Kaiser* settlement would cause it to have to continue litigating *Kaiser*, the answer is simple. All of the cases cited above support the power of a federal district court to enjoin later-filed, parallel proceedings in their entirety. Any impediment to such an injunction was eliminated when *Kaiser* was removed to federal court. Thus, any arguable harm to CIGNA can be simply eliminated by enjoining the parties from continuing to litigate the *Kaiser* case.

23

proposed settlement that has been preliminarily approved in *Kaiser* without the express approval of this Court. Ensuring orderly disposition of the matters at issue in this MDL proceeding, by enjoining the parallel, later-filed Illinois proceeding, is even more critical than in any of the above-cited cases approving such injunctions. In MDL 1334 this Court has before it not just the case against CIGNA, but the cases against virtually every major player in the managed care industry. These cases allege that Provider Plaintiffs have been substantially injured by the same or similar misconduct of Defendants acting in conspiracy. If CIGNA is allowed to settle these claims outside the scrutiny of this Court, every other Defendant before this Court will take the position that it cannot, for competitive business reasons, settle for terms any more stringent than those in the *Kaiser* settlement – terms CIGNA admits the Provider Plaintiffs here found unacceptable. It is imperative that CIGNA be enjoined from going forward with the *Kaiser* settlement.

The injunction sought here is not materially different from this Court's injunction of the various arbitration proceedings instituted by the Defendants. In that order, this Court found that it must enjoin the arbitrations to prevent the Defendants from circumventing the orders of this Court and the Eleventh Circuit Court of Appeals.  In the present circumstance, the requested injunction is necessary to prevent CIGNA from circumventing: a) the Multi-District Litigation Panel's orders consolidating the managed care litigation in this Court; b) this Court's class certification order; c) this Court's mediation order; and, as this Court observed at the December 3 hearing, d) the "spirit of what the Multi-District Panel wanted to do with these cases" (12/3/2002 Hearing Transcript, p. 6)

Because of the unique nature of MDL 1334, this Court has the ability to award, or facilitate through settlement, industry-wide relief, not the piecemeal relief sought by CIGNA in *Kaiser*. CIGNA should not be allowed, through its collusive efforts to consummate a sweetheart settlement without

24

scrutiny by this Court, to negatively impact the industry-wide relief that might be possible in this case.

Accordingly, Provider Plaintiffs respectfully request that this Court enjoin CIGNA, and

all those acting in concert or conjunction with CIGNA, from going forward with the *Kaiser* settlement

and/or from proceeding with litigation of the *Kaiser* case.

Respectfully submitted this 10th day of December, 2002.

Archie C. Lamb, Jr.
LAW OFFICES OF ARCHIE LAMB
2017 Second Avenue North, 2nd Floor
Birmingham, Alabama 35203
Tel: 205-324-4644
Co-Lead Counsel for Provider Plaintiffs

Aaron Podhurst
PODHURST ORSECK JOSEFSBERG,
EATON MEADOW OLIN & PERWIN
25 West Flagler Street, Suite 800
Miami, Florida 33130
Tel: 305-358-2800
Liaison Counsel for Plaintiffs

Nicholas B. Roth
EYSTER KEY TUBB WEAVER & ROTH
402 E. Moulton Street
Decatur, Alabama 35601
Tel: 256-353-6761

Jeffery A. Mobley
LOWE MOBLEY & LOWE
1210 - 21st Street
Haleyville, Alabama 35565
Tel: 205-486-5296

Mark Gray
GRAY & WEISS
1200 PNC Plaza
Louisville, Kentucky 40202

Robert Foote
FOOTE & MEYERS
13 South 7th Street
Geneva, Illinois 60134

KOZYAK TROPIN & THROCKMORTON
200 S. Biscayne Boulevard, Suite 2800
Miami, Florida 33131
Tel: 305-372-1800 / Fax: 305-372-3508
Co-Lead Counsel for the Provider Plaintiffs

Harley S. Tropin (Fla. Bar No. 241253)
Janet L. Humphreys (Fla. Bar No. 607258)
Adam M. Moskowitz (Fla. Bar No. 984289)

Dennis G. Pantazis
GORDON SILBERMAN WIGGINS & CHILDS
1400 SouthTrust Tower, 420 20th Street North
Birmingham, Alabama 35203
Tel: 205-328-0640

Joe R. Whatley, Jr.
Charlene P. Ford
WHATLEY DRAKE
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel: 205-328-9576

J. Mark White
WHITE DUNN & BOOKER
2025 3rd Avenue North, Suite 600
Birmingham, Alabama 35203
Tel: 205-323-1888

Guido Saveri and R. Alexander Saveri
CADIO ZIRPOLI
One Embarcadero Center, Suite 1020
San Francisco, California 94111-3600

25

Jay Waller, Esq.
CAMPBELL WALLER & McCALLUM
2100-A Southbridge Parkway, Suite 450
Birmingham, Alabama 35209

Kenneth S. Canfield, Esq.
DOFFERMYRE SHIELDS CANFIELD
 KNOWLES & DEVINE
1355 Peachtree Street, Suite 1600
Atlanta, Georgia 30309

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail on this 10th day of December, 2002, to all parties of record listed on the Court's Service List dated September 27, 2002, and to the following individuals:

*Attorney for Kaiser and Corrigan*
Judy L. Cates, Esq.
CARR KOREIN TILLERY
10 Executive Woods Court
Belleville, Illinois 62226
T: 618-277-1180 / F: 618-222-6939

*Co-counsel for Plaintiffs*
Michael C. Dodge, Esq.
DODGE ANDERSON & JONES, P.C.
One Lincoln Centre
5400 LBJ Freeway, Suite 800
Dallas, Texas 75240
T: 972-960-3200 / F: 972-960-3221

John G. Harkins, Jr.
HARKINS CUNNINGHAM
2800 One Commerce Square
2005 Market Street
Philadelphia, Pennsylvania 19103-7042
T: 215-851-6700 / F: 215-851-6710

*Attorneys for Defendants*
Kurt Reitz,  I Alexa Peters
THOMPSON COBURN LLP
P.O. Box 750
Belleville, Illinois 62222-0750
T: 618-277-4700 / F: 618-236-3434

Brian D. Boyle, Teresa E. Dawson,
Neil K. Gilman, Kerry A. Krentler,
Matthew L. Olmsted, Richard G. Parker
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, DC  20004-1109
T: 202-383-5300 / F: 202-383-5414

2956/101/216193.1

26

# Exhibit A

# HARKINS CUNNINGHAM

ATTORNEYS AT LAW
SUITE 600
601 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2615
202 973-7600
FACSIMILE 202 973-7610

2800 ONE COMMERCE SQUARE
2005 MARKET STREET
PHILADELPHIA, PA 19103-7042
215 851-8700
FACSIMILE 215 851-8710

WRITER'S DIRECT DIAL
(215) 851 -6701

RECEIVED
CLERK'S OFFICE

2002 DEC -6  P 2: 24

10 ROCKEFELLER PLAZA
SUITE 1400
NEW YORK, NY 10020-1903
212 972-1600
FACSIMILE 212 218-1900

December 6, 2002

_**via Hand Delivery**_

Michael J. Beck, Clerk
Judicial Panel on Multidistrict Litigation
One Columbus Circle, NE
Thurgood Marshall Judiciary Building, Room G-255
Washington, D.C. 20002

Re:    MDL No. 1334, _In re Managed Care Litigation_

Dear Mr. Beck:

I am counsel to CIGNA Corporation in the above-captioned MDL litigation. I write to notify the Panel of a case, _Kaiser, et al. v. CIGNA Corporation, et al._, No. 02-CV-1179-GPM, that has been removed to the United States District Court for the Southern District of Illinois.[1] The underlying allegations in _Kaiser_ involve common questions of fact with actions previously transferred under Section 1407. However, because a settlement has been reached and preliminarily approved by the Illinois federal district court after two years of pretrial proceedings in the state court from which the action was recently removed, transfer would not serve the convenience of the parties and witnesses and would not be in the interest of justice. We do not believe that Panel precedent or the purposes of transfer support designation of _Kaiser_ as a potential tag-along action in a conditional transfer order.

---

[1] The complete case name is _Timothy N. Kaiser, M.D. and Suzanne Lebel Corrigan, M.D., on behalf of themselves and others similarly situated, v. CIGNA Corporation, CIGNA Healthcare of St. Louis, Inc., and CIGNA Healthcare of Texas, Inc._ The _Kaiser_ case has been assigned to Chief Judge G. Patrick Murphy.

**HARKINS CUNNINGHAM**

Michael J. Beck, Clerk
December 6, 2002
Page 2

Panel decisions reflect a consistent practice of declining to transfer cases in which settlements have been reached. In *In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377 (J.P.M.L 2002), for example, the Panel recently declined to transfer fourteen cases where, among other reasons, "a nationwide class action settlement agreement [had] been reached with each of the five telecommunications companies named as defendants in the actions before the Panel." *Id.* at 1378. Transfer was unwarranted, the Panel found, because the settlement, "if ultimately approved, would finally resolve the vast majority of the litigation sought to be transferred." *Id.* The Panel reached a similar conclusion in *In re Charles Schwab & Co. "Best Execution" Securities Litig.*, Docket No. 1316 (April 14, 2000), finding transfer inappropriate where – as in *Kaiser* – a settlement of a state case subsequently removed to federal court had been preliminarily approved by the federal court. (A copy of the Panel's unreported Order Denying Transfer in *Schwab* is attached.)

The Panel's rationale for declining to transfer cases that have settled reflects nothing less than the essential mandate of Section 1407. It would not "advance the just and efficient conduct of the litigation or serve the convenience of the parties or witnesses to transfer the causes of action against those defendants with whom settlement has been reached." *In re Hotel Telephone Charge Antitrust Litig.*, 341 F. Supp. 771, 773 (J.P.M.L. 1972). Indeed, even short of settlement, the Panel has declined to transfer cases in which pretrial proceedings are well-advanced and therefore the objectives of Section 1407 would not be served. *See, e.g., In re Rely Tampon Prods. Liab. Litig.*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982); *In re Magic Marker Secs. Litig.*, 470 F. Supp. 682, 685 (J.P.M.L. 1979). That is certainly the case here. The settlement that was negotiated in *Kaiser v. CIGNA Corp.* followed over two years of active litigation and discovery in Illinois state court prior to removal of the action, including the entry of a contested class certification order in March 2001. By contrast, merits discovery has only just begun in MDL No. 1334.

In any event, in accordance with Rule 7.5(e), this letter is intended to notify the Panel of a potential tag-along action. Based upon Panel precedent and the purposes of the MDL statute discussed above, we respectfully submit that the *Kaiser* case should not be transferred to MDL No. 1334.

**HARKINS CUNNINGHAM**

Michael J. Beck, Clerk
December 6, 2002
Page 3

Copies of the complaint, the order preliminarily approving settlement, and a Proof of Service are attached to this notice.

Sincerely,

*John G. Harkins, Jr./aw*

John G. Harkins, Jr.

Enclosures

cc:    MDL No. 1334 Service List
       Plaintiffs' Counsel identified on the *Kaiser* Complaint

## PROOF OF SERVICE

I, Matthew Ludwig, hereby certify that on this 6th day of December, 2002,

I caused to be served true and correct copies of this letter notice filed with the Judicial

Panel on Multidistrict Litigation, by first class mail, postage prepaid, upon liaison

counsel in MDL No. 1334, Lead counsel in the Provider Track of MDL No. 1334, and

the plaintiffs' counsel identified on the *Kaiser* Complaint, as follows:

Aaron S. Podhurst, Esq.
Barry L. Meadow, Esq.
PODHURST, ORSECK,
JOSEFSBERG, EATON, MEADOW,
OLIN & PERWIN, PA
25 West Flagler Street, Suite 800
Miami, FL 33130

Hilarie Bass, Esq.
Mark P. Schnapp, Esq.
Christine M. Nanfeldt, Esq.
GREENBERG TRAURIG, PA
1221 Brickell Ave.
Miami, FL 33131

Archie C. Lamb, Jr., Esq.
LAW OFFICES OF ARCHIE C.
LAMB, LLC
2017 Second Ave.
North Birmingham, AL 35203

Harley S. Tropin, Esq.
Janet L. Humphreys, Esq.
Adam M. Moskowitz, Esq.
KOZYAK TROPIN &
THROCKMORTON, PA
2800 First Union Financial Center
200 South Biscayne Blvd.
Miami, FL 33131

Judy L. Cates, Esq.
Troy A. Doles, Esq.
Jodi L. Wilson, Esq.
CARR KOREIN TILLERY
#10 Executive Woods Court
Belleville, IL 62226

Debra Brewer Hayes, Esq.
Dennis Reich, Esq.
REICH & BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX 77027

Michael C. Dodge, Esq.
David W. Dodge, Esq.
DODGE, ANDERSON & JONES, P.C.
One Lincoln Centre
5400 LBJ Freeway, Suite 800
Dallas, TX 75240

Matthew W. Ludwig

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

APR 14 2000

FILED

*DOCKET NO. 1316*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE CHARLES SCHWAB & CO., INC., ET AL., "BEST EXECUTION" SECURITIES LITIGATION

*Gordon Dumont v. Charles Schwab & Co., Inc., E.D. Louisiana, C.A. No. 2:99-2840*
*Robert C. Thomas, et al. v. Charles Schwab & Co., Inc., E.D. Louisiana, C.A. No. 2:99-2841*

## BEFORE JOHN F. NANGLE, CHAIRMAN, WILLIAM B. ENRIGHT, CLARENCE A. BRIMMER, JOHN F. GRADY, BAREFOOT SANDERS, LOUIS C. BECHTLE* AND JOHN F. KEENAN, JUDGES OF THE PANEL

### ORDER DENYING TRANSFER

Presently before the Panel is a motion, pursuant to Rule 7.4, R.P.J.P.M.L., 181 F.R.D. 1, 10 (1998), by plaintiffs in the two above-captioned actions (*Dumont* and *Thomas*), to vacate the Panel's order conditionally transferring the actions to the Northern District of California for inclusion in the centralized pretrial proceedings occurring there in this docket before Judge William H. Orrick, Jr. Also before the Panel is a similar motion to vacate brought by the three defendants in MDL-1316, Mayer & Schweitzer, Inc., Charles R. Schwab, and Charles Schwab & Co., Inc. (Schwab), the sole defendant in *Dumont* and *Thomas*. Plaintiffs in MDL-1316 favor transfer of these two actions to the Northern District of California.

*Dumont* and *Thomas* were filed in Louisiana state court in February 1995 on behalf of plaintiff investors who have been customers of Schwab. Although the state courts certified the class as defined in each action, a state appellate court later found that all state law claims in *Dumont* were preempted by federal securities law and regulations. The parties in both actions then initiated settlement discussions which led to the execution of a settlement agreement on June 30, 1999, after which the actions were consolidated, amended, and removed to federal court in September 1999. *Dumont v. Charles Schwab & Co., Inc.*, Nos. Civ. A. 99-2840, 99-2841, 2000 WL 49159, at *1 (E.D. La. Jan. 20, 2000). After a hearing in October 1999, Judge Charles Schwartz, Jr., of the Eastern District of Louisiana "granted preliminary approval of the settlement agreement, ordered notice to the class members, and scheduled a hearing on final approval of the agreement." *Id.* at *1. He subsequently stayed settlement proceedings pending a decision by the Panel. *Id.* at *3.

---

* Judge Bechtle took no part in the decision of this matter.

IMAGED AUG 23 '02

- 2 -

On the basis of the papers filed and the hearing held, the Panel finds that Section 1407 transfer of *Dumont* and *Thomas* to the Northern District of California at the present time would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of this litigation. We observe that the two actions contain allegations of federal securities law violations that raise questions of fact common to previously transferred actions in this litigation. We note, however, that the *Dumont* and *Thomas* litigation has proceeded for over five years, a proposed settlement has been preliminarily approved by Judge Schwartz, and he has demonstrated a resolve to adjudicate the actions expeditiously. Under these circumstances, we are persuaded that transfer is unwarranted.

IT IS THEREFORE ORDERED that the motions to vacate are GRANTED, and the Panel's conditional transfer order designated as "CTO-1" filed on January 4, 2000, be, and the same hereby is, VACATED.

FOR THE PANEL:

John F. Nangle
Chairman

# Exhibit  B



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

MDL No. 1334
Master File No. 00-1334-MD-MORENO

IN RE: MANAGED CARE LITIGATION

THIS DOCUMENT RELATES TO THE PROVIDER TRACK

## STATEMENT UNDER PENALTY OF PERJURY OF DONALD P. "ROCKY" WILCOX

(1) My name is Donald P. "Rocky" Wilcox. I am the general counsel of the Texas Medical Association. I am over the age of 21 and have personal knowledge of the facts contained in this statement.

(2) I am currently attending the interim meeting of the American Medical Association at the Hilton Riverside Hotel in New Orleans, Louisiana. Several thousand physicians as well as numerous medical association representatives are in attendance.

(3) When I arrived at the AMA registration desk at the beginning of the session, I found a stack of invitations to an "Open House" to learn more about the settlement in Kaiser v. CIGNA. A copy of the invitation is attached to this statement as Exhibit A.

(4) It is my understanding that distribution of the invitation was not approved or endorsed by the American Medical Association.

(5) On Monday, December 9, 2002, I attended an open meeting of the Litigation Center of the AMA and State Medical Societies, a consortium of the American Medical Association and almost all state medical associations. The meeting was also attended by more than 100 other doctors and representatives of state medical associations. At the conclusion of the meeting, Judy Cates spoke to the group. She discussed the settlement in Kaiser v. Cigna, argued that the settlement is a good one that should be supported by physicians, directed the group to a website she has set up – www.cigna-classaction.com -- which she said contains information about the settlement, and explained that a full notice will go out to doctors by December 20, 2002. Ms. Cates also told the group that she would be in a room at the hotel today to further discuss the Kaiser settlement. Following her presentation, Ms. Cates and her co-counsel distributed a handout to doctors and others as they were leaving the room. A copy of the handout is attached as Exhibit B.

(6) At the meeting of the AMA Litigation Center, Paul S. Sanders, M.D., current Chair of the Litigation Center, stated that neither the Litigation Center nor the Board of Trustees has taken a position on the merits of the Kaiser settlement.

(7) This statement is made under penalty of perjury in accordance with the United States Code.

Dec 5, 2002
Date

Donald P. "Rocky" Wilcox

YOU ARE CORDIALLY INVITED
TO AN

# OPEN HOUSE

TO LEARN MORE ABOUT THE

# KAISER V. CIGNA

## SETTLEMENT

**DATE:** SATURDAY, DEC. 7TH
**TIME:** NOON TO 8:00 P.M.

**DATE:** SUNDAY, DEC. 8TH AND
MONDAY, DEC. 9TH
**TIME:** 2:00 P.M. - 8:00 P.M.

**DATE:** TUESDAY, DEC. 10TH
**TIME:** NOON - 6:00 P.M.

**WHERE:** SUITE 624
WYNDHAM RIVER FRONT
HOTEL
701 CONVENTION CENTER BLVD.
NEW ORLEANS, LA. 70130
(504) 524-8200

BRING YOUR DELEGATES
AND MEET WITH COURT-APPOINTED LEAD
COUNSEL:

JUDY L. CATES

MICHAEL C. DODGE

DEBRA BREWER-HAYES

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| TIMOTHY N. KAISER, M.D., and | v. | CIGNA CORPORATION, CIGNA HEALTHCARE OF |
|---|---|---|
| SUZANNE LeBEL CORRIGAN, M.D., | | ST. LOUIS, INC., and CIGNA HEALTHCARE OF TEXAS, INC., |
| **Plaintiffs** | | **Defendants** |

### Proposed Settlement Documents
**(This Settlement is subject to Final Approval by a Federal District Court.)**

These Court filings are in .pdf format and are viewable with the free Adobe Acrobat Reader.
If you do not have Acrobat Reader you can download it from Adobe here.

## Class Counsel:

1. Judy L. Cates; (800) 288-5520; (618) 277-1180; fax: (618) 222-6939; E-Mail: jcates@carrkorein.com

2. Mike Dodge; (800) 947-0177; (972) 960-3201; fax: (972) 341-5201; E-Mail: miked@texasatty.com

3. Debra Brewer-Hayes; (713) 622-7271; fax: (713) 623-8724; E-Mail: dhayes@reichandbinstock.com

Am I a Class Member?

Case Background from Recent Press:

1. St. Louis Post Dispatch
2. New York Times
3. American Medical Association
4. Wall Street Journal
5. Miami Herald

*Visit the web site:*

*WWW.CIGNA-CLASSACTION.com.*

## 1. Settlement Consideration (Linked to Agreement Sections):

"Settlement Consideration" means the benefits which Class Counsel believe have been conferred, and will be conferred, on Class Members through this Litigation and through performance of this Settlement Agreement. These benefits include:

(i) Defendants' agreement to fund the payment of certain Valid Proofs of Claim with an initial deposit in the Claim Compensation Fund of Ten Million Dollars ($10,000,000.00) and with additional deposits as necessary;

(ii) Defendants' agreement to pay Category One Proofs of Claim at the fee schedules specified in this Settlement Agreement, without any limitation on Defendants' responsibility to make or fund payments for all Valid Category One Proofs of Claim;

(iii) Defendants' agreement to pay Category Two Proofs of Claim at the fee schedules specified in this Settlement Agreement, without any limitation on Defendants' responsibility to make or

fund payments for all Valid Category Two Proofs of Claim;

(iv) Defendants' agreement to facilitate Class Members' presentation of certain Category Two Proofs of Claim by preparing a Facilitation List, thus enabling Class Members to search their records more efficiently for documentation necessary to request compensation under this Settlement Agreement;

(v) Defendants' agreement to pay Medical Necessity Denial Compensation at the fee schedules specified in this Settlement Agreement, without any limitation on Defendants' responsibility to make or fund payments for all Valid Medical Necessity Denial Proofs of Claim;

(vi) Defendants' agreement to implement the Prospective Relief described in section 4.4 of this Settlement Agreement;

(vii) Defendants' agreement, as part of this Settlement Agreement, to waive their right to enforce valid arbitration agreements with Class Members in connection with the relief available under this Settlement;

(viii) Defendants' agreement to minimize the costs of dispute resolution proceedings to health care providers in the future;

(ix) Defendants' agreement to compensate Class Members by depositing Ten Million Dollars ($10,000,000.00) in a Prompt Pay Settlement Fund for pro rata distribution to Class Members or, alternatively, to make or fund payments for all Delayed Claims payable pursuant to Fast Track Dispute Resolution Proceedings as set forth in this Settlement Agreement;

(x) Defendants' agreement to waive their defense of "no private right of action" under state prompt pay statutes and Defendants' agreement to pay for Delayed Claims in those states without a specific prompt pay statute;

(xi) Defendants' agreement to pay interest in the future on delayed claims at the rate of six percent (6%) per annum, even for those health care providers not covered by state prompt pay statutes;

(xii) Defendants' agreement to fund the Public Interest Fund contemplated by section 4.5 of this Settlement Agreement at a minimum of Two Million Dollars ($2,000,000.00);

(xiii) Defendants' agreement to relieve Class Members of the burden of having to pay attorneys' fees, costs and expenses out of the monetary relief made available under this Settlement Agreement by making separate payment of attorneys' fees, costs and expenses to Class Counsel, requested in an amount up to Thirty Six Million Dollars ($36,000,000.00), which represents a sum not to exceed eighteen percent (18%) of the minimum cash benefit conferred, as set forth below; and

(xiv) Defendants' agreement to pay Administration Costs and the costs of two separate notices. Based upon the calculations available to Class Counsel as of the date of this Settlement Agreement, Class Counsel believe that the minimum cash benefit conferred upon putative class members solely for Defendants' Claim Coding and Bundling Edits (i.e., Category One Compensation and Category Two Compensation) is Two Hundred Million Dollars ($200,000,000.00).

**2. Settlement Agreement Table of Contents (Linked to Agreement Sections).**

3. **Settlement Agreement** (Internal and Exhibit Links).

4. **Exhibits to Settlement Agreement:**

Exhibit 1-Category One Codes

Exhibit 2-Order of Preliminary Approval and Conditional Class Certification (Entered November 26, 2002)

Exhibit 3-Class Counsel List

Exhibit 4-Defendants' Counsel List

Exhibit 5-Fast Track Dispute Request

Exhibit 6-Order of Final Approval

Exhibit 7-Judgement

Exhibit 8-Initial Notice

Exhibit 9-Intitial Notice Summary

Exhibit 10-Plan of Notice

Exhibit 11-Category One Claim Form

Exhibit 12-Category Two Claim Form

Exhibit 13--Medical Necessity Claim Form

Exhibit 14-Prompt Pay Claim Form

---

Third Amended Class Action Complaint (Filed November 22, 2002).

Plaintiff's Motion for Conditional Class Certification and Memorandum of Law in Support of Plaintiff's Motion for Conditional Class Certification (Filed November 26, 2002).

Memorandum of Law in Support of Joint Motion for Preliminary Approval of Settlement (Filed November 26, 2002).

---

For further information please contact cignaclassattys@aol.com, Mike Dodge, Judy Cates, or Debra Hayes.

This CD and the documents provided in it are prepared by Dodge, Anderson & Jones, P.C.; Carr Korein Tillery L.L.C.; and, Reich & Binstock (Class Counsel) for informational purposes only. This Settlement is subject to Final Approval by a Federal District Court.

**This site and CD are not sponsored or maintained by CIGNA Corporation or any subsidiary or affiliate of CIGNA Corporation.**

12/5/02

Not certified by the Texas Board of Legal Specialization.

Electronic communications are not confidential.

Copyright © 2001, 2002: Dodge, Anderson & Jones, P.C. Michael C. Dodge is the attorney responsible for this web site.

# Exhibit  C

# MODERN PHYSICIAN
ESSENTIAL BUSINESS NEWS FOR THE PHYSICIAN EXECUTIVE

current issue   subscribe   our opinion   data   classifieds   media   marketplace   about us   archives   events/events

[ Back ]



## Judge to decide on injunction against Cigna settlement

**Attorneys involved in agreement will seek to win over skeptics at AMA meeting**

December 4, 2002

*By Leigh Page*

A federal judge in Miami says he will decide by Dec. 13 whether to issue a temporary injunction against Cigna's proposed class action settlement agreement with doctors.

Meanwhile, at the AMA meeting that starts this weekend, attorneys who negotiated the settlement will try to persuade delegates the settlement is not a sell-out of doctors' interests. Critics contend that Cigna is making only superficial changes in claims processing and contracting policies.

The Cigna settlement was preliminarily approved on Nov. 26 by another federal judge, U.S. District Judge G. Patrick Murphy in East St. Louis, Ill. He was ruling on a class action lawsuit brought from an Illinois court that had been filed against Cigna by Timothy Kaiser, M.D., an Alton, Ill., otolaryngologist.

According to attorneys who attended a hearing yesterday in Miami, U.S. District Judge Federico Moreno said if he upholds the settlement, the deadline would allow administrators to meet their own Dec. 20 deadline to send out notices to 700,000 physicians and other providers in the nationwide class.

The hearing was requested by attorneys for 13 medical societies with competing class action lawsuits against Cigna and almost a dozen other health plans, all being tried in Moreno's Miami court. The settlement would end the Miami actions against Cigna.

Under the proposed agreement, Cigna would pay doctors and other providers at least $75 million, would reveal its claims processing rules and would relax a few of those rules for at least the next two years.

But opponents—including the medical societies of California, Texas, New York and Florida—say they want Cigna and other plans to make more sweeping changes, not just in claims processing rules but in areas such as contracting.

In the hearing, Moreno gave no indication he was upset that the unexpected Illinois actions would supercede the Cigna cases in Miami, and he said he had a cordial phone conversation with Murphy, according to Debra Hayes, a Houston attorney who helped negotiate the Cigna settlement.

Hayes says she expects Moreno would uphold the agreement because it would be highly unusual for one federal judge to issue an injunction against another federal judge's ruling.

If Moreno does not issue an injunction, Hayes says doctors will then have to be persuaded to accept the agreement, which would be easier if the medical societies dropped their opposition. Opponents will be able to voice their opposition at a fairness hearing on March 14.

To make their case, Hayes says she and Judy Cates, lead attorney for Kaiser in the settlement, will open a hotel hospitality suite at the AMA interim meeting in New Orleans on Saturday afternoon. Hayes acknowledged that Cigna has agreed to pay her group of attorneys $36 million if a settlement goes through.

Meanwhile, on Monday at the same AMA meeting, the plaintiff medical societies will caucus to persuade doctors to side with them.

So far, the AMA has maintained a neutral stance toward both sides. Medical societies in Washington state, Montana, Illinois and Missouri, as well as the American Academy of Otolaryngology-Head and Neck Surgery, have either endorsed the Cigna settlement agreement or given support to the Kaiser lawsuit.

This site is best viewed using version 4.0 or higher of Netscape or Internet Explorer, with a screen resolution of 1024x768.

Entire contents © 1996-2002 by Crain Communications, Inc.
All rights reserved.

Web site hosting and implementation by ChoiceOne Online
Please report problems to webmaster
Privacy Policy





# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

NIGHT BOX
FILED

SEP 1 2 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

|  |  |  |
|---|---|---|
| TICIA JOSEPH, on behalf of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Case No. 03-CV-61452 (HOEVELER) |
| | : | |
| v. | : | |
| | : | |
| NESTLÉ WATERS NORTH AMERICA INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO REMAND

---

Jeffrey M. Garrod, Esq.
Michael S. Haratz, Esq.
Orloff, Lowenbach, Stifelman &
    Siegel, P.A.
101 Eisenhower Parkway
Roseland, New Jersey  07068
Telephone (973) 622-6200
Facsimile (973) 622-3073

and

Harley S. Tropin, Esq. (No. 241253)
David P. Milian, Esq. (No. 844421)
Kozyak Tropin & Throckmorton, P.A.
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Tel. 305-372-1800
Fax: 305-372-3508

291167

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO REMAND

### PRELIMINARY STATEMENT

This memorandum is submitted on behalf of defendant Nestlé Waters North America, Inc. ("NWNA" or "defendant") in opposition to the motion by plaintiff Ticia Joseph to remand this action to Florida State Court, the Circuit Court of the Seventeenth Judicial District, Broward County. The class-action complaint filed in this action contains identical or virtually identical factual allegations to eleven (11) other class actions pending in various other jurisdictions -- six (6) of which were instituted by the same core group of attorneys as plaintiffs' counsel herein. All of the actions, including the instant action, and another action pending in this Court and consolidated herewith,[1] are premised upon the alleged false labeling by NWNA in labeling its "Poland Spring" brand of bottled water as "spring water."

The factual allegations in the complaint center on the following three (3) areas: (1) that Poland Spring brand bottled water is labeled and advertised as "spring water" when it does not meet the standard of identity for "spring water" -- a standard necessarily defined and governed by federal law set down under regulations promulgated by the United States Food and Drug Administration ("FDA"), pursuant to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301 et seq. (at times, "FDCA");[2] (2) that the water is labeled and promoted as being pure, free from contamination, from "protected sources," "deep in the woods of Maine," (and is not); and (3) that

---

[1] In the other action consolidated herewith, "Scott Maravilla v. Nestlé Waters North America Inc., plaintiff filed, and later withdrew, a motion to remand.

[2] The complaint alleges that Poland Spring is not spring water, but is well water or ground water. The complaint conspicuously fails to specifically cite a regulation or statute that defines the standard for "spring water," but instead, references "the definition of 'spring water'" under the laws of the various state laws. (Complaint, ¶91(a). In any event, "spring water," "well water" and "ground water" are terms that are defined by federal law. See, 21 U.S.C. §165.110(a)(2)(vi), (ii) and (viii). There can be no different or contrary standard of identity imposed by a state. 21 U.S.C. §343-1. As discussed further below, the FDCA controls, notwithstanding plaintiffs' pleading which disregards the determinative federal standard in an attempt to evade the exercise of subject matter jurisdiction by this Court.

291167

the source of the water is not the original Poland Spring, despite implications in the labeling that it is.

Because plaintiffs cannot prevail in this action without resort to the FDCA standard of identity for "spring water," which defines and governs plaintiff's alleged state law cause of action, this action involves a substantial question of federal law. Accordingly, federal question jurisdiction under 28 U.S.C. §1331 is present.

The requirements of 28 U.S.C. §1332 have also been met. Plaintiff and defendant are citizens of different states. Plaintiff is a citizen of Florida and brings this proposed class action on behalf of all Florida residents who have purchased Poland Spring Natural Spring Water in the past four years. NWNA is deemed a citizen of Delaware and Connecticut, as it is incorporated in the State of Delaware and maintains its principal place of business in the State of Connecticut. In addition to compensatory damages for the class members, plaintiffs assert a group right on behalf of the "general public" and seek far-reaching permanent injunctive relief and the creation of a common fund -- namely, the imposition of a constructive trust funded by the disgorgement of profits allegedly obtained by the purported false and misleading labeling and marketing of Poland Spring brand bottled water as "spring water" -- which clearly (from the allegations of the complaint) satisfies and exceeds the requirement that a matter in controversy exceed $75,000 (exclusive of interest and costs).

For the reasons set forth below, plaintiff's motion to remand should be denied, and their transparent efforts to avoid the exercise of subject matter jurisdiction by the Court *via* artful pleading should be rejected.

## LEGAL ARGUMENT

## POINT I

### THE EXERCISE OF REMOVAL JURSDICTION IS APPROPRIATE BASED UPON THE EXISTENCE OF A FEDERAL QUESTION PURSUANT TO 28 U.S.C. §1331

As a general matter, a defendant may remove to the appropriate federal district court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. §1441(a). Accordingly, the propriety of removal "depends on whether the case originally could have been filed in federal court." Chicago v. International College of Surgeons, 522 U.S. 156, 163 (1997); Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). The district courts have original jurisdiction under the federal question jurisdiction statute over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. §1331.

A cause of action arises under federal law "when the plaintiff's well-pleaded complaint raises issues of federal law." Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987). However, the mere fact that a plaintiffs' complaint does not raise a federal question on its face is not determinative of the jurisdiction issue. Indeed, an "independent corollary to the well-pleaded complaint rule is the further principle that a plaintiff may not defeat removal by omitting to plead necessary federal questions." Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 475 (1998). If it is determined that "a plaintiff has 'artfully pleaded' claims in this fashion", federal question jurisdiction will lie "even though no federal question appears on the face of the plaintiff's complaint." *Id.* Accordingly, a federal court may "look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded the suit so as to couch a federal claim in terms of state law." Burda v. M. Ecker Co., 954 F.2d 434, 438 (7th Cir. 1992). In such cases, the court will find that the claim does arise under federal law, and is therefore removable. *Id.*

-3-

A substantial federal question sufficient to confer federal question jurisdiction exists where a claimant must prove a substantial aspect of federal law in order to prevail. The Supreme Court of the United States has long held that "even though state law creates [a party's] causes of action, its case might still "arise under' the laws of the United States if" a claimant's "right to relief under state law requires resolution of a substantial question of federal law." International College of Surgeons, 522 U.S. at 164.

In Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983), a unanimous court found that "[e]ven though state law creates appellant's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." A federal question is "substantial" where "the vindication of a right under state law necessarily turned on some construction of federal law . . . ." . Id. at 9. See also, Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 201-02 (1921).

Indeed, a number of courts have recently applied the principles of Franchise Tax Bd. and held that the existence of a decisive question of federal law provides a basis for federal question jurisdiction. In the recent opinion in Ayres v. General Motors Corp., 234 F.3d 514, 517-18 (11th Cir. 2000), the Eleventh Circuit found that federal question jurisdiction was present in the case before it because, although plaintiffs' claims were not brought directly under federal law, those claims "depend[ed] entirely on interpretation of the federal mail and wire fraud statutes." In Ayres, the class action plaintiffs brought suit against a defendant car manufacturer and parts distributor alleging violations of Georgia's state Racketeering Influenced and Corrupt Organizations Act, Ga. Code Ann. §16-14-1 et seq. ("Georgia RICO").

-4-

Under the Georgia RICO statute, plaintiffs were required to prove at least one "predicate offense" that constituted racketeering. *Id.* at 516-17. To demonstrate that requisite predicate offense, plaintiffs relied upon two federal statutes. First, plaintiffs alleged that defendant violated the federal standards found in the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. §30118, et seq., which imposed upon defendant the duty to disclose alleged safety defects to the plaintiffs. *Id.* at 517. Second, plaintiffs asserted that defendant's breach of the duty imposed under the Safety Act was a violation of the federal mail fraud and wire fraud statutes, 18 U.S.C. §1341, 1342. Those violations of the mail and wire fraud statutes, in turn, were the alleged "predicate offenses constituting racketeering under Georgia's RICO statute", the state statute under which plaintiffs brought their action. *Id.* at 516.

Defendant removed the case to the District Court for the Northern District of Georgia, and plaintiffs sought to remand the action, alleging a lack of subject matter jurisdiction. The district court found subject matter jurisdiction and the Eleventh Circuit affirmed. *Id.* at 517. The Eleventh Circuit Court held that "a violation of the federal mail and wire fraud statutes is an essential element of the plaintiffs' cause of action, the proof of which involves resolution of a substantial, disputed question of federal law." [emphasis added]. *Id.* at 518. Although plaintiffs' claims were brought under the Georgia RICO statute, "resolution of [the] case depend[ed] entirely on interpretation of the federal mail and wire fraud statutes and their interaction with the Safety Act." [emphasis added] *Id.* The court observed that plaintiffs must prove "a violation of the federal mail and wire fraud statutes to satisfy the necessary predicate acts of their Georgia RICO cause of action". *Id.* at 519. Accordingly the court concluded that the case before it was "squarely within the language of . . . Franchise Tax Board, in which the Supreme Court indicated that it was well established that federal question jurisdiction exists where a plaintiff's cause of

-5-

action has as an essential element the existence of a right under federal law which will be supported by [one] . . . construction of the federal law . . . but defeated by another construction concluding the opposite." *Id.* at 519.

As plaintiffs herein have argued, the Ayres plaintiffs argued that pursuant to Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986), federal question jurisdiction was precluded because the federal statutes at issue do not provide a private right of action. The court emphatically rejected that argument and noted that plaintiffs' claims were an "attempt to enforce [the federal statutes] through a private Georgia RICO action", and the success of plaintiffs' Georgia RICO action depended entirely upon whether plaintiffs could "establish a violation of the federal mail and wire fraud statutes." Ayres, 234 F.3d 514, 519 n.9.[3]

A number of district courts within the 11th Circuit have recognized and applied this principle. In Re United Container LLC, 284 B.R. 162, 172 (S.D. Fla 2002)("Federal question jurisdiction may also be available if a substantial, disputed question of federal law is a necessary element of a state cause of action."); Coker v. Daimler Chrysler Corp., 220 F.Supp.2d 1367, 1370 (N.D.Ga. 2002)(federal question jurisdiction exists "where resolution of a federal issue would determine the outcome of [the] case" because state law claims "depend for their success on favorable resolution of the federal issues"); See, Greaves v. McAuley, 2003 U.S. Dist. LEXIS 2319, *27 (N.D.Ga. 2003)(remanded because "court cannot say that a violation of federal statutes is an essential element of the Plaintiffs' cause of action").

In finding federal question jurisdiction, the Eleventh Circuit in Ayres cited with approval the opinion in West 14th St. Commercial Corp. v. 5 West 14th Owners Corp., 815 F.2d 188, 193

---

[3] Although the plaintiffs in Ayres were represented by Barry A. Ragsdale of Ivey and Ragsdale, who also serves as counsel for plaintiffs in the case at bar, plaintiffs fail to cite the Ayres opinion or address the principles therein in their remand papers filed with this Court.

(2d Cir.), cert. denied, 484 U.S. 850 (1987).  Ayres, 234 F.3d at 520.  In West 14th St.

Commercial Corp., the Second Circuit stated that "whether the federal issue arising from the

state law cause of action is sufficiently 'substantial' to confer federal question

jurisdiction" requires an inquiry into the "nature of the federal issues at stake."  In conducting

this inquiry, the Second Circuit held that, where, "in a state cause of action, the federal issue is

decisive," the "federal ingredient . . . is sufficiently substantial to confer the arising under

jurisdiction."  Id. at 196.  See also, Milan Express Co., Inc. v. Western Sur. Co., 886 F.2d 783,

787 (6th Cir. 1989).

        As demonstrated by the Ayres opinion, plaintiffs' reliance on Merrell Dow is misplaced.

Initially, plaintiffs engage in a very superficial analysis of that 5 to 4 opinion and distort the

holding and reasoning of the case by suggesting [at P. Br. 9-10] that removal jurisdiction may

not be exercised in connection with a private-action complaint alleging a state law cause of

action that incorporates the federal standard under the FDCA.  A more careful reading of Merrell

Dow reveals that it stands for a very different proposition -- namely, that a district court may

have federal question subject matter jurisdiction, notwithstanding the absence of complete

preemption (because there is no private right of action under the FDCA), if a substantial federal

question necessarily must be addressed for plaintiff to prevail on a pleaded state law cause of

action.  Merrell Dow, 522 U.S. at 814, n.12.

        In Merrell Dow, plaintiff alleged that a child was born with multiple deformities as a

result of the mother's ingestion of Bendectin during pregnancy.  In five of the six counts,

recovery of damages was sought on common law theories of negligence, breach of warranty,

strict liability, fraud and gross negligence.  In one count, Count IV, it was alleged that the drug,

Bendectin, was misbranded in violation of the FDCA because its label did not provide adequate

warning that it was potentially dangerous.  It was alleged that the violation of the FDCA was a rebuttable presumption of negligence.  Merrell Dow, 522 U.S. at 805.

The Court in Merrell Dow concluded preliminarily that because there was no private right of action under FDCA, there could not be complete preemption, and, accordingly, removal jurisdiction could not be premised upon a theory of complete preemption.  Significantly, however, the Court did not end its analysis at this narrow point; rather, it went on to address whether federal question jurisdiction may properly be exercised if a substantial federal question were found to exist.  Merrell Dow, 522 U.S. at 812-14, n.12.  The Court noted that "because the jury could find negligence on the part of Merrell Dow without finding a violation of the FDCA, the plaintiffs' causes of action did not depend measurably upon a question of federal law."  Id. at 807.  Accordingly, the Court held that a substantial federal question did not exist sufficient to support federal question jurisdiction.  Id.  The Court in Merrell Dow was careful to distinguish and not disturb other Supreme Court opinions (e.g., Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921)), holding that a substantial federal question existed where the state law cause of action depended upon the determination of the federal question.  Id.

The plaintiff's claims in this case are not analogous to those in Merrell Dow because plaintiff herein cannot prevail without a finding that NWNA has violated the FDCA regulation governing the standard of identity of spring water.  Rather, plaintiff's claims are akin to those in Ayres because plaintiff's success or failure here depends entirely upon construction of federal law.[4]

---

[4]  Plaintiffs' reliance upon the cases cited at the bottom of page 10 through the middle of page 12 of their moving memorandum all involved safety of drugs or devices and either personal injury or the risk of personal injury to the plaintiff and members of the class – factors entirely missing from the allegations of the complaint herein.  In Kasky v. Perrier Group of America, Inc., 1991 WL 577038 (S.D.Cal. 1991)(the only case cited by plaintiffs [at Pl. Mem., p. 12] not involving personal injury or risk thereof), in concluding that no substantial federal question existed, the Court found that the state law rights could easily "have been violated without any violation of federal law."  1991 U.S. Dist. LEXIS at *17.  The Court in Kasky cited the opinion in Merrell Dow in noting that the causes of action

Continued on next page

-8-

In an attempt to avoid federal court subject matter jurisdiction, plaintiff has artfully pleaded claims purporting to invoke a standard of "spring water" defined under the laws of various other unidentifiable states [see complaint, ¶ 91.a.].  There is no Florida statute or regulation that purports to address the standard of identity or definition for "spring water."  This allegation is an obvious strategy, as plaintiff cannot conceivably be arguing that the laws of any other state (which state or states are not identified by plaintiff) would have extraterritorial effect governing spring water sold to residents of Florida.  Clearly, putting aside the reality of preemption of the FDCA and federal regulations thereunder, under any and all colorable views of this case, there is one and only one standard of identity that defines "spring water" sold in the State of Florida, and which plaintiff must prove has been violated.  That is the federal standard set forth in 21 C.F.R. §165.110(a)(2)(vi).

Plaintiff pleads that FDUTPA has been violated because NWNA sells Poland Spring bottled water labeled as spring water, when it does not meet the definition of "spring water."  To prove her claim, plaintiff must prove that the Poland Spring brand of bottled water does not meet the definition of spring water set forth in 21 C.F.R. §165.110(a)(2)(vi).

Not only is the federal issue here determinative of plaintiff's claims, but the federal issues raised by those claims are indeed substantial.  In making a federal question determination, it is proper to review the legislative intent in creating the federal statute before the court.  See Merrell, 478 U.S. at 830; Milan Express Co., Inc. v. Western Sur. Co., 886 F.2d at 786

---

[Continued from previous page] did not arise under federal law when clearly the policies and interests of allowing injured or potentially injured plaintiffs their day in court under state law claims are strong, and entirely inapplicable to this case.  The plaintiffs in the cases cited by plaintiffs here did not have to prove aspects of federal law to prevail on their injury claims, as the federal standards were but one indicia of liability.  In this case, plaintiffs have not alleged causes of action sounding in negligence or strict liability, and have not asserted claims for personal injury, as to which their reference to the definition of spring water would at best be only one indicia or piece of evidence of a defendant's alleged negligence.  Here, to the contrary, the core of plaintiffs' claims is that NWNA has violated the law by mislabeling its product as "spring water" when it is not "spring water," a matter governed and determined by federal law.  This federal issue is determinative as to whether plaintiffs prevail in this action.

-9-

(analyzing legislative history of Interstate Commerce Act and its regulations). Jurisdictional issues arising from a statute must be analyzed in light of the history of that statute, the demands of reason and coherence, and the dictates of sound judicial policy. Romero v. International Terminal Operating Co., 358 U.S. 354, 379 (1959). Accordingly, a reviewing court must address whether the federal law at issue should be "subjected to the peculiarities of interpretation in fifty different state forums." Milan Express, 886 F.2d at 787.

In this case, the Federal Food Drug and Cosmetic Act expressly forbids states from imposing any requirements contrary to those imposed under the FDCA and its regulations. Specifically, under the section entitled "National Uniform Nutrition Labeling", 21 U.S.C. §343-1(a),

> ...no State or political subdivision of a State may directly or indirectly establish . . . any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity . . . .

21 U.S.C. §343-1(a). The federal regulation sets forth a precise uniform and technical federal standard regarding the requisites for identifying a product as "spring water." 21 CFR §165.110(a)(2)(vi). The FDA asked and answered the identical issues that form the basis of plaintiff's cause of action. In short, the FDA addressed the standard of identity for "spring water," incorporating both scientific analysis as well as consumer expectation. 21 CFR §165.110(a)(2)(vi). The United States Congress clearly intended that the FDA's standard of identity result in "[n]ational uniform labeling." 21 U.S.C. §343-1. The strong policies and purposes underlying the FDCA, the regulations thereunder, and the federal regulatory enforcement scheme demonstrate this substantial federal interest and support the exercise of removal jurisdiction over the complaint filed herein.

-10-

Plaintiff is aware of the federal law issues implicated by this action but has attempted to omit them from her complaint. Plaintiff's counsel has acknowledged in an Affidavit of Thomas Sobel, one of plaintiff's lead and primary counsel in this lawsuit, subscribed and sworn to on June 27, 2003 and filed in the lawsuit of Carrabassett Spring Water Co. et al. v. Garve Ivey, et al., No. 03-3015BLS, Commonwealth of Massachusetts Superior Court, County of Suffolk, that in order to be called "spring water," the FDA's definition or standard of identity of "spring water" must be satisfied [see accompanying Affidavit of Jeffrey M. Garrod, Exh. "A"].

Mr. Sobel and other plaintiff's counsel in this class action, Garve Ivey of Ivey and Ragsdale, participated in a mediation with NWNA wherein Sobol and Ivey represented a putative consumer class asserting the very same claims that are asserted in this lawsuit. In Mr. Sobol's affidavit he discloses and makes public by virtue of the filing of that affidavit, "Claimants' Position Statement For Submission and Mediation", which he identifies in paragraph 27 of his affidavit as a position statement that he and other counsel submitted on behalf of the putative consumer class and the competitor claimants. In that position statement, plaintiff's counsel makes almost the identical claims that are asserted in this lawsuit, the central and primary claim being that Poland Spring brand water is not "natural spring water." The argument that plaintiff's counsel makes in that statement as to why NWNA has allegedly falsely and deceptively labeled its product as spring water is as follows:

> None of the four (4) sources that Nestlé uses for its Poland Spring natural spring water products qualifies as "spring water." None of the sources meet the Food and Drug Administration (FDA) definition regarding the characteristics that a source must have in order to be called "spring water." [emphasis added].

Plaintiff's counsel goes on to specifically quote from the FDA definition citing 21 U.S.C. §165.110(a)(2)(vi) and goes on to argue why Poland Spring brand bottled water does not comply

-11-

with the FDA definition of "spring water" [see pages 4 through 12 of plaintiffs' counsel's mediation statement which is part of Exhibit "A" to the Garrod Affidavit filed herewith].

Despite plaintiff's intentionally vague reference in her complaint to "laws of the various states," plaintiff has admitted elsewhere that a substantial federal question is raised by her complaint, and accordingly the exercise of subject matter jurisdiction by the Court is appropriate.[5]

## POINT II

### THE REQUIREMENTS FOR DIVERSITY JURISDICTION UNDER 28 U.S.C. §1332 ARE MET

A district court has original diversity jurisdiction where the requirements of 28 U.S.C. §1332 are satisfied.  Under 28 U.S.C. §1332(a), the "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."

There is no dispute that the citizenship of the parties in this case is diverse.  Plaintiff is a citizen of Florida and alleged named representative of a purported class consisting of residents of Florida who purchased Poland Spring brand bottled water during the period commencing four (4) years prior to the filing of the complaint.  [complaint, ¶78].  Defendant is a Delaware corporation with its principal place of business in Connecticut.  See Notice of Removal. Accordingly, the diverse citizenship prerequisites of 28 U.S.C. §1332(a), as well as the requirements of 28 U.S.C. §1441(b) that no defendant be a citizen of the forum state, have been

---

[5] Plaintiff has submitted to the Court the Memorandum Opinion of the District Court in Connecticut remanding to state court the action known as "Michele Savalle and SDB Trucking, LLC v. Nestlé Waters North America Inc." It is respectfully submitted that this opinion (which addressed only federal question jurisdiction) is not binding herein and addresses different factual and statutory circumstances. Unlike Florida, Connecticut has its own regulation defining "spring water," which plaintiff pleads was violated. In this action, Florida has no definition of spring water, plaintiff has not pled a Florida regulation defining spring water, and plaintiff must therefore rely only upon the federal standard of identity for spring water. The Court in Connecticut acknowledged that federal question is proper if the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law. [Op., p. 3]. It does in this case.

-12-

satisfied.

In addition to an award of compensatory damages, plaintiff seeks entry of judgment providing for, among other things, "restitution to the general public, including disgorgement of Defendant's profits obtained by virtue of their false advertising..." Complaint, p. 38 ¶d. Accordingly, by plaintiff's own pleading she is seeking the creation of a common fund for the benefit of not only those who are members of the alleged class, but for the "general public" as a whole.

The amount of this alleged common fund sought by plaintiff -- which plaintiff alleges to be "tens of millions [of dollars]," see complaint, ¶27 -- is not based or conditioned upon the size of the alleged plaintiff class or the individual harm to those class members brought by defendant's alleged misconduct. Indeed, the amount of the alleged fund sought by plaintiff for the "general public" is entirely independent of the size of the alleged class. Accordingly, the entire sum should be considered in determining whether the jurisdictional minimum amount in controversy has been met.

The United States Supreme Court recognized this principle in Zahn v. International Paper Co., 414 U.S. 291, 294 (1973), when it held that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." The "doctrine of aggregation," as it is known, is based upon the interpretation of the phrase within 28 U.S.C. §1332, "matter in controversy."

Plaintiff's claim for disgorgement is premised upon an integrated right of the general public against NWNA, and not upon the number of class members. No contractual rights, or other rights under law, are alleged in the complaint, nor do any exist in any event, to support specific claims for individual payment of a portion of NWNA's profits that plaintiffs seek to

have "disgorged." Any ultimate recovery of a share of the profits by any individual class member necessarily must await the establishment of a formula governing allocation of the alleged profits.

Not only has the plaintiff distinguished between her claims for compensatory damages and awards for disgorgement of profits, (see complaint p. 38), but a number of Circuit Courts and various other courts have noted such a difference. See Danielson v. Winchester-Conant Properties, Inc., 322 F.3d 26, 50-51 (1st Cir. 2003); BASF Corp. v. Old World Trading Co., Inc., 41 F.3d 1081, 1096 (7th Cir. 1994); Securities and Exchange Commission v. Blavin, 760 F.2d 706, 713-14 (6th Cir. 1985).

A number of other courts have concluded that a claim for disgorgement of profits brought by a class of plaintiffs is an assertion of a group right or remedy and not that belonging to any member of the group. See, Durant v. Servicemaster Co., 147 F.Supp.2d 744, 747 (E.D. Mich. 2001); In Re Microsoft Corp., 127 F.Supp.2d 702 (D. Md. 2001), aff'd, 309 F.3d 193 (4th Cir.), cert. denied., 123 S. Ct. 2605 (2003). Underlying this conclusion is the fundamental distinction between a claim for compensatory damages (aimed at making whole the individual who has been injured) and a claim seeking disgorgement of profits (to recover from one who allegedly has been unjustly enriched by the amount that he has received), and the fact that the latter is not based upon the number of individuals in the group or on the losses of any one individual. This approach that allows aggregation where plaintiffs assert a group right separate and apart from individual damages suffered by each of them serves "the purpose of a jurisdictional amount in controversy requirement -- to keep trivial cases away from the federal court system." 14B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, §3703 at 124-25 (3d Ed. 1998).

Citing <u>Zahn v. International Paper Co.</u>, 414 U.S. 291 (1973), the District Court in <u>Durant</u> observed that "[w]hen two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single unit, it is essential that the demand of each be of the requisite jurisdictional amount . . .." <u>Durant</u>, 147 F. Supp.2d at 748.  However, the aggregation of sums sought by multiple plaintiffs is required and can satisfy the jurisdictional amount determination where "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Id.* at 749 (citing <u>Sellers v. O'Connell</u>, 701 F.2d 575, 579 (6th Cir. 1983)).

Describing this type of common and undivided interest, the Court explained that "an identifying trait of a common and undivided interest is that if one plaintiff were to fail to collect his share, the remaining plaintiffs would collect a larger share." <u>Durant</u>, 147 F. Supp.2d at 749. The critical factor in this analysis "is the nature of the right that plaintiffs assert," and not whether a common pool of money is created as a mere convenience for distributing the funds to the plaintiffs.  *Id.*  If the plaintiffs in <u>Durant</u> prevailed, they would collectively receive a common fund into which the defendant would have to disgorge all of the profits that were received through defendant's unjust enrichment.  *Id.*  The court observed that the fund would arise not as vindication of the rights of the individual plaintiffs, but rather, as vindication of the plaintiffs' common right to prevent defendant from profiting from its misdeeds.  Accordingly, "plaintiffs would recover per capita from the disgorgement fund regardless of any actual individualized losses that each may have suffered . . . therefore, plaintiffs are seeking a common and undivided interest in the form of the common fund, and aggregation of the amount of disgorgement is in order." *Id.* at 749.

The amount of the disgorgement fund requested by plaintiff would not in any way be based upon plaintiff's actual damages, and indeed as pled by plaintiff is in addition to compensatory damages and for the benefit of the public. "Compensatory damages, conversely, are limited to the extent of Plaintiffs' actual losses." *Id.* Accordingly, the Court in <u>Durant</u> held that where the putative class of plaintiffs have claimed disgorgement in addition to their claim for compensatory damages (as the plaintiff in this case has pleaded), and have not disavowed their claimed entitlement to damages under the state laws giving rise to their causes of action (which plaintiffs in this case have not done), "a claim for unjust enrichment is aggregated and removed properly." *Id.*

The court in In Re <u>Microsoft</u> found that the jurisdictional amount was satisfied for the same reasons. 127 F.Supp.2d 702. The court in <u>Microsoft</u> observed that the claim for disgorgement was in addition to and unrelated to the alleged damages suffered by each plaintiff. *Id.* at 720. Specifically, the court observed that disgorgement "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss." *Id.* at 719 (<u>quoting</u> Dan B. Dobbs, <u>Law of Remedies</u> §4.1(1)(1993)). Consistent with the nature of disgorgement and the right asserted by the plaintiff, the <u>Microsoft</u> court held that the total amount of profits sought by the plaintiffs easily exceeded the jurisdictional amount under 28 U.S.C. §1332. *Id.*; <u>see</u> <u>also</u>, <u>Aetna U.S. Healthcare, Inc. v. Hoechst</u>, 48 F.Supp.2d 37, 41 (D.C. Cir. 1999); <u>In re Cardizem</u>, 90 F.Supp. 2d 819, 825-26 (E.D. Mich. 1999). Concluding that the jurisdictional limit was satisfied, the court found that "plaintiff's complaint claims that, <u>without reference to any actual damages sustained by any individual plaintiff</u>, defendants must disgorge the profits derived from their" wrongdoing. *Id.* at

-16-

41 (emphasis added).  Therefore, "[i]f any given plaintiff does not collect his, her, or its share, then it does not change the amount of profits of which defendants must be disgorged." *Id*

Here, plaintiff seeks "a judgment for the damages sustained by the plaintiff and the class defined herein . . . ".  Complaint, p. 38 ¶c.  In addition thereto, plaintiff seeks a judgment for "restitution to the general public, including disgorgement of Defendant's profits . . ." *Id* at ¶d.  The amount of the resulting disgorgement fund, if plaintiff was to prevail, would be the same regardless of the number of plaintiffs that join the class action suit, because, as discussed above, the claim for disgorgement is not a mere alternative means of recovering compensatory damages.  Moreover, the amount of disgorged profits is distinct and unrelated to the alleged compensatory damages suffered by the plaintiffs.  The claim for disgorgement is for the "general public" while compensatory damages are only for purported class members who comprise only residents of Florida.  Complaint p. 38 ¶¶'s c and d.  Because plaintiffs' disgorgement claim asserts a group right held by the public that is unrelated and in addition to their alleged individual damages, the total sum of the disgorgement monies should be aggregated to meet the amount in controversy.  By plaintiff's own assertions, complaint ¶27, that sum is well in excess of $75,000 (exclusive of interest and costs).

Plaintiff also seeks to enjoin NWNA from "communicating to the public" certain representations that they allege have the "tendency or capacity to mislead the public . . .."  Complaint p. 38 ¶e.  Cases within the Eleventh Circuit determine the value of injunctive relief for jurisdictional purposes from the plaintiffs' perspective.  Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1268 (11th Cir. 2000).  The value of the relief to class action plaintiffs cannot be aggregated to sustain diversity jurisdiction "when an injunction protects rights that are separate and distinct among the plaintiffs", such as where each plaintiff asserts his or her own individual

-17-

rights under separate insurance policies. *Id.* at 1271; see Lucia v. Teledyne Continental Motors, 173 F.Supp.2d 1253, 1262 (S.D.Ala. 2001)("when a given class of plaintiffs assert rights that arise from individual contracts with a defendants, those rights are separate and distinct").

However, as with a claim for disgorgement, aggregation of the value of injunctive relief to a class of plaintiffs is permissible where "multiple plaintiffs seek to enforce a single title or right in which they have a common and undivided interest". *Id.* at 1261 (citing Zahn, 414 U.S. at 294). Plaintiff makes clear, by the express terms of the complaint, that she seeks to assert a right held by "the public" to be protected from alleged misconduct. This injunctive relief is unrelated to the alleged harm incurred by each individual plaintiff, and therefore, does not relate to the individual and separate rights held by each plaintiff.[6] The value of this relief to the class of plaintiffs, based upon the allegations of Paragraph 27 of the complaint, is at least "tens of millions" in profits that plaintiffs allege NWNA has received based upon a purported spring water price premium supported by alleged misrepresentations of defendant.[7]

---

[6] Compare complaint p. 38 ¶c, requesting relief for the "Plaintiff and the class defined herein" with ¶e, requesting injunctive relief for the benefit of "the public".

[7] Plaintiff argues that her request for injunctive relief and the rights asserted thereunder are separate and individual. Yet the cases cited by plaintiff at pages 16 and 17 of her moving brief regarding the valuation of the matter in controversy -- Kasky v. Perrier Group of America, Inc., 1991 W.L. 577038 (S. D. Cal. 1991) and Pierson v. Source Perrier, S.A., 848 F. Supp. 1186 (E.D. Pa., 1994) -- do not support plaintiff's position. Those cases did not address a claim, such as the claims here, where plaintiffs expressly assert rights held by "the public" that are unrelated to the individual rights of each plaintiff. Indeed, the court in Kasky stated that aggregation has been permitted "when a 'common and undivided' interest among the members of the class can be shown; or where the named representative is suing to obtain or preserve a 'common trust fund' on behalf of all members of the class." 1991 W.L. 577038 at *4. Nor do the Eleventh Circuit cases cited by plaintiff [P. Mem. 18-19] support her position. Far from asserting rights of "the public," each of the cases cited by plaintiff relates to discrete individual contracts, leases or insurance policies that gave rise to separate and individual rights to each plaintiff. The only Eleventh Circuit case cited by plaintiff which was not brought under separate and discrete contracts or agreements of each plaintiff is Cohen v. Office Depot, Inc., 204 f.3d 1069 (11th Cir. 2000). But contrary to plaintiffs' argument, the Cohen court never addressed whether the value of injunctive relief sought by plaintiffs should be aggregated because the value of that relief was "too speculative and immeasurable to establish the requisite amount in controversy in either event." *Id.* at 1079.

## POINT III

## PLAINTIFFS' CHALLENGE TO THE ADEQUACY OF
## THE NOTICE OF REMOVAL IS WITHOUT MERIT

Plaintiffs' argument that the Notice of Removal is without sufficient facts and "defective," and that their counsel were left to guess as to the basis for removal is misleading and, at best, disingenuous. 28 U.S.C. §1446(a) requires only a "short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." The same liberal pleading rules employed in testing the sufficiency of a pleading apply in appraising the sufficiency of a defendant's notice of removal; detailed grounds for removal need not be pleaded. 14C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3733 at p. 356 (3d Ed. 1998); see Hobbs v. Blue Cross & Blue Shield, 100 F. Supp. 2d 1299, 1302-3 (M.D. Ala. 2000), reversed on o.g., 270 F.3d 1324 (11th Cir. 2001) "the same liberal rules testing the sufficiency of a pleading should also apply to evaluating the sufficiency of a defendant's notice of removal"); Achtenberg v. Mississippi, 393 F.2d 468 (5th Cir. 1968). The removal petition herein sets forth the grounds for removal with a level of specificity sufficient to permit assessment as to the legal basis for the notice of removal.

Moreover, the Eleventh Circuit holds that this court can consider evidence submitted after the Notice of Removal has been filed. Sieminski v. Transouth Financial Corp, 216 F.3d 945, 946 (11th Cir. 2000). To determine the propriety of removal, the Sieminski court stated that the Court may consider evidence submitted after the removal petition is filed, but only to establish the facts present at the time of removal. Id. at 946. [8]

---

[8] The cases cited by plaintiffs from other jurisdictions do not represent the law of the Eleventh Circuit regarding the sufficiency of notice averments in a notice of removal. The 11th Circuit in Sieminski specifically rejected the holdings of Laughlin v. Kmart Corp, 50 F.3d 871 (10th Cir. 1995) and Gaus v. Miles, Inc., 980 F.2d 564 (9th Cir. 1992), accordingly, plaintiff's reliance on those cases in the moving brief is erroneous. Id. at 948.

-19-

In any event, counsel have known for a period of months not merely the factual basis for the removal, but the legal basis as well, as they have addressed these arguments in their removal motions in other cases.[9] The argument that plaintiff or her counsel have been forced to guess as to the basis for removal is grossly false and misleading.[10]

## CONCLUSION

For the foregoing reasons, and those stated at oral argument of the motion, defendant Nestlé Waters North America Inc. respectfully requests that the Court deny Plaintiff's motion to remand.

Dated:  September 12, 2003

Respectfully submitted,

NESTLÉ WATERS NORTH AMERICA INC.
By their attorneys,

By: _____
JEFFREY M. GARROD
Orloff, Lowenbach, Stifelman & Siegel, P.A.
101 Eisenhower Parkway
Roseland, New Jersey  07068
Tel: 973-622-6200
Fax: 973-622-3073

Harley S. Tropin, Esq. (No. 241253)
David P. Milian, Esq. (No. 844421)
Kozyak Tropin & Throckmorton, P.A.
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Tel. 305-372-1800
Fax: 305-372-3508

Co-Counsel for Defendant

---

[9] Assuming, but not conceding, that the notice of removal herein may be viewed as setting forth insufficient facts, the remedy is not an automatic remand, as sought by plaintiffs, but rather, leave to amend pursuant to 28 U.S.C. §1653, which permits the grant of leave of court to amend or supplement defective allegations of jurisdiction. See also, Armada Coal Export, Inc. v. Interbulk, Ltd., 726 F.2d 1566, 1568-9 (11th Cir.1984) (rejecting remand request and granting leave to amend its removal petition).

[10] Defendants should not be taxed costs and fees because of the reasonableness of removing the action to federal court in light of the strong arguments made for diversity jurisdiction and federal question jurisdiction. See McGettigan v. Ford Motor Co., 2003 U.S. Dist. LEXIS 8886 (S.D. Ala. 2003). The "decision as to whether to award fees under § 1447(c) turns primarily, if not solely, on the merit of the removal." Gray v. New York Life Insurance, 906 F.Supp.628, 637 (N.D.Atla. 1995). In this case, there is more than ample support in law for the excuse of removal jurisdiction, and accordingly, liability for fees would not be appropriate. Id.